THE HONORABLE BENJAMIN H. SETTLE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| KYLIE STEELE,<br><br>                     Plaintiff,<br><br>   v.<br><br>NATIONAL RAILROAD PASSENGER<br>CORPORATION, d/b/a AMTRAK,<br><br>                    Defendant. | Case No. 3:19-cv-05553-BHS<br><br>**DEFENDANT NATIONAL RAILROAD PASSENGER CORPORATION'S MOTION FOR A NEW TRIAL, JUDGMENT AS A MATTER OF LAW, OR IN THE ALTERNATIVE REMITTITUR**<br><br>**NOTE ON MOTION CALENDAR: JANUARY 14, 2022** |

## INTRODUCTION AND SUMMARY OF RELIEF REQUESTED

Defendant National Railroad Passenger Corporation ("Amtrak") respectfully moves for a new trial, pursuant to Fed. R. Civ. P. 50(b) and 59. In the alternative, Amtrak renews its motions for judgment as a matter of law on damages for future medication costs in the Life Care Plan and for future wage loss and care services, and seeks remittitur or an amended judgment. Such relief is necessary to address the miscarriage of justice which resulted from the virtual trial format, the inability to effectively use medical records to challenge credibility issues with respect to the extent and permanency of Plaintiff's injuries, and the lack of evidence supporting the jury's excessive verdict.

## AUTHORITY AND ARGUMENT

### I.   AMTRAK SHOULD BE GRANTED A NEW TRIAL

After a jury trial, a court may grant a new trial for any reason for which a new trial has

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S POST-TRIAL MOTIONS - 1
CASE NO. 3:19-cv-05553-BHS
019188.0447/8812136.5

**LANE POWELL** PC<br>1420 FIFTH AVENUE, SUITE 4200<br>P.O. BOX 91302<br>SEATTLE, WA  98111-9402<br>206.223.7000  FAX: 206.223.7107

previously been granted in an action in federal court. Fed. R. Civ. P. 59(a)(1)(A). "Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.' " *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). "Ultimately, the district court can grant a new trial under Rule 59 on any ground necessary to prevent a miscarriage of justice." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014). Although each error discussed herein warrants granting a new trial, the impact of trial errors must be considered cumulatively. *See Jerden v. Amstutz*, 430 F.3d 1231, 1240 (9th Cir. 2005); *Gordon Mailloux Enters., Inc. v. Firemen's Ins. Co. of Newark, N.J.*, 366 F.2d 740, 742 (9th Cir. 1966) ("We conclude it too must be reversed; although the errors requiring reversal, if considered separately, were perhaps harmless, their cumulative effect was prejudicial.").

**A.     The Court Abused its Discretion By Conducting a Remote Jury Trial Over Amtrak's Objection**

　　　　　1.     The Federal Rules of Civil Procedure Do Not Authorize Remote Jury Trials.

The Federal Rules of Civil Procedure have no provision allowing jury trials to be conducted completely by remote video format. Rule 77(b), addressing "**Place for Trial and Other Proceedings**" provides: "Every trial on the merits must be conducted in open court and, so far as convenient, in a regular courtroom." By a congressionally-approved amendment in 1996, Rule 43(a) was edited to allow for "**testimony** in open court by contemporaneous transmission from a different location," *i.e.*, from some location other than the "open court," but that is only "[f]or good cause in compelling circumstances and with appropriate safeguards." (Emphasis added.) The Advisory Committee Note addressing this 1996 amendment states:

> The importance of presenting live testimony **in court** [as opposed to from a remote location] cannot be forgotten. The very ceremony of trial and the presence of the factfinder may exert a powerful force for truthtelling. The opportunity to judge the demeanor of a witness face-to-face is accorded great value in our tradition. Transmission cannot be justified merely by showing that it is inconvenient for the witness to attend the trial."

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S POST-TRIAL MOTIONS - 2
CASE NO. 3:19-cv-05553-BHS
019188.0447/8812136.5

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

Fed. R. Civ. P. 43, Advisory Committee Note, 1996 Amendment (emphasis added). Further, a recent article authored by chief judge of a federal district, a litigation attorney, and a professor of civil procedure and federal courts,[1] reviewed how videoconferencing was being used by courts during the pandemic and concluded that matters such as this, with significant amounts at issue, hotly contested credibility issues, and voluminous documentary evidence (much of it medical records the Court erroneously refused to admit) are not advisable to conduct remotely. *Zooming* at 13-14. While it may be appropriate in certain circumstances, remote transmission of testimony in a civil jury trial with the features of this case was simply not appropriate, especially now that many of the initial exigencies of the COVID-19 pandemic have been tempered by increased vaccination rates and decreased infection rates.[2]

    2.   <u>The Court's Decision to Impose a Remote Jury Trial Over Amtrak's Objection Was Inconsistent with its Own General Orders, Recent Precedent, and Practice in Other Cases.</u>

In this district, a defendant's objection to a civil jury trial conducted via the Zoom.gov platform can only be overruled if the stringent standards of Fed. R. Civ. P. 43(a) are met. Specifically, the Court must determine through a careful exercise of its discretion that there is good cause and compelling circumstances to conduct a remote jury trial, and that there are appropriate safeguards of the defendant's rights in place. *Le v. King Cty.*, 524 F. Supp. 3d 1113,

---

[1] The Hon. Lee H. Rosenthal of the United States District Court for the Southern District of Texas, Christopher L. Dodson of Bracewell LLP, and Scott Dodson of the University of California-Hastings College of Law, respectively. *See* Scott Dodson, Lee H. Rosenthal, and Christopher L. Dodson, *The Zooming of Federal Civil Litigation*, 104-3 Judicature 13, 19 (Fall and Winter 2020-21) ("*Zooming*").

[2] A white paper issued by the American Board of Trial Advocates ("ABOTA") in early June of last year addressing civil jury trials during the pandemic noted that the language in Rule 77, despite exceptions for pre-recorded depositions under Rule 32 and real-time video testimony under Rule 43, "seems to preclude the possibility of a completely online trial in which the lawyers and jurors participate from a remote location. … There is no legal precedent in support of a completely virtual (remote) trial." It thus proceeded to "set forth considerations for live civil jury trials." ABOTA COVID-19 Task Force, Guidance for Conducting Civil Jury Trials During the COVID-19 Pandemic, at 8 (2020) (hereinafter "ABOTA Guidance"), available at https://www.abota.org/Online/Resources/Guidance_for_Conducting_Civil_Jury_Trials_During_the_COVID-19_Pandemic.aspx.

DEFENDANT NATIONAL RAILROAD PASSENGER CORPORATION'S POST-TRIAL MOTIONS - 3 CASE NO. 3:19-cv-05553-BHS
019188.0447/8812136.5

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

1116 (W.D. Wash. 2021).  Amtrak respectfully submits that the imposition of a remote trial over Amtrak's objection was an abuse of discretion that warrants a new trial.

Of critical importance here is the fact that the *Le* Court relied on the Western District of Washington's COVID-19 Orders (and predicate public health situation) as of **March 2021** for its finding of "good cause" and "compelling circumstances."  *Id.* ("the Court need look no farther than General Orders 01-20 and 0-20, which set forth the reasons for closing the courthouses in Seattle and Tacoma, and General Order18-20, which articulated the basis for keeping the doors essentially shut through at least March 31, 2021.").

However, by **mid-November 2021**, when this Court overruled Amtrak's objection, the public health situation and the presumptive approach to civil jury trials as embodied in this Court's COVID-19 related General Orders was very different.  As vaccination rates rose and infection rates fell, this Court issued General Order 10-21, dated June 30, 2021, which recognized that "a significant majority of adults in this district have now been fully vaccinated against the novel Coronavirus" and "the procedures of General Order 18-20 will no longer be continued.  **All civil, criminal, and bankruptcy in-person hearings and trials may proceed as scheduled. The courthouses are open to the public.**"  Declaration of Andrew G. Yates ("Yates Decl."), December 21, 2021, at ¶ 2 and Ex. A (Gen. Order 10-21 (W.D. Wash. June 30, 2021) (emphasis added)).

Notably, with the emergence of the Delta variant in the late summer and fall of this year, this Court's response was not to close the Courthouse doors again.  Rather, it adopted reasonable social distancing and masking requirements for all individuals regardless of vaccination status in step with the official public health recommendations of the Western Washington counties where the district's courthouses were located.  Yates Decl., at ¶ 3 and Ex. B (Gen. Order 11-21 (W.D. Wash. Aug. 13, 2021)) .  This Order did not signal a return to a fully remote paradigm for civil proceedings.  *See id.* at 2 ("Individuals who are participating in Court proceedings will be advised to remove their mask to speak.  Witnesses will be asked to remove their mask while they are on the witness stand.").  Here, in dispositive contrast to the situation as it existed at the time this

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S POST-TRIAL MOTIONS - 4
CASE NO. 3:19-cv-05553-BHS
019188.0447/8812136.5

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

Court decided *Le*, under the General Orders in effect at the time of this trial, the Courthouse doors were "open to the public" with civil jury trials allowed to go forward in person with observance of reasonable measures to prevent the spread of COVID-19.  The "good cause and compelling circumstances" that this Court found sufficient to overrule the defendant's objection in *Le* simply cannot be said to be present here.  As such, it was an abuse of discretion to impose a remote trial over Amtrak's objection.

The actual operations of this Court close in time to the date of this trial confirm that the justifications for a remote trial at time of *Le* did not exist when this matter was tried.  The Western District of Washington had been handling in-person proceedings and jury trials as early as October 25, 2021.  *Dragos v. Cornea, et al.*, 2:19-cv-01338-JCC.  Most tellingly, on the fourth day of this trial, this Court reversed its denial of the defendant's objection to a Zoom jury trial in another railroad case and informed the parties that they would have an in-person trial starting November 30, 2021—just one week after the conclusion of this matter.  *Norvell v. BNSF Railway Co.*, 3:17-cv-05683-BHS, Dkt. 172 ("The trial in this matter will NOT be conducted using the Zoom platform, but will be conducted at the U.S. District Courthouse, Tacoma, Courtroom E."); Dkt. 191 "Jury Trial Day 1 begun on 11/30/2021…").  Yates Decl., at ¶ 4 and Ex. C (*Norvell* docket).  It is Amtrak's understanding that *Novell* went to trial before a live jury that has since returned a verdict.

Here, Amtrak objected to proceeding with this case via Zoom and requested a short postponement of the trial so that it could be done in person.   Yates Dec., at ¶ 5 and Ex. D (11/16/2021 TT 4:19-7:17) attached thereto.  Although the Court had previously acknowledged that Judge Bryan just completed a three-week in-person jury trial and stated that it "would have preferred to try this in person," the Court decided to proceed with the Zoom trial over Amtrak's objection. Yates Decl., at ¶ 6 and Ex. E (Tel Conf. Tr. 11/10/2021, at 11:10-17).  Amtrak renewed this motion on the first day of trial and this Court again denied the request for an in-person trial on the mistaken premise that the COVID-19 infection rate "[was] as high or nearly as high as it was at its peak." Ex. D (11/16/2021 TT 7:18-8:11).  Given that jury trials in this very Court were

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S POST-TRIAL MOTIONS - 5
CASE NO. 3:19-cv-05553-BHS
019188.0447/8812136.5

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000 FAX: 206.223.7107

held shortly before and immediately after this case, the decision to deny Amtrak an in-person proceeding can only be considered an abuse of discretion.

No doubt, the COVID-19 pandemic presented Courts with previously unimagined difficulties in discharging the requirements of Fed. R. Civ. P. 1 "to secure the just, speedy, and inexpensive determination of every action and proceeding."  Amtrak, however, respectfully submits that the imposition of a remote trial in this case got the balance wrong.  Instead of postponing the start of the trial for a week or two, the Court required Amtrak to go forward with a Zoom trial.  The benefits of this approach are vastly outweighed by the loss of many of the host of rights and benefits attendant to an in-person jury trial.

**B.     The Remote Jury Trial Also Violated Amtrak's Constitutional Rights**

There is no dispute that Amtrak has a Seventh Amendment right to a jury trial in this matter. *Jacob v. City of New York*, 315 U.S. 752, 62 S.Ct. 854, 86 L.Ed. 1166 (1942) ("The right of jury trial in civil cases at common law is a basic and fundamental feature of our system of federal jurisprudence which is protected by the Seventh Amendment.  A right so fundamental and sacred to the citizen, whether guaranteed by the Constitution or provided by statute, should be jealously guarded by the courts.").

1.     <u>The Remote Format Denied Amtrak its Constitutional Right to a Fair Trial</u>.

A jury absent from the courtroom and, instead, watching a trial presentation individually via video conference technology is simply not the same as one present in person in open court as contemplated by the Seventh Amendment's preservation of "the right of trial by jury."  A virtual jury trial effectively prevents jurors from meaningfully discharging one of their most important duties—deciding the credibility of witnesses in resolving factual disputes – an absolutely central consideration in this specific case.  As noted in the American Board of Trial Advocates COVID-19 Task Force:

> The fundamental role of the jury is to determine the facts by judging the credibility of witnesses and weighing the evidence introduced at trial. In order to execute its main function, seeing and hearing the witness in person is critical. … Every jurisdiction has specific jury instructions for judging witness

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S POST-TRIAL MOTIONS - 6
CASE NO. 3:19-cv-05553-BHS
019188.0447/8812136.5

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

credibility. Uniform in the instructions is the judgment of the manner in which the witness looked, acted and spoke during testimony. **Actions that affect credibility include looking at documents, counsel, or other persons in the courtroom during testimony.** A fulsome opportunity to all aspects of the demeanor of witnesses is vital to the process of weighing credibility.

Yates Decl., at ¶ 7 and Ex. F (at p. 10) attached thereto.

      As a result of both potential distractions and technical limitations, jurors are simply less engaged in a virtual trial than if sitting in a courtroom. Accordingly, a virtual trial effectively denied Amtrak both its Seventh Amendment rights to a jury trial[3] and due process as well as its constitutional right that said trial be fair.[4] *See, e.g.*, Yates Decl., at ¶ 8 and Ex. G (Order, Doc. 261, *Infernal Technology, LLC v. Sony Interactive Entertainment, LLC*, No. 2:19-CV-00248-JRG, at 3 (E.D. Tex. Nov. 20, 2020)) ("While some motion practice may be adequately addressed via virtual proceedings, the Court believes that the fair adjudication of the rights of the parties, as envisioned by the Framers and embodied in the … Seventh Amendment[], requires jury trials to be conducted in-person."), and at 3 n.4 ("This Court is persuaded that the remote, sterile, and disjointed reality of virtual proceedings cannot at present replicate the totality of human experience embodied in and required by our … Seventh Amendment[].").

      In *In re RFC and ResCap Liquidating Trust Action*, 444 F. Supp. 3d 967 (D. Minn. 2020), the court, in deciding to allow two witnesses to testify remotely under Fed. R. Civ. P. 43's guidelines, noted the inferiority of "trial by videoconference" compared to "a trial where witnesses testify in the same room as the factfinder." *Id.* at 970. Quoting from a Seventh Circuit decision, *Thornton v. Snyder*, 428 F.3d 690, 697 (7th Cir. 2005), *cert. denied*, 547 U.S. 1192 (2006), the court stated that "[v]irtual reality is rarely a substitute for actual presence and … even in an age of advancing technology, watching an event on the screen remains less than the

---

[3] *Curtis v. Loether*, 415 U.S. 189, 194-95 (1974).

[4] *Anderson v. Sheppard*, 856 F.2d 741, 745 (6th Cir. 1988) ("[i]t is beyond dispute that '[a] fair trial in a fair tribunal is a basic requirement of due process") (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S POST-TRIAL MOTIONS - 7
CASE NO. 3:19-cv-05553-BHS
019188.0447/8812136.5

**LANE POWELL PC**
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000 FAX: 206.223.7107

complete equivalent of actually attending it." *In re RFC*, 444 F. Supp. 3d at 970 (internal quotations omitted).  The court continued:

> Certain features of testimony useful to evaluating credibility and persuasiveness, such as "'[t]he immediacy of a living person'" can be lost with video technology, and the "'ability to observe demeanor, central to the fact-finding process, may be lessened[.]'" [*Thornton*, 428 F.3d at 697] (citations omitted). Accordingly, "remote transmission [of testimony] is to be the exception and not the rule." *Lopez v. NTI, LLC*, 748 F. Supp. 2d 471, 479 (D. Md. 2010).

*Id*.  Although the Minnesota court found that good cause existed to allow these two witnesses to testify remotely during the early days of the pandemic, it nevertheless noted that, "[i]f this were a jury trial," its "concerns about clarity would perhaps be heightened."  *Id*. at 972.  *See also Fairstein v. Netflix, Inc.*, No. 2:20-cv-00180-JLB-MRM, 2020 WL 5701767, at *8 (M.D. Fla. Sept. 24, 2020) (where case required evaluation of witnesses' recollection of events from years ago, "[v]irtual proceedings may not be enough for the Court (or jurors) to properly evaluate the witnesses' credibility"; "live testimony from witnesses seated in the same room as the judge and jury may be necessary").

Due to the complicated medical and credibility issues to be discussed during trial, Amtrak expressed serious concerns about the jury being distracted during testimony.  Ex. D (11/16/2021 TT at 5:20-6:2).

Indeed, research supports that remote trials do not have the same gravitas as in person trials and therefore juror attention is diminished.

> [T]he architecture of the traditional courthouse and the symbolism of its interior design, decorations, and statuary reinforce participants' sense that they have entered a special place to engage in a special sort of activity. … Governmental flags and seals, as well as the generally imposing structure of the building and often the major courtrooms themselves, also signal the authority of the state. The architecture and symbolism of the courtroom and courthouse encourage those who enter to perform their roles in the hearing or trial with an attitude of formality, respect, and seriousness. … Things are different on Zoom. There is no imposing building or formal room; lay participants sit in the same rooms in their homes or offices in which they conduct many of their daily routines.

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

1   Susan A. Bandes and Neal Feigenson, "<u>Virtual Trials: Necessity, Invention, and the Evolution</u>
2   <u>of the Courtroom</u>," 68 Buff. L. Rev. 1275, 1316 (Dec. 2020) (footnote omitted).

3           Juror attention throughout the trial is critical to a fair outcome at trial, but is difficult to
4   ensure in a virtual setting.  Jurors have access to televisions, cell phones, and tablets outside the
5   view of the Zoom camera.  They may access the internet to learn more about the Amtrak
6   derailment and verdicts in other cases arising out of the derailment, or search the internet for
7   medical conditions during medical testimony.

8           Amtrak's concerns here were not theoretical—the jurors during this matter frequently
9   looked off screen, appeared to look down at their cell phones, or in the case of one juror, walked
10   from room to room during testimony.  Most significantly, without the jury's presence in the
11   courthouse and significant symbolism of being in court, there was no way to determine if jurors
12   had casual conversations with other household members during the trial and especially during
13   deliberations and the frequent colloquies between counsel and the Court outside their presence.
14   By proceeding with the trial virtually, Amtrak's constitutional right to a fair jury trial was denied.
15   Finally, Amtrak was not afforded a fair trial because it cannot be sure that witnesses were
16   properly excluded from testimony.  In its objection to a Zoom trial, Amtrak expressed concerns
17   about the issue of witness exclusion.  Ex. D (11/16/2021 TT 6:3-12).  The Court agreed there
18   was no way to monitor that. Yates Decl., at ¶ 9 and Ex. H (9/27/2021 PTC Tr. 21:6-22:2) attached
19   thereto.  Under the Federal Rules, "at a party's request, the court must order witnesses excluded
20   so that they cannot hear other witnesses' testimony."  Fed. R. Civ. P. 615.  As the Court
21   recognized, there was no way to determine if excluded witnesses were listening before their
22   testimony, and if there was any communication with witnesses while they were testifying, or if
23   they had scripts of their direct testimony in front of them.  *See* Ex. E (Tel. Conf. 11/10/2021 at
24   11:4-9) ("We operate as much as we can as if we are having the trial in person in the courtroom
25   with the usual rules, which witnesses are going to be excluded.  It is a little bit hard, as you know,
26   to enforce that.  That's another one of the shortcomings of Zoom trials.").  While failure to

27

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S POST-TRIAL MOTIONS - 9
CASE NO. 3:19-cv-05553-BHS
019188.0447/8812136.5

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

1  exclude witnesses might not be grounds to grant a new trial on its own, it adds to the cumulative

2  prejudice that Amtrak suffered as a result of this remote trial.

3      2.      The Remote Format Hindered Effective Confrontation of Witnesses.

4      "In almost every setting where important decisions turn on questions of fact, due process

5  requires an opportunity to *confront* and cross-examine adverse witnesses." *Goldberg v. Kelly*,

6  397 U.S. 254, 269 (1970) (emphasis added).  While witnesses can be effectively cross examined

7  by remote means in some circumstances, a civil jury trial with significant economic and non-

8  economic claims based on subjective symptoms alleged to have had a significant impact on

9  vocational and social functioning is not one of them.

10     The problems of being able to determine credibility in a virtual trial were addressed by a

11 federal district court judge in New York in an order postponing an evidentiary hearing.  *Hassoun*

12 *v. Searls*, 453 F. Supp. 3d 612 (W.D.N.Y. 2020).   The court noted that it had considered

13 conducting the hearing "in a virtual format" but had decided not to do so.  *Id.* at 626.  The court

14 stated that "the factual disputes in this matter rest heavily, if not almost exclusively, on matters

15 of credibility," and determined "that a virtual hearing would present significant challenges in

16 being able to adequately perform the critical credibility assessments that this matter requires."

17 *Id.*  If the judge in the courtroom would have difficulty assessing credibility, imagine the juror

18 sitting at home.

19     The Advisory Committee Notes to the Federal Rules of Civil Procedure note that the right

20 to confront witnesses face to face is critical.  Fed. R. Civ. P. 43, 1996 Notes of Advisory

21 Committee ¶ 3 ("The importance of presenting **live testimony in court** cannot be forgotten.  The

22 very ceremony of trial and the presence of the factfinder may exert a powerful force for

23 truthtelling.  The opportunity to judge the demeanor of a witness face-to-face is accorded great

24 value in our tradition.") (emphasis added).

25     "The perception that confrontation is essential to fairness has persisted over the centuries

26 because there is much truth to it." *Coy v. Iowa*, 487 U.S. 1012, 1019 (1988).  "A witness 'may

27 feel quite differently when he has to repeat his story looking at the man whom he will harm

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S POST-TRIAL MOTIONS - 10
CASE NO. 3:19-cv-05553-BHS
019188.0447/8812136.5

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

greatly by distorting or mistaking the facts." *Id*. (quoting Z. Chafee, *The Blessing of Liberty* 35 (1956)). "It is always more difficult to tell a lie about a person 'to his face' than 'behind his back.'" *Id*. "In the former context, even if the lie is told, it will often be told less convincingly." *Id*.

The heart of this matter is the degree to which Plaintiff was injured and impaired. There were major credibility issues for the jury to decide when resolving these issues. In addition to the medical records the Court did not admit, significant evidence on this issue was presented on direct and cross examinations of Plaintiff and her treating doctors and experts. For Amtrak to receive a fair trial, it was critical that the jury have the opportunity to observe the Plaintiff in the courtroom and how she is able to function. Ex. D (11/16/2021 TT 4:23-5:11). A major focus of this case centered around Plaintiff's subjective cognitive and physical complaints, whether these complaints had resolved or were permanent in nature, and whether these complaints caused Plaintiff's alleged diminished earning capacity and future care needs. As conceded by Dr. Chesnutt, all diagnostic imaging of Plaintiff's brain were negative, so Plaintiff's credibility was sharply at issue. Yates Decl., at ¶ 10 and Ex. I (11/17/2021 TT 186:2-10, 202:10-13) attached thereto. In fact, the stark difference between the lack of vocational efforts by Plaintiff, as compared with her active social, travel, and volunteer activities needed to be addressed with Plaintiff, her mother, medical treaters, and experts on the stand in front of the jury.

Moreover the jury understandably encountered Zoom fatigue during the course of the trial after listening to hours and hours of complicated medical testimony for four days. The decision to permit a virtual trial in a case where Plaintiff asked for a verdict in excess of $23 million ignored the infeasibility of jurors digesting critical information by staring at a small screen all day. This decision was even more prejudicial because during deliberations, the jurors were unable to observe the individual demeanor of others, to assess the group dynamic, and to participate fully in persuading and being persuaded—which is exactly what each and every juror must do.

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S POST-TRIAL MOTIONS - 11
CASE NO. 3:19-cv-05553-BHS
019188.0447/8812136.5

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

1

2

### C. The Exclusion of Key Medical Records Denied Amtrak a Fair Trial, Particularly in the Context of a Remote Proceeding

3

4

Erroneous evidentiary rulings can support the grant of a Rule 59 motion for a new trial.

*See, e.g. Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995); *Murphy v. City

5

of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990).  Despite the fact that this case was a damages

6

only personal injury trial where the single most important issues were Plaintiff's physical and

7

mental health, Amtrak inexplicably was not permitted to introduce Plaintiff's medical records

8

into evidence.[5]  Although evidentiary issues are often discretionary, the Court's failure to admit

9

key records was prejudicial error that warrants a new trial.

10

At the Pretrial Conference, the Court stated that a medical record could be admitted if it

11

satisfies the rules of evidence, including hearsay rules."  Ex. H (9/27/2021 PTC Tr. 7:20-8:10,

12

27:17-23).  At trial, however, the Court essentially reversed course.   *See* Ex. I (11/17/2021 TT

13

172:25-173:7).  When Amtrak wanted to admit key records, the Court ruled on at least two

14

occasions that the medical records would not come in because there are "voluminous medical

15

records" and "[i]f we start with medical records, then we are going to start with all kinds of other

16

medical records.  They are not going to come into evidence."  Yates Decl., at ¶¶ 11-12 and Ex. J

17

(11/18/2021 TT 151:14-20); Ex. K (11/22/2021 TT 43:24-44:4) attached thereto.

18

However, Plaintiff made much of the fact that she attended over 300 medical

19

appointments in opening, witness exams, and closing.  *See, e.g.*, Ex. D (11/16/2021 TT 20:14-

20

21); Ex. K (11/22/2021 TT 63:3-10).  To preclude Amtrak admitting evidence of the nature of

21

those appointments, including admissible statements from her and her providers, as well as direct

22

evidence of her recovery, was prejudicial error.  A particular case in point is Dr. Chesnutt's

23

agreed that his records reflected that Plaintiff reported running up to 6 miles.  Ex. I (11/17/2021

24

TT 199:20-21); Yates Decl., at ¶ 13 and Ex. L (A-90 at Steele 009074) thereto.  Amtrak was not

25

allowed to admit the relevant portion of this record when it cross examined Dr. Chesnutt, but

26

[5] Indeed, numerous medical records were admitted into evidence in Related Cases, including *Skyllingstad v. NRPC*, 18-cv-00648; *Wilmotte v. NRPC*, 18-cv-00086; *Linton v. NRPC*, 18-cv-05564; *Garza v. NRPC*, 18-cv-05106.  *See* Yates Decl., at ¶¶ 19-21 and Ex. R, S, and T attached thereto.

27

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

Plaintiff was allowed to accuse Amtrak's counsel of lying with respect to Plaintiff's recovery, which included the ability to run up to 6 miles per day, without Amtrak being able to show the jury in black and white the record that supported its position about Ms. Steele's activity levels. Ex. K (11/22/2021 TT at 51:16-52:13).

The fear of having voluminous medical records coming in is not a sufficient basis for excluding medical evidence.  While a medical record is hearsay, it is indisputably admissible under various hearsay exceptions.  Fed. R. Evid. 803.  In fact, Rule 803(4) provides a hearsay exception for a statement that: (A) "is made for – and is reasonably pertinent to – medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause."  Plaintiff did not even make any hearsay objections, as they would be frivolous.  Further, the Court was required to make a factual determination on the admissibility of the medical evidence which this Court did not do.  Fed. R. Evid. 104(a).  Since the primary issues at trial were Plaintiff's physical and mental health conditions, Plaintiff's medical records were essential to Amtrak's damages defense.  The Court erred in excluding medical records, thus depriving Amtrak of the ability to challenge the extent and permanency of Plaintiff's claims that she would, *inter alia*, need over 50 years of future treatment and could only, at best, work part time at a minimum wage job for the rest of her life.

   1.   <u>Plaintiff's Emergency Room and Urgent Care Records Should Have Been Admitted In Support of Amtrak's Position that Plaintiff Did Not Meet the DSM-5 Diagnostic Criteria for a Mild Neurocognitive Disorder</u>.

During its cross-examination of Dr. Chesnutt, Amtrak asked about whether Plaintiff met the diagnostic criteria for mild neurocognitive disorder caused by a mild traumatic brain injury. Ex. I (11/17/2021 TT 190:23-192:6).  Plaintiff's counsel objected followed by a colloquy.  *Id.*, at 192:20-195:4.  In light of the Court's ruling on summary judgment, Amtrak clearly stated that it was not challenging the mTBI,[6] but the nature and severity of the sequela from that injury,

---

[6] Amtrak reserves its right to challenge this Court's decision granting summary judgment (Dkt. 36) on appeal because this Court's September 16, 2021 (Dkt. 36) and November 15, 2021 decisions are based upon the lack of another cause for her head injury and **not** on the actual diagnosis.  "[T]he Court granted in part Plaintiff Steele's Motion for Partial Summary Judgment

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S POST-TRIAL MOTIONS - 13
CASE NO. 3:19-cv-05553-BHS
019188.0447/8812136.5

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

something the Court ruled that it could challenge at trial.  *Id.*, at 193:16-22.  Even though Amtrak

had all the medical records and argued that these should be permitted into evidence (*see* Ex. J

[11/18/2021 TT 6:11-13]), the Court did not allow Amtrak to introduce even the most probative

medical records (*see* Ex. H [9/27/2021 PTC Tr. 7:20-8:10, 27:17-23]; Ex. I [11/17/2021 TT

172:25-173:7]; Ex. K [11/22/2021 TT 43:22-44:4]), including records that would have

established that the symptoms Plaintiff allegedly experienced did not meet the DSM-5 criteria

for mild neurocognitive disorder.

The Court's exclusion of Plaintiff's ER and Urgent Care records precluded Amtrak from

meaningfully disputing the sequela flowing from her mTBI, most pointedly the alleged mild

neurocognitive disorder – something Plaintiff told the jury would essentially preclude her from

gainful employment during her lifetime. Specifically, this error precluded Amtrak from offering

evidence that she did not meet the diagnostic criteria for a mild neurocognitive disorder under

the DSM-5.  Yates Decl., at ¶ 14 and Ex. M (American Psychiatric Association, Desk Reference

to the Diagnostic Criteria from DSM-5 (2013) at 624-625).  *See* Yates Decl., at ¶ 15-16 and Ex.

N (A-82 excerpts) and Ex. O (A-99).  In other words, Amtrak adhered to the Court's limited

decision that the derailment caused the mild traumatic brain injury, but the Court's evidentiary

rulings at trial prevented it from disputing the nature and severity of such injury, notwithstanding

the Court's ruling that Amtrak could do so.

Amtrak was further hamstrung in its ability to challenge the extent of Plaintiff's cognitive

impairment when the Court reversed its prior ruling and limited Amtrak's use of the DSM-5

criteria after first allowing limited cross examination based upon the inconsistency between

Plaintiff's initial symptoms and her alleged severe cognitive impairment.  Ex. J (11/18/2021 TT.

11:3-14).  This coupled with the exclusion of the relevant ER and Urgent Care records, unfairly

deprived Amtrak of the ability to put into evidence records which showed Plaintiff's cognitive

---

on **Causation**." *Id.*, at p. 1 (emphasis added).  Amtrak respectfully notes that the Court's partial
summary judgment decision on causation was improperly permitted to be extended to a
diagnosis, as a matter of law, even though that was not the thrust of Plaintiff's motion and had
the impermissible effect of shifting the burden of proof from Plaintiff to Amtrak.

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S POST-TRIAL MOTIONS - 14
CASE NO. 3:19-cv-05553-BHS
019188.0447/8812136.5

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

impairment did not fit the DSM-5 criteria.  Adding to this prejudice, Amtrak then was not permitted to argue that Dr. Chesnutt disagrees with the crucial and universally accepted diagnostic criteria. Ex. I (11/17/2021 TT 190:23-192:5).

It solely was within the province of the jury to determine whether Plaintiff's symptoms met the DSM-5 criteria for mild neurocognitive disorder.  The four criteria for mild neurocognitive disorder includes loss of consciousness, posttraumatic amnesia, disorientation and confusion, and neurological signs. Ex. M.  (DSM-5 at 624).  Significantly, "the neurocognitive disorder presents **immediately** after the occurrence of the traumatic injury or immediately after recovery of consciousness and persists past the post-injury period." *Id*. (emphasis added).

Plaintiff's medical records, particularly the records from the Emergency Room and Urgent Care, should have been admitted to establish that the criteria for mild neurocognitive disorder were not met and therefore raised serious questions about the extent of Plaintiff's alleged disability nearly four years after the accident.  Thus, the Court's refusal to permit defendant to admit Plaintiff's medical records and the limitation on the use of the DSM-5 severely prejudiced Amtrak's ability to establish its defense to the jury.

2.    Other Medical Records Should Also Have Been Admitted.

As a result of the Court's decision to exclude medical records generally, juror attention was further diminished when a witness was asked to locate specific information in his or her voluminous records.  In the cases of Drs. Chesnutt and Carson, this consisted of 1,707 pages. *See, e.g.*, Ex. I (11/17/2021 TT 179:14-180:16, 186:13-22, 208:4-210:17, 210:24-211:22); Ex. J (11/18/2021 TT 161:6-22).  In some instances, the witness did not have a copy of the medical record in front of him even though Plaintiff's counsel had agreed to make sure the medical witnesses were in possession of their records during cross examination. Ex. I (11/17/2021 TT 196:15-19).  There is no question that allowing the jurors to see Plaintiff's medical records during the trial and especially during deliberations would have been more effective than Amtrak's counsel having to read out loud relevant portions of the medical records during hours of cross

DEFENDANT NATIONAL RAILROAD PASSENGER CORPORATION'S POST-TRIAL MOTIONS - 15
CASE NO. 3:19-cv-05553-BHS
019188.0447/8812136.5

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000 FAX: 206.223.7107

examination.  *See, e.g.*, Ex. I (11/17/2021 TT 185:17-25, 212:11-24).   No one could seriously contend that transitory cross examination had the same impact as records the jury could review during deliberations.   That is precisely why Plaintiff's counsel could boldly accuse Amtrak of lying about Plaintiff running up to 6 miles because he knew the jury would not have the benefit of the records.  Ex. I (11/17/2021 TT 199:20-21); Ex. L (A-90 at Steele 009074).

Equally importantly, Amtrak's ability to cross-examine Plaintiff's treating providers and expert witnesses was severely restricted.  Without showing the jury the relevant medical records, Amtrak could not effectively highlight the inconsistencies and differences between the opinions and conclusions of Plaintiff's treaters and experts in their testimony with what was recorded in the contemporaneous medical records.  Nor could Amtrak show the jury the many examples of substantial improvement in physical and cognitive function that Plaintiff reported over the course of her treatment.  Most significantly, the jury did not see records proving that Plaintiff made a conscious decision to not look for gainful employment until her case was resolved.  Ex. L (A-90 at Steele 9100) ("discussed need to wait on settlement before clear what options may be. [D]egree in environment especially urban landscapes could provide opportunities . . . encouraged her to dream for time being."  "acknowledge again need to wait . . . before clear what options may be.")  And during their deliberations, the jury had no opportunity to review these records in contrast to the vague but bleak picture painted by the testimony of Plaintiff and other witnesses.

For example, Plaintiff alleged that she has sustained excruciating daily headaches as a result of the derailment.  The Court's ruling excluded Dr. Chesnutt's November 2018 treatment note indicating that Plaintiff's change in birth control "may have caused some hormone changes that trigged migraines.  She has recently switched back to her original birth control."  Ex. L (A-90 at OHC 766).  And Plaintiff herself told another treating provider, Dr. Braden Nago, that she "had a rough month" presumably because she "switched to a generic birth control from my regular YAZ birth control (for cost reasons) and believe I experienced some negative reactions from it.  I was consistently more easily lightheaded, nauseous, and had really varying emotions **and the worst headaches I've ever experienced…..** [T]hen saw the UW Headache Clinic the

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S POST-TRIAL MOTIONS - 16
CASE NO. 3:19-cv-05553-BHS
019188.0447/8812136.5

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

next day.  There I had an emotional meltdown and could not stop crying.  Later that day, I had an 8 or 9/10 headache and severe anger associated with the pain." Yates Decl., at ¶ 18 and Ex. P (A-70) (emphasis added).

Ultimately, the Court's decision to disallow the introduction of medical records into the record had a dramatic impact on the outcome of the trial, as it allowed Plaintiff and her witnesses to paint a completely different picture than the records revealed.  By precluding medical records, Plaintiff was free to ignore her recovery which allowed her to freely travel, complete her Master's degree, exercise regularly, and fully participate in and lead volunteer activities, while intentionally putting off gainful employment until the trial was over.  Amtrak's inability to introduce medical records into evidence allowed Plaintiff to offer opinions that were in stark contrast to the medical records.  Thus, for no evidentiary reason besides the fact that they may be cumbersome or voluminous, Amtrak was precluded from introducing into evidence medical records demonstrating that most of Plaintiff's injuries have resolved and she was in fact repeatedly urged to resume gainful employment.  *See, e.g.,* Ex. L (A-90, at OHC 000696) ("I would highly encourage engaging in work and using your education to continue progressing back into this part of life."); at OHC 000609 ("Encourage school and/or work to a level that is subthreshold symptoms.").

**D.     A New Trial is Also Warranted Because the Verdict Was Clearly Against the Weight of the Evidence**

Even if a verdict is supported by substantial evidence, the court may grant a motion for a new trial if it concludes that the verdict is contrary to the clear weight of the evidence.  *Silver Sage Partners Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001).  When weighing the evidence and evaluating the credibility of the witnesses, the Court is not required to view the evidence from the perspective most favorable to the prevailing party.  *U.S. v. Kellington*, 217 F.3d 1084, 1095 (9th Cir. 2000).  "Instead, if, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, then the motion should be granted." *Lacey Marketplace Assocs.*

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S POST-TRIAL MOTIONS - 17
CASE NO. 3:19-cv-05553-BHS
019188.0447/8812136.5

1  *II, LLC v. United Farmers of Alberta Co-op. Ltd.*, No. C13-0383JLR, 2015 WL 4604044, at *3

2  (W.D. Wash. July 30, 2015), *rev'd in part sub nom. Lacey Marketplace Assocs. II LLC v. United*

3  *Farmers of Alberta Co-op. Ltd.*, 720 F. App'x 828 (9th Cir. 2017) (quoting *Landes Const. Co. v.*

4  *Royal Bank of Can.*, 833 F.2d 1365, 1371-72 (9th Cir.1987)) (internal quotation marks omitted).

5        At most, Plaintiff suffered a mild TBI, from which she recovered, as demonstrated by her

6  returning to Antioch College where she completed her master's degree in education with a

7  specialization in urban environmental education, while receiving many outstanding evaluations

8  of her coursework following the derailment.

9        The medical records repeatedly note her improvement with respect to her ability to

10  participate in social and recreational activities.  During the pandemic, she started a film club and

11  lead discussions about the movies over Zoom.  Ex. J (11/18/2021 TT 98:11-99:4).  She has baked

12  bread and drove 40 miles each way to take it to her friend.  *Id.*, at 105:17-20.  She has shot

13  baskets, played board games, enjoys going to the library to get books, walked up to several miles

14  a day, enjoys gardening, has gotten back to dancing, balancing on a Wii Fit platform, and gone

15  biking around the neighborhood.  *Id.*, at 117:4-18, 134:12-135:20.  She has traveled to Lopez

16  Island and Victoria, Canada by ferry.  *Id.*, at 127:9-128:15.  She has taken 12 commercial airplane

17  flights since the derailment, including trips to Arizona and twice to Hawaii.  *Id.*, at 53:8-54:19.

18  She recently went on one camping trip with her family and also attended two weddings.  *Id.*, at

19  55:12-24.  Her treating psychologist, Dr. Brown, never told her that she can't work.  Ex. I

20  (11/17/2021 TT 75:9-10).  Not one treating physician ever noted in the thousands of pages of

21  medical records that she was unable to work or restricted in leisure activities. This Court should

22  also recognize that Plaintiff's claims are highly suspect in light of her testimony that she initially

23  had to wear a hat because of her light sensitivity and that she even wore a hat inside for her initial

24  neuropsychological testing in January of 2019, but the surveillance video showed her at a park

25  in the sun with no hat for nearly an hour on July 5, 2018, and mingling with other people with no

26  hesitation.  Further, contrary to her claim she could not multi-task, surveillance evidence

27

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S POST-TRIAL MOTIONS - 18
CASE NO. 3:19-cv-05553-BHS
019188.0447/8812136.5

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

disclosed her walking a dog and playing hopscotch at the same time, and texting and walking her dog at the same time.  *See* A-108 (surveillance video).

## II.   AMTRAK RENEWS ITS MOTIONS FOR JUDGMENT AS A MATTER OF LAW ON THE CLAIMS FOR FUTURE MEDICATIONS AND ECONOMIC LOSSES

During trial, the Court' denied Amtrak's motions for judgments as a matter of law under Fed. R. Civ. P. 50 with respect to damages for future medications and other future economic losses, which included wage loss and caretaking services. Ex. K (11/22/2021 TT at 4:12-6:25). Amtrak renews these motions under Fed. R. Civ. P. 50(b). A renewed motion may be granted where "the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006). The court should overturn a jury's verdict if it is not supported by "substantial evidence."  *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009).

## A.   Plaintiff Failed to Meet Her Evidentiary Burden With Respect To Future Medications

"Where there is no medical testimony to indicate that there was a reasonable certainty that treatment was required, damages for future medical expenses are properly denied." *Buchalski v. Universal Marine Corp.*, 393 F. Supp. 246 (W.D. Wash. 1975).  At trial, it was Plaintiff's burden to introduce evidence to establish to a reasonable degree of medical certainty that she would need to take the same seven medications for the next 51.8 years, including Emgality or its generic Galcanezumab.  *See generally* Plaintiff's Trial Exhibit 16; Yates Decl., at ¶ 19 and Ex. Q (11/19/2021 TT 98:22-99:11). As Amtrak pointed out at trial, future medications are approximately 40% of the cost of the Life Care Plan — approximately $800,000 on the low end and over a million dollars on the upper end. *Id.*, at 187:22-188:11).

To recover damages for future medical expenses, a plaintiff must present medical testimony to show that it is more probable than not that future medical treatment is necessary to a reasonable degree of medical certainty. *See, e.g., Erdman v. Lower Yakima Valley, Washington Lodge No. 2112 of B.P.O.E.*, 41 Wn. App. 197, 208 (Div. 3, 1985) ("The general rule is that one may recover for future medical expenses reasonably certain to be incurred.  Prior to an allowance

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S POST-TRIAL MOTIONS - 19
CASE NO. 3:19-cv-05553-BHS
019188.0447/8812136.5

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

1   for the cost of future medical care, evidence must indicate the care will be necessitated by the

2   plaintiff's injury."), *review denied*, 104 Wn.2d 1030 (1985); *Stevens v. Gordon*, 118 Wn. App.

3   43, 55, 74 P.3d 653, 660 (2003) ("Damages are awardable for medical expenses that are

4   reasonably certain to be necessary in the future.") (*citing Leak v. United States Rubber Co.*, 9

5   Wn. App. 98, 103, 511 P.2d 88 (1973)).

6       Anthony Choppa, Plaintiff's life care planner, testified that "I rely on Dr. Chesnutt [to

7   establish that Plaintiff] would need this medication for the rest of her life." Ex. Q (11/19/2021

8   TT at 99:14-16).  *See also id.* at 98:22 to 99:1 ("Q:…who do you rely on…for your opinion that

9   she would need various medications next 50 years?  A: That would be Dr. Chesnutt.").  On cross

10  examination, Mr. Choppa confirmed that he relied on Dr. Chesnutt for including Emgality in the

11  Life Care Plan:

12      **Q.**  Just so it is clear to the ladies and gentlemen, you relied on Dr.
13      Chesnutt for putting this in your Life Care Plan; isn't that what you
        just said?

14
15      **A.**  Ultimately, yes.  I saw it in the records.  But in terms of the
        future, yes, I relied on the physician, yes.

16  *Id.*, at 100:3-7).  Indeed, Mr. Choppa acknowledged that it is "standard methodology" for a life

17  care planner to rely on a physician to establish the medical need for a Life Care Plan item.  *Id.*,

18  at 100:17-19).

19      There is, however, not a scintilla of evidence in the trial record that can support Mr.

20  Choppa's reliance on Dr. Chesnutt with regard to Plaintiff's needs for Emgality for the rest of

21  her life, or any other medication.  Dr. Chesnutt testified as follows:

22      **Q:**  …You are familiar with the medication she was taking for her
23      migraine,   Emgality?

24      **A:**  I don't prescribe that medication.  It is prescribed by the
25      specialty headache clinic neurologist.

26      **Q:**  Are you familiar with it at all?

27      **A:**  Not that familiar with it because I don't prescribe it ever.

**Q:** You don't know how long people can take that, do you?

**A:** No, I don't.

Ex. Q (11/18/2021 TT 163:11-20).

At no point during his testimony did Mr. Choppa ever identify what doctor opined on a more probable than not standard that Ms. Steele would require Emgality or any medication for the next 50 years.  As noted, he only relied on Dr. Chesnutt, who knew nothing about the medication.  Because there is no competent underlying medical testimony supporting the inclusion of future medications in the Life Care Plan, the damages associated with those items should be excluded.  *In re Ethicon, Inc., Pelvic Repair System Products Liability Litigation*, No. 2:12–MD–02327, 2014 WL 186872, *13 (S.D. W. Va. 2014) (excluding life care planner testimony to extent there was not a reliable medical foundation).

Mr. Choppa cannot rely on Dr. Chesnutt's opinion because Dr. Chesnutt is not familiar with the medications, never prescribed them, and had no idea how long people can take the medications. Ex. J (11/18/2021 TT 163:11-20).  Simply put, Mr. Choppa's claim that he relied on Dr. Chesnutt for Mr. Choppa's opinion that Plaintiff will be taking these medications for the next 50 years is belied by Dr. Chesnutt's own testimony.

There can be no claim that Dr. Chesnutt relied on Dr. Nago's treatment notes or records Ex. K (11/22/2021 TT 5:4-18 because he makes no specific reference to them.  With respect to the Plaintiff's headache treatment at the University of Washington, Dr. Chesnutt testified that "[m]ost of her care has been up in the Seattle area, University of Washington, and then the Polyclinic." Ex. D (11/16/2021 TT 74:11-12).  Dr. Chesnutt was unable to offer any other details about Plaintiff's headache treatment except to say that he was not familiar with Emgality, did not prescribe it, and did not know how long people can take that.  Ex. J (11/18/2021 TT 163:11-20).

Further, because Dr. Chesnutt was not familiar with Emgality, did not prescribe it, and did not know how long people could take it, it logically follows that he could not testify to a

1    reasonable degree of medical certainty that Plaintiff would require Emgality (or any other

2    medication) for the next 50 years.  Nor did he!

3           Despite the lack of medical evidence and the lack of testimony to a reasonable degree of

4    medical certainty, the Court denied Amtrak's motion for judgment as a matter of law.  Ex. K

5    (11/22/2021 TT 6:9-11).  The Court simply accepted Plaintiff's unsupported argument at face

6    value, even though it acknowledged that there was no specific citation to the record to support

7    the claim.  *Id.*, at 4:25-5:1.

8           Because the Life Care Plan items for future medications lack the necessary support in the

9    record, the jury's award for future medicals cannot be upheld[7] and Amtrak should be granted

10   judgment as a matter of law on this issue.

11   **B.      Plaintiff's Future Wage Loss and Services Claims Lack Proper Evidentiary Support**

12          The jury's award of future economic damages lacked any evidentiary basis and Amtrak

13   is entitled to a judgment as a matter of law on that claim.

14          At trial, Mr. Choppa testified that the sole basis for his conclusion that Plaintiff could

15   only work at most a part time minimum wage job rested on his conversation with Dr. Lemoncello,

16   whom he erroneously assumed to be a "treater" charged with returning Plaintiff to work. Ex. Q

17   (11/19/2021 TT 124:21-25, 144:14-17; 145:5-9).  Mr. Choppa was, of course, wrong on both

18   counts – as the Court and parties acknowledged – Dr. Lemoncello was neither an expert witness

19   nor a treater.  Ex. J (11/18/2021 TT 187:21-22, 190:8-191:7).

20           Under the Court's prior *in limine* ruling, Dr. Lemoncello could only testify as a fact

21   witness based on his limited observations of Plaintiff in the fall and winter of 2020, when both

22   he and she were wearing masks and face shields.  As the Court stated during the September 29,

23   2021 pretrial conference, Dr. Lemoncello would be permitted to testify like any other lay witness

24   who is a co-worker or supervisor.  Ex. H (9/27/2021 PTC Tr. 13:23-15:16).  However, at trial,

25   the Court let Mr. Choppa's testimony regarding Dr. Lemoncello go the jury over Amtrak's

---

[7] With respect to future medicals, Plaintiff's economist testified that the present value on the low end is $832,000 on the low end and over one million dollars on the high end.  Ex. Q (11/19/2021 TT 187:14-188:11).

26

27

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S POST-TRIAL MOTIONS - 22
CASE NO. 3:19-cv-05553-BHS
019188.0447/8812136.5

objection.  Ex. Q (11/19/2021 TT at 125:1-3).  This would otherwise be another error warranting a new trial, but the actual evidence was so overwhelmingly contrary to Mr. Choppa's vocational assessment of Plaintiff that Amtrak should be granted a judgment as a matter of law on that claim.

In contrast to this brief observation by a lay witness, the Plaintiff's medical records repeatedly discuss Plaintiff's improvement, that she needs to get on with her life, and her treaters encouraged her to work.  Ex. I (11/17/2021 TT 75:9-16 [Brown], 207:4-9 [Chesnutt]); *see also* Ex. L (OHC 000696-697).  There was no competent medical evidence to support any theory that Plaintiff could not work in the field of environmental education.  Her psychologist, Dr. Brown, never told Plaintiff that she could not work and did not place any limitations on her.  Ex. I (11/17/2021 TT 75:9-10, 15-16).  There was no testimony from any treating provider that Plaintiff could not work.  Nor is there any indication in Plaintiff's voluminous medical records that she will never be able to work full time for the rest of her work life, once she returns to gainful employment.

Plaintiff earned her Masters' degree in education **after** the derailment.  Plaintiff wrote a 60-page Master's thesis to complete her studies.  Ex. J (11/18/2021 TT 122:16-24).  Susan Marie Byers, who was the director of the urban environment education master's program at Antioch University since 2015 taught Plaintiff and testified that Plaintiff was "highly intelligent" and "a strong student with strong writing and oral presentation skills, as well, and a critical thinker." *Id.*, at 140:3-16, 142:13-143:9.

Her impressive resume and March 25, 2019 cover letter stated that she has "professional experiences as an environmental educator" and is "a multidisciplinary team member, strong self-starter, and compassionate and open-minded educator."  Ex. Q (11/19/2021 TT 131:7-14); Ex. J (11/18/2021 TT 109:21-110:18); see also A-60, A-63.  As noted, during this time, she led workshops in her program, wrote a "masterful final essay," and was a strong contributor in class "as always."  Ex. J (11/18/2021 TT 123:10-15; 173:10-18; 174:11-16).  At the same time, she also served as a writing advisor for other students at Antioch's campuses.  *Id.*, at 111:4-13.

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S POST-TRIAL MOTIONS - 23
CASE NO. 3:19-cv-05553-BHS
019188.0447/8812136.5

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

In addition, there is no evidentiary basis for Mr. Choppa's conclusion that Plaintiff needs a household assistant, medical case manager, care services assistant, and yardwork and house maintenance assistant. Once again, this is based upon mistaken testimony from Dr. Chesnutt that Plaintiff has not been independent since the accident because her mother has taken care of her. In fact, the undisputed testimony is that Plaintiff returned to Seattle in early 2018 to complete her Master's Degree and remained there until she graduated in June 2019, in a different state from her mother, who resided and worked in Oregon. Ex. J (11/18/2021 TT 13:2-14; 15:13-23). In addition, Plaintiff admitted she cooked, drove, gardened, read, and managed her own doctors' appointments on her computer's calendar. Contrary to needing a medical case management, when Plaintiff returned to Portland from Seattle, after obtaining her Master's she interviewed several therapists before deciding upon Dr. Carson. Ex. I (11/17/2021 TT 65:17-19).

Accordingly, Amtrak is entitled to a judgment as a matter of law on Plaintiff's economic loss claim, including any future wage loss and for the various assistants identified by Mr. Choppa.

## III.   IN THE ALTERNATIVE, AMTRAK IS ENTITLED TO A SUBSTANTIAL REMITTITUR OR AMENDMENT OF THE JUDGMENT

If this Court does not grant a new trial, in the alternative, a substantial remittitur should be granted. The remittitur procedure is available to correct excessive verdicts. *Pershing Park Villas Homeowners Ass'n v. United Pacific Ins.*, 219 F.3d 895, 905 (9th Cir. 2000).

### A.   Standard for Remittitur

If, after viewing the damages in the light most favorable to the prevailing party, the court finds that that the damages award is excessive, it may either deny the motion if the prevailing party accepts a remittitur or grant the motion for a new trial. *Arnold v. Pfizer, Inc*., No. 3:10-CV-01025-AC, 2015 WL 268967, at *5 (D. Or. Jan. 21, 2015) (citing *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814 (9th Cir. 2001)). A trial court granting a motion for remittitur does not substitute its judgment for the jury's; it reduces the judgment to the maximum amount sustainable by the proof. *Id.* The jury's award for noneconomic damages "must be in

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S POST-TRIAL MOTIONS - 24
CASE NO. 3:19-cv-05553-BHS
019188.0447/8812136.5

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

1  proportion to the injury suffered" and supported by competent evidence. *Hill v. GTE Directories*

2  *Sales Corp.*, 71 Wn. App. 132, 140, 856 P.2d 746, 751 (1993).

3          A jury's damage award will be upheld unless the amount is "grossly excessive or

4  monstrous, clearly not supported by the evidence, or based only on speculation or guesswork."

5  *Del Monte Dunes v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996).  Here, the standard

6  for remittitur or amendment of the judgment to reduce the damages award is met because the

7  future non-economic and future economic damages awarded by the jury were clearly excessive

8  and unsupported by the evidence.

9          A court has discretion to grant a new trial where a verdict appears to be against the weight

10  of the evidence, and that discretion "includes overturning verdicts for excessiveness and ordering

11  a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a

12  reduction (remittitur)."  *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996).  The

13  Ninth Circuit has instructed that "[i]f we find that a jury's damages award exceeds the maximum

14  amount sustainable by the probative evidence, we will not hesitate to order a remission of the

15  excess by the plaintiff or, in the alternative, a new trial."  *Los Angeles Mem'l Coliseum Comm'n*

16  *v. Nat'l Football League*, 791 F.2d 1356, 1366 (9th Cir. 1986).

17  **B.**      **The Evidence Warrants a Substantial Remittitur**

18          The jury awarded Plaintiff future economic damages in the amount of $3,700,000, which

19  includes the amounts for future medication costs, future wage loss and four assistants for the rest

20  of Plaintiff's life.  The jury also awarded Plaintiff $2,000,000 in future non-economic damages.

21  The jury further awarded $960,000 for past non-economic damages. These amounts are grossly

22  excessive in light of the evidence and the Court should grant Amtrak a substantial  remittitur to

23  prevent injustice.

24          As discussed above, Plaintiff did not meet her burden of proving by competent evidence

25  that she would need the future medications specified in the Life Care Plan, or that she is entitled

26  to other future losses, particularly economic losses for future income or four assistants.  For

27  example, a medical case manager would cost $218,000 over the course of Plaintiff's life but both

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S POST-TRIAL MOTIONS - 25
CASE NO. 3:19-cv-05553-BHS
019188.0447/8812136.5

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

1    Dr. Brown and Dr. Carson testified that Plaintiff was capable of managing her own care, as she

2    has been doing.  Ex. I (11/17/2021 TT 65:20-24 [Brown]); Ex. Q (11/19/2021 TT 219:11-13

3    [Carson]).  Nor was there any evidence that Plaintiff would need 1,200 massages, shower chairs,

4    a handheld shower, grab bars or a gym membership as a result of the accident for the next 50

5    years.

6         Accordingly, a remittitur is appropriate if the Court does not grant judgment as a matter

7    of law on this issue. At most, the future economic loss award should be reduced to $250,000.

8         Furthermore, the future non-economic damages of $2 million should be substantially

9    remitted.  By Plaintiff's own admission based upon the medical records referenced in cross

10   examination, she has traveled extensively, gone to large events such as Mariner games, reads and

11   goes to the library, spends time on the computer for social and volunteer activities, kayaks,

12   exercises daily, attends weddings and other celebrations, gets together with friends, including

13   trips together to other states, runs, snorkels, fishes, plays pick-up soccer and basketball, gardens,

14   mountain bikes, dances, sews, bakes, camps and kept up on her multiple foreign language study.

15   The only activity she has not engaged in since the accident is snow boarding.  Ex. J (11/18/2021

16   TT 85:23-24).  Thus, there is no basis for any non-economic award for the future.  Most

17   significantly, she has recovered and not one physician testified her condition will deteriorate.  To

18   the contrary, patients with mild TBI's typically improve, as Plaintiff has. Ex. I (11/17/2021 TT

19   187:8-13).  At most, the future non-economic award should be reduced to $75,000.

20        Finally, the award of $960,000 for past non-economic damages is excessive based upon

21   the active life the Plaintiff has enjoyed once she improved a few months after the accident. While

22   Plaintiff did not look for gainful employment after completing her Masters, she enjoyed leisure

23   activities with no restriction.  In fact, upon her graduation, she decided to take time off, as she

24   told Dr. Chesnutt in June 2019, that she was taking the summer off to travel and have fun before

25   starting to look for work in the fall.  Ex. L (A-90 at OHC 000265).  As discussed above, her

26   alleged injuries did not limit her in any significant manner after a few months following the

27   accident.  At trial, there were many photographs showing Plaintiff enjoying life, including with

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S POST-TRIAL MOTIONS - 26
CASE NO. 3:19-cv-05553-BHS
019188.0447/8812136.5

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

crowds, loud noise and bright lights, with no manifestation of the slightest distress.  Ex. A-59, A-107.  Contrary to Plaintiff's testimony, by July 5, 2018, she was able to go to the park, sit in the sun with no hat and interact comfortably with others and was not trying to avoid crowds.  Ex. A-108. By November and December 2020, she only complained of headaches "occasionally." Ex. Q (11/19/2021 TT 40:7-15).  At most, her past non-economic damages should be reduced to $350,000.

## CONCLUSION

For the reasons above, Amtrak respectfully requests the following relief:

1.      A new trial on all issues; or, in the alternative,

2.      Judgment as a matter of law on the future economic claim for medications, future wage loss, and 4 assistants for the rest of her life; or in the alternative,

3.      Entry of an amended judgment or remittitur reducing the jury's excessive and unsupported compensatory damages awards as set forth above.

DATED:  December 21, 2021

LANE POWELL PC


By  s/ Andrew G. Yates
     Andrew G. Yates, WSBA No. 34239
     yatesa@lanepowell.com
     Tim D. Wackerbarth, WSBA No. 13673
     wackerbartht@lanepowell.com


LANDMAN CORSI BALLAINE & FORD, PC


By  s/ Mark S. Landman
     Mark S. Landman, Pro Hac Vice
     mlandman@lcbf.com
     John A. Bonventre, Pro Hac Vice
     jbonventre@lcbf.com

*Attorneys for Defendant National Railroad Passenger Corporation*

DEFENDANT NATIONAL RAILROAD PASSENGER CORPORATION'S POST-TRIAL MOTIONS - 27
CASE NO. 3:19-cv-05553-BHS
019188.0447/8812136.5

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107