THE HONORABLE BENJAMIN H. SETTLE

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

**KYLIE STEELE**,

                              Plaintiffs,

v.

**NATIONAL RAILROAD PASSENGER**
**CORPORATION, a/k/a AMTRAK, a**
**District of Columbia corporation; and,**
**DOES ONE THROUGH FIFTY,**

                              Defendants.

Case No.  3:19-cv-05553-BHS

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S MOTION FOR A NEW**
**TRIAL, JUDGMENT AS A MATTER**
**OF LAW, OR IN THE ALTERNATIVE**
**REMITTITUR**

## INTRODUCTION

Amtrak's 27 page does little more than argue the very points it argued at trial, ignoring the substantial evidence supportive of Ms. Steele's damages that were decided by the jury.  There has been no miscarriage of justice in this case.  Rather, the verdict is likely low in the face of the overwhelming evidence of the damages and losses sustained by Ms. Steele as a result of Amtrak's actions.[1]  Regardless, none of the bases put forward by Amtrak for a new trial, for judgment as a

---

[1] Of course, disappointingly, no upward modification of the jury's verdict is allowed in our jurisprudence. *Dimick v. Schiedt*, 293 U.S. 474 (1935).

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL,
JUDGMENT AS A MATTER OF LAW, OR REMITTITUR - Page 1
Case No.: 3:19-cv-05553-BHS

**ROSSI VUCINOVICH P.C.**
1000 Second Avenue, Suite 1420
Seattle, Washington 98104
(425) 646-8003/ Fax (425) 646-8004

matter of law, or for remittitur have merit, and all should be denied.  The jury's verdict, supported

by strong evidence in support of Ms. Steele, should stand.

## I.      A NEW TRIAL IS UNWARRANTED ON ANY OF THE BASES OUTLINED BY AMTRAK

### A.      A Remote Trial Was Appropriate, Authorized by Rules and Circumstances, and Had Appropriate Safeguards

#### 1.      The Zoom Trial Was Authorized by Rules and the Pandemic Crisis

The Federal Rules of Civil Procedure and the situation posed by the COVID-19 pandemic

allowed for this Court to conduct a trial by the Zoom.gov platform as it elected to do.  Amtrak's

arguments to the contrary are baseless, and its motion for a new trial on this ground should be

denied.

Both Rules 77(b) and 43(a) permit the Court to convene a jury trial by contemporaneous

videoconferencing technology.  Fed. R. Civ. P. 77(b); 43(a); *see also, e.g., Liu v State Farm Mut.*

*Auto. Ins. Co.*, 507 F. Supp. 3d 1262, 1265 (W.D. Wash. 2020); *and Gould Elecs. Inc. v.*

*Livingston Cty. Rd. Comm'n*, 470 F. Supp. 3d 735, 738 (E.D. Mich. 2020).  Rule 77(b) provides

that "[e]very trial on the merits must be conducted in open court and, so far as convenient, in a

regular courtroom."  Fed. R. Civ. P. 77(b) (emphasis added).  This Rule specifically allows for

modification of the location of proceedings "in open court" outside the traditional courtroom.

Trials may be conducted in a non-traditional manner when "exigencies make traditional

procedures impracticable."  *Gould*, 470 F. Supp. 3d at 738.  Rule 43(a) provides that "[f]or good

cause in compelling circumstances and with appropriate safeguards, the court may permit

testimony in open court by contemporaneous transmission from a different location."  Fed. R.

Civ. P. 43(a).  Like Rule 77(b), Rule 43(a) affords flexibility when circumstances dictate

proceeding with testimony outside the regular courtroom.

**ROSSI VUCINOVICH P.C.**
1000 Second Avenue, Suite 1420
Seattle, Washington 98104
(425) 646-8003/ Fax (425) 646-8004

1   The Court enjoys broad discretion to determine whether good cause and compelling

2   circumstances exist under Rules 77(b) and 43(a) to conduct remote civil jury trials. *Thomas v.*

3   *Anderson*, 912 F.3d 971, 977 (7th Cir. 2018) ("[U]nder Rule 43(a), the judge has discretion to

4   allow live testimony by video for 'good cause in compelling circumstances and with appropriate

5   safeguards.'") *cert. denied* 140 S.Ct. 533 (2019); see also *Gould*, 470 F. Supp. 3d at 740

6   ("Determining whether good cause and compelling circumstances exist is a matter left to the

7   court's discretion."). "Moreover, a court's discretion is augmented by its 'wide latitude in

8   determining the manner in which evidence is to be presented' under the Federal Rules of

9   Evidence." *In re Alle*, Case #2:20-cv-11116-MCS, 2021 WL 3032712 at *4 (C.D. Cal. July 19,

10  2021), *citing Parkhurst v. Belt*, 567 F.3d 995, 1002 (8th Cir. 2009).  Compelling circumstances

11  need not, of course, even rise to the level of a global pandemic such as the one in which we find

12  ourselves today.  "The most persuasive showings of good cause and compelling circumstances

13  are likely to arise when a witness is unable to attend trial for unexpected reasons, such as accident

14  or illness, but remains able to testify from a different place." Fed. R. Civ. P. 43(a) advisory

15  committee's note to 1996 amendment.  In this pandemic, that is the situation that faced *all*

16  witnesses and *all* jurors—the unexpected risks of transmission of a dangerous virus in the

17  community and in the courtroom.

18  In support of its argument that a remote trial was unnecessary, Amtrak reached back in

19  time to cite General Order 10-21, dated June 30, 2021.  Amtrak argues that vaccinations had

20  increased and infection rates had fallen as of that date.  (Dkt. 99 at p. 4.)  However, that Order

21  was issued before the Delta variant (or Omicron variant) took hold, and was premised on the

22  then-declining number of infections.  Even so, it still included the following provision, flatly

23  ignored by Amtrak in its analysis: "Civil bench and jury trials may be conducted remotely over

24
PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL,
JUDGMENT AS A MATTER OF LAW, OR REMITTITUR - Page 3
25  Case No.: 3:19-cv-05553-BHS

ROSSI VUCINOVICH P.C.
1000 Second Avenue, Suite 1420
Seattle, Washington 98104
(425) 646-8003/ Fax (425) 646-8004

1   Zoom.gov if good cause is established for such a procedure on a case-by-case basis, at the

2   discretion of individual judges."  WDW Gen. Order 10-21.  And, of course, Amtrak even

3   concedes that "it may be appropriate" to hold remote trial proceedings (Dkt. 99 at p. 3).

4        Good cause and compelling circumstances in fact existed to conduct the jury trial

5   remotely through the Court's videoconferencing platform in this case at the time it was tried.

6   The global pandemic has killed more than 800,000 Americans and over 5,000,000 people

7   worldwide.  It is now clear that the optimism about the pandemic inching toward an end – as

8   reflected in the Court's June 20, 2021 General Order – was unwarranted.  This country and the

9   Western District of Washington are currently in the midst of a new wave of infections sparked

10  by the Delta and Omicron variants combined with the reopening of public spaces and in-person

11  activities.

12       This Court made specific findings in advance of the trial that "[t]he infection rate in the

13  Western District of Washington [from COVID-19], in particular southwest Washington from

14  which we draw our pool, is as high or nearly as high as it was at its peak.  And that was the basis

15  and continues to be the basis for [ ] Chief Judge Martinez's urging that we conduct jury trials

16  through the Zoom platform." (TT 11/16/21 at 7:19-24).[2]  Such infection rates have continued to

17  rise since this trial was completed.  On December 30, 2021, this Court again fully suspended in-

18  person trials for five weeks citing the ongoing public health crisis.  See, General Order 16-21

19  ("In the last month, the average daily number of individuals testing positive for COVID-19 has

20  increased exponentially in the Western District of Washington. COVID-19 hospitalizations have

21

22  _____
    [2] For ease of reference, trial transcript excerpts are attached to the Declaration of James K. Vucinovich in the order
23  they appear in this briefing.  The trial transcripts are docket numbers 89 (11/16/21), 90 (11/17/21), 91 (11/18/21),
    92 (11/19/21), and 93 (11/22/21).  Citations will be to the page and line in the trial transcript, as opposed to the
    declaration, throughout the brief.

24  PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL,          **ROSSI VUCINOVICH P.C.**
    JUDGMENT AS A MATTER OF LAW, OR REMITTITUR - Page 4               1000 Second Avenue, Suite 1420
                                                                       Seattle, Washington 98104
25  Case No.: 3:19-cv-05553-BHS                                        (425) 646-8003/ Fax (425) 646-8004

1   doubled in King County.  This surge was predicted by local public health officials and attributed

2   to the arrival of the Omicron variant.").  The Court made clear thereafter, on January 7, 2022,

3   that courts retain the discretion to proceed with virtual trials via the Zoom.gov platform in the

4   midst of this ongoing pandemic.  *See* WDW Gen. Order 01-22.

5        Indisputably, it was not an abuse of discretion to hold remote jury trials in November

6   2020.  Given the circumstances, it was likewise unquestionably not an abuse of discretion to hold

7   one in mid-November 2021.  In fact, given the situation recognized in General Orders 16-21 and

8   01-22, it is possible that the decision to resume *any* in-person trials may have been hasty.  The

9   pandemic has not ended, and life, and courtroom trials, cannot return to "normal" yet.  Amtrak

10  has not demonstrated how it was an abuse of discretion to hold a remote trial in light of this

11  public health crisis, and its motion for a new trial on this ground should be denied.

### 2.        Appropriate Safeguards Were in Place for the Zoom Trial

13       It is no doubt important that appropriate safeguards be present for Zoom trials such as

14  this one consistent with Rule 43, and that is precisely why the safeguards put in place by the

15  Western District of Washington for such trials are so important.  Those safeguards, followed

16  here, appropriately ensured the parties' rights were not prejudiced.

17       As the Western District of Washington has held before, "appropriate safeguards" as

18  denoted in Rule 43 are "(1) to ensure that the witness testimony may be tested by cross-

19  examination, and (2) to allow the trier of fact to observe the demeanor of the witness."  *Liu*, 507

20  F.Supp.3d at 1265 (citations omitted).   As Judge Rothstein went on to explain, live

21  videoconferenced testimony meets both goals:

22       Both purposes are satisfied with contemporaneous videoconferencing technology.
         First, there is no question that the parties in this case will be allowed to cross-
23       examine the witnesses.  And second, modern videoconferencing technology
         allows for near instantaneous transmission of testimony with no discernable

24  PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL,
    JUDGMENT AS A MATTER OF LAW, OR REMITTITUR - Page 5

25  Case No.: 3:19-cv-05553-BHS

difference between it and 'live' testimony, thereby allowing a juror to judge credibility unimpeded. *See In re RFC & ResCap Liquidating Trust Action*, 444 F.Supp.3d 967, 971 (D.Minn. 2020) ("Given the speed and clarity of modern videoconference technology, where good cause and compelling circumstances are shown, such testimony satisfies the goals of live, in-person testimony and avoids the short-comings of deposition testimony." (internal marks omitted)); *Aoki v. Gilbert*, No. 2:11-cv-02797, 2019 WL 1243719, at *1 (E.D. Cal. Mar. 18, 2019) (finding that appropriate safeguards existed to allow witnesses to appear by videoconference because the witnesses "will testify under oath, and will be subject to cross-examination"); *Warner v. Cate*, No. 1:12-cv-1146-LJO-MJS, 2015 WL 4645019, at *1 (E.D. Cal. Aug 4, 2015) ("Because a witness testifying by video is observed directly with little, if any delay in transmission . . . courts have found that video testimony can sufficiently enable cross-examination and credibility determinations, as well as preserve the overall integrity of the proceedings."); *In re Vioxx Prods. Litig.*, 439 F.Supp.2d 640, 644 (E.D. La. 2006) (contemporaneous transmission of video testimony through current technology permits "the jury to see the live witness along with his hesitation, his doubts, his variations of language, his confidence or precipitancy, his calmness or consideration, and, thus satisfies the goals of live, in-person testimony[.]" (internal citation and marks omitted)); *F.T.C. v. Swedish Match North America, Inc.*, 197 F.R.D. 1, 2 (D.D.C. 2000) (noting that "there is no practical difference between live testimony and contemporaneous video transmission"); *Gould*, 470 F.Supp.3d at 738 (same).

*Id.* at 1265-66.

As this Court is also well aware, the Western District of Washington went to great lengths to provide adequate safeguards so that the parties to a remote jury trial receive a fair trial. *Goldstine v. FedEx Freight Inc.*, No. C18-1164 MJP, 2021 WL 952354, at *11 (W.D. Wash. Mar. 11, 2021). The Court convened a committee to study the potential of using the Zoom.Gov platform to conduct remote civil jury trials during the COVID-19 pandemic. *Id.* The Court's Committee studied the practical and technical safeguards that could be put in place to provide a fair proceeding to litigants. *Id.* The Committee also worked to ensure that jurors who lacked access to technology, training, or the internet could participate. *Id.* After gathering data and conducting a mock remote civil jury trial, the Committee issued a detailed set of procedures for both Court staff and participating attorneys to follow. *Id.* The remote jury trial process implemented in this District works effectively

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL, JUDGMENT AS A MATTER OF LAW, OR REMITTITUR - Page 6
Case No.: 3:19-cv-05553-BHS

ROSSI VUCINOVICH P.C.
1000 Second Avenue, Suite 1420
Seattle, Washington 98104
(425) 646-8003/ Fax (425) 646-8004

to reproduce the core components of a civil trial.  The Zoom.Gov platform permits the instantaneous transmission of live video testimony to all parties and jurors.  *Id.*  It allows the parties to pose questions to witnesses and interpose objections. It also allows the Court to make rulings on objections, hold side bars, and excuse the jury to deliberate in a "virtual" jury room where jurors can each view admitted exhibits on their own device.  *Id.*  Jurors and the Court are able to assess witness demeanor and credibility in virtually the same way as happens in open court—by looking directly into the faces of the witnesses—with the added benefit of seeing those faces head-on.  *Id.*

Amtrak offers no cogent argument as to how it was *actually* prejudiced in any way by the Zoom trial.  That a juror may have looked away momentarily is no different than jurors briefly looking away during a trial in the courtroom.  Certainly, Amtrak has not said and cannot say that the jurors were not attentive on the whole throughout the trial, as they clearly were.  Other challenges, namely just bare concerns lacking evidentiary support, that the jury *could have* ignored the instructions of this Court in speaking with others must be rejected as well, as "[j]urors are presumed to follow the court's instructions." *Cheney v. Washington*, 614 F.3d 987, 997 (9th Cir. 2010).  Amtrak can show no witness improprieties either, and in fact the one time they asked a witness about remaining excluded from the proceedings, they found out that she had obeyed the Court's directives on the issue.  (TT 11/18/21 at 52:23-53:2 (Nancy Steele indicating she had not attended the trial previous to her testimony)).

The fact of the claim being of significant value is also of no particular import to the argument about the platform being appropriate.  Value standing alone has no unique power to change the processes utilized by the Court.  Further, the "critical information" that the jury had to digest, (Dkt.99 at p. 11), was almost entirely from Plaintiff's witnesses.  Amtrak put on but one witness, to discuss a 12-minute-long surveillance video.  Amtrak's arguments were, essentially, that Ms. Steele was doing well and had substantially recovered, certainly not concepts that were difficult for the jury to grasp.

**ROSSI VUCINOVICH P.C.**
1000 Second Avenue, Suite 1420
Seattle, Washington 98104
(425) 646-8003/ Fax (425) 646-8004

And finally, a Zoom trial solely on damages such as this one has far less complex issues to consider than one involving difficult issues of liability and causation.  As a result, Amtrak's motion on these grounds should be denied.

### B.      The Zoom Trial Did Not Violate Amtrak's Constitutional Rights

Amtrak argues next that it was denied a jury trial under the Seventh Amendment and due process of law.  Because Amtrak had a jury trial as the Seventh Amendment requires and because the procedures adequately protected Amtrak's and Ms. Steele's interests and allowed for a fair trial for all parties, Amtrak's motion on this ground should also be denied.

The Seventh Amendment to the United States Constitution holds that "the right of trial by jury shall be preserved."  U.S. Const. amend. VII.  This means, of course, that a jury, and not just a judge, must be allowed to decide liability of the litigants to certain actions, including the present action.  Amtrak cites no authority for the proposition that a virtual trial with a jury is not a jury trial under the Seventh Amendment, and its citation to *Curtis v. Loether*, 415 U.S. 189, 194-95 (1974), which dealt with the applicability of the Seventh Amendment to a certain statutory damage claim, is inapposite.  Simply put, there is no case law of which Ms. Steele is aware that challenges Zoom trials as not being jury trials under the Seventh Amendment.

As it relates to due process concerns of Amtrak, these are little more than reiterations of its concerns about sufficient safeguards in the process discussed at length above.  Namely, Amtrak complains again about confronting witnesses, though it is clear that Amtrak had and took full advantage of its ability to cross-examine witnesses, even taking hours longer in its cross-examination than Ms. Steele's attorneys did in direct examination of the witnesses.  Witnesses all appeared by live video feed, and credibility, as discussed above, could be determined fairly by the jury.  The jury appropriately and fairly weighed the consistent testimony of witnesses from

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL, JUDGMENT AS A MATTER OF LAW, OR REMITTITUR - Page 8
Case No.: 3:19-cv-05553-BHS

**ROSSI VUCINOVICH P.C.**
1000 Second Avenue, Suite 1420
Seattle, Washington 98104
(425) 646-8003/ Fax (425) 646-8004

all walks of Ms. Steele's life indicating the severity and permanence of her impairments as a result of the traumatic brain injury she suffered in the train wreck for which Amtrak was liable.

For these reasons as well, Amtrak's motion for a new trial should be denied.

### C. Medical Records Were Appropriately Not Admitted Into Evidence, and Amtrak Suffered No Substantial Prejudice From That Decision

The proper non-admission of medical records *as documentary evidence* neither hindered Amtrak in freely questioning witnesses at length about such records and thereby introducing the substance of such records to the jury nor in arguing its points, limited as they were, about Ms. Steele's halting recovery as reflected in such records.[3]  Arguments about purported prejudice from the lack of admission of the thousands of pages of medical records is both insincere and absurd.

#### 1. Medical Records Generally Were Utilized Extensively by Amtrak

Ms. Steele made a motion *in limine* to exclude, *as admitted documentary evidence*, the voluminous medical records.  They contained an abundance of irrelevant and confusing information (including medical terminology and abbreviations not at issue in the case).  The Court reserved ruling on that issue, noting that generally testimony from Ms. Steele and the treating providers about symptoms would be how information on medical records came in, subject to impeachment as appropriate.[4]  *See* Plaintiff's Motions *in Limine* (Dkt. 33 at pp. 4-7); Transcript of Orders on Motions *in Limine* (September 27, 2021 at 6:20-7:4, attached to Delaration of James K. Vucinovich ("Vucinovich Decl.") at ¶5 and Ex. 3).  At trial, Amtrak was given broad leeway to discuss various aspects of the medical records with witnesses, including

---

[3] That Amtrak elected to primarily utilize cross-examination time to address meetings between counsel and witnesses instead of addressing substantive issues reflects Amtrak's freedom to formulate its defense as it chose to.
[4] One medical record, an examination of Ms. Steele's eyes by a neuro-ophthalmologist, was nonetheless admitted by stipulation of the parties.

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL,
JUDGMENT AS A MATTER OF LAW, OR REMITTITUR - Page 9
Case No.: 3:19-cv-05553-BHS

**ROSSI VUCINOVICH P.C.**
1000 Second Avenue, Suite 1420
Seattle, Washington 98104
(425) 646-8003/ Fax (425) 646-8004

1   records of other treaters (e.g., discussing Dr. Carson's records with several witnesses).  In fact,

2   Amtrak published portions of medical records to the jury repeatedly during the trial prior to the

3   offer or admission of any such records.  The first time it did so, Amtrak improperly published

4   information that had been excluded by the Court about disability insurance.  (*See* TT 11/17/21 at

5   164:22-173:9).  In response, and rather than have thousands of pages of such records placed

6   before the jury, the Court excluded the records as documentary evidence, and held, "You can

7   bring up medical records and ask witnesses about them, but they don't need to go into evidence.

8   . . . I don't want to see another mistake like the one that just occurred."  (TT 11/17/21 at 173:3-

9   9).  Amtrak did not hesitate to bring up the medical records throughout the testimony thereafter,

10  discussing them with various witnesses and picking and choosing everything it wished to bring

11  before the jury.

12      The gravamen of Amtrak's argument on this point is that the jury "merely" *heard* the

13  evidence that Amtrak believes to be favorable to its case, as opposed to having the documents

14  themselves on hand to peruse in the jury room.  (Dkt. 99 at p. 16 ("No one could seriously

15  contend that transitory cross-examination had the same impact as records the jury could review

16  during deliberations").  On the contrary, it is hard to imagine anyone seriously contending that

17  this Court should set aside the jury's verdict because certain cumulative evidence was not

18  admitted (documents stating what was already in evidence through testimony), or that evidence

19  was not admitted in the *format* one party preferred.

20      District courts may exclude relevant evidence whose "probative value is substantially

21  outweighed by a danger of ... needlessly presenting cumulative evidence." Fed.R.Evid. 403.

22  "Cumulative evidence replicates other admitted evidence."  *United States v. Ives*, 609 F.2d 930,

23  933 (9th Cir.1979).  Also, even assuming *arguendo* that exclusion of the actual documents as

24  PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL,
    JUDGMENT AS A MATTER OF LAW, OR REMITTITUR - Page 10

    **ROSSI VUCINOVICH P.C.**
    1000 Second Avenue, Suite 1420
    Seattle, Washington 98104
    (425) 646-8003/ Fax (425) 646-8004

25  Case No.: 3:19-cv-05553-BHS

1  evidence was erroneous, an erroneous evidentiary ruling may serve as a basis for a new trial

2  only if it "substantially prejudiced" a party. *See Ruvalcaba v. City of Los Angeles*, 64 F.3d

3  1323, 1328 (9th Cir. 1995). In other words, Amtrak must demonstrate that "more probably than

4  not," the evidentiary error "tainted the verdict." *Harper v. City of Los Angeles*, 533 F.3d 1010,

5  1030 (9th Cir. 2008). It has not.

6      The Court admitted evidence in the case that Ms. Steele attended over 300 medical

7  appointments in connection with her injuries from the train wreck, as it came into evidence as a

8  list of such appointments to which Amtrak ultimately did not object. Vucinovich Decl. at ¶7 and

9  Ex. 5 thereto (Plaintiff's Trial Exhibit 19). The summary of appointments constituting trial Exhibit

10 19 was admitted under Federal Rule of Evidence 1006, which provides that a summary chart may

11 be used "to prove the content of voluminous writings . . . that cannot be conveniently examined

12 in court." FRE 1006. "The admission of summaries of voluminous books, records, or documents

13 offers the only practicable means of making their contents available to judge and jury." Fed. R.

14 Evid. 1006, Advisory Committee's note. As argued when we raised this Exhibit's admissibility,

15 the summary pulled from "thousands of pages of information" to present the information therein,

16 noting "the dates, facility, [and] doctor" from Ms. Steele's medical visits. (TT at 11/18/21 at 4-

17 5). Amtrak now argues that it somehow was precluded from having the opportunity to discuss

18 "the nature of these appointments, including admissible statements from her and her providers,

19 as well as direct evidence of her recovery," (Dkt. 99 at p. 12), but Amtrak was not denied that

20 opportunity *at all*. In fact, it was Amtrak that insisted on removing descriptive information about

21 the 300+ appointments from the Rule 1006 summary of appointments. (TT at 11/18/21 at 5).

22 They nonetheless could have discussed the content of each of those appointments with

23 Dr. Chesnutt, with Ms. Steele, or with other providers with requisite knowledge, and *actually did*

24

**ROSSI VUCINOVICH P.C.**
1000 Second Avenue, Suite 1420
Seattle, Washington 98104
(425) 646-8003/ Fax (425) 646-8004

25

1   *so* to some degree; the trial record is replete with questioning by Amtrak about contents of chart

2   notes from various visits.  To the extent they did not do so, they *elected* not to extensively do so,

3   and cannot now be heard to argue that their own failure to do more somehow prejudiced them.

4   For instance, Ms. Steele was asked by Amtrak repeatedly about records of visits with Dr.

5   Chesnutt, and Amtrak published chart notes from Dr. Chesnutt containing correspondence from

6   Ms. Steele despite their lack of admission into evidence.  (TT 11/18/21 at 130:12-131:24; 131:25-

7   132:8).  She was asked about Dr. Chesnutt providing approval for her to drive on February 13,

8   2020.  (TT 11/18/21 at 132:16-22).  And she was asked about going on trips that she'd discussed

9   with Dr. Chesnutt.  (TT 11/18/21 at 133:5-24).  Ms. Steele was additionally asked about notes

10  from Dr. Carson from September 22, 2021 about being coached about handling difficult

11  questions in front of the jury, despite restriction of that category of evidence pre-trial.  (TT

12  11/18/21 at 93:3-97:23; *see also* 11/19/21 at 6:24-13:3 (discussion of the issue at length in context

13  of remainder of note)).

14  Amtrak asked Dr. Brown about the emergency room record and the diagnosis of a

15  concussion at that time.  (TT 11/17/21 at 65:7-11).  And they inquired with Dr. Brown about

16  chart notes that indicated Ms. Steele should focus on "tangible goals."  (TT 11/17/21 at 84:6-17).

17  Amtrak rather extensively questioned Dr. Chesnutt about medical records as well, though

18  they did not limit it to the "couple of pages" mentioned early in their cross-examination.  (TT

19  11/17/21 at 153:24-25).  Initially, two pages of chart notes were allowed to be published to the

20  jury despite an objection.[5]  (TT 11/17/21 at 154-155).  Those records concerned Ms. Steele's trip

21  to Hawaii and activities she planned to engage in there.  (TT 11/17/21 at 155-157).  Amtrak also

22

23  [5] Of course, this is the record published to the jury that improperly included information about a disability insurance inquiry that had specifically been excluded *in limine* by the Court, leading to medical records not going into evidence.  (*See* TT 11/17/21 at 164:22-167:4; 172:15-173:9).

24  PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL,
    JUDGMENT AS A MATTER OF LAW, OR REMITTITUR - Page 12

    ROSSI VUCINOVICH P.C.
    1000 Second Avenue, Suite 1420
    Seattle, Washington 98104
    (425) 646-8003/ Fax (425) 646-8004

25  Case No.: 3:19-cv-05553-BHS

1  read extensively from an April 14, 2019 record from Ms. Steele thereafter (TT 11/17/21 at

2  157:13-158:7).   Several references were made to SCAT tests performed by Dr. Chesnutt on

3  Ms. Steele over the years.  (e.g., TT 11/17/21 at 159:10-160:21; 173:15-174:22).  Dr. Chesnutt

4  was further asked about a visit in which Ms. Steele had some "random questions" (as noted in

5  the chart) and discussed hand cramps and baking in the Sarah Bellum volunteer bakery for brain-

6  injured persons, fishing, her graduation from Antioch, her exercise, dancing, and yoga.  (TT

7  11/17/21 at 175:8-181:1).  Thereafter, just as it did with Dr. Brown, Amtrak asked Dr. Chesnutt

8  about notes from the visits of Ms. Steele to the emergency room on the day of the train wreck

9  and to urgent care the day following the train wreck (TT 11/17/21 at 195:14-197:19), along with

10  medical visits of September 8, 2018 (204:2-205:11), November 15, 2018 (TT 11/17/21 at 203:18-

11  25), February 1, 2019 (TT 11/17/21 at 185:9-186:23; 207:10-208:3), October 15, 2019 (TT

12  11/17/21 at 210:24-212:24 (a note from Dr. Carson)), December 5, 2019 (TT 11/17/21 at 206:9-

13  23), October 15, 2020 (TT 11/17/21 at 213:1-24), June 24, 2021 (TT 11/17/21 at 181:2-182:12),

14  June 28, 2021 (TT 11/18/21 at 161:6-163:7), and July 29, 2021 (TT 11/17/21 at 182:13-185:6).

15       They also discussed Ms. Steele's improvements over time with Dr. Chesnutt at some

16  length, as to her post-concussion symptoms, frequency of headaches, ability to be exposed to

17  light, ability to participate in school, increased energy and stamina, increased ability to exercise,

18  speech improvements, neck improvement, and her participation in yoga, running, kayaking,

19  biking, lunges, planking, shooting a basketball, and playing the piano.  (TT 11/17/21 at 197:20-

20  201:20).  They even got him to *erroneously* agree that she had noted she'd run 6 miles by *not*

21  showing him the pertinent medical record and asking him to blindly comment on it, when the

22  medical record they *specifically* cite for that assertion and that they indicate prejudice for its lack

23  of admission states only, "Had vasovagal sys when running, walking more, mostly getting 10K."

24

25

(A-90 at 9074, Ex. L to Yates Decl. (Dkt. 100).).[6]   Amtrak even discussed the change in Ms. Steele's birth control with Dr. Chesnutt.  (TT 11/17/21 at 198:2-18).  They discussed brain imaging studies in the charts.  (TT 11/17/21 at 201:21-203:3).  And Amtrak discussed records of her not posing a "fall risk."  (TT 11/17/21 at 208:4-210:17 (referencing a January 23, 2018 record)).

Amtrak even asked Nancy Steele, Ms. Steele's mother, about a comment *she* had made to Dr. Chesnutt noted on the December 5, 2019 chart about Ms. Steele's humor returning.  (TT 11/18/21 at 52:7-15).

Dr. Carson was asked by Amtrak about neurocognitive testing in the records (without a specific record being identified).  (TT 11/19/21 at 213:10-14).  Additionally, Amtrak asked him about his chart notes from visits on November 2, 2020, (TT 11/19/21 at 217:15-20), April 19, 2021, (TT 11/19/21 at 218:1-5), June 28, 2021, (TT 11/19/21 at 218:20-24), April 22, 2020, (TT 11/19/21 at 219:1-6), and February 24, 2021, (TT 11/19/21 at 220:21-223:9).

Evidence includes, of course, the sworn testimony of witnesses.  *See* Jury Instruction No. 4.  Such testimony, which constituted the brunt of the evidence in this case, is due no less weight than any document.  The fact that Amtrak freely questioned witnesses about whatever medical records it wanted to means that any prejudice from failing to admit the cumulative records themselves to the jury room is minimal, if not entirely nonexistent.  Certainly, given the extent of questioning of witnesses concerning the medical records, Amtrak cannot prove any sort of substantial prejudice from the lack of additional admission of such records.

---

[6] And that assertion about running six miles was *directly* contradicted by Ms. Steele's testimony wherein she stated:  "I have been attempting running.  I haven't really successfully been running since the crash. . . . I haven't ever walked six miles in a row.  Perhaps throughout the course of twelve hours, an entire day, I might have reached six miles.  That would probably be one of my highest step counts, if you will."  (TT 11/18/21 at 134:4-5; 13-16).

ROSSI VUCINOVICH P.C.
1000 Second Avenue, Suite 1420
Seattle, Washington 98104
(425) 646-8003/ Fax (425) 646-8004

1

## 2.      The ER and Urgent Care Records Are No Different

2      Just as with the other medical records, Amtrak had the opportunity to freely question

3  witnesses as it chose to about the ER and Urgent Care records, and it did so to some degree as

4  noted above.  Put simply, Amtrak was *not* denied the opportunity to question witnesses about the

5  DSM-V diagnostic criteria for neurocognitive disorder or whether Ms. Steele met the diagnostic

6  criteria in the context of the ER and Urgent Care records from the days immediately following

7  the train wreck.  Quite to the contrary, Amtrak extensively questioned Dr. Chesnutt on the DSM-

8  V criteria for neurocognitive disorder (though he notably disagreed with counsel's interpretation

9  of the word "immediate" therein) in the context of those very records, and asked additional

10  questions to Dr. Brown about the records.  Notably, neither the DSM-V itself, nor any portion

11  thereof, was ever offered as an exhibit (even illustratively), and the only way it got into evidence

12  at the trial was through such questioning of the treating medical witnesses.  But Amtrak was

13  nonetheless able to argue its point through such testimony, and argued it again in closing.  (TT

14  11/22/21 at 81:10-23 (arguing that Dr. Chesnutt disagreed with the DSM-V diagnosis for mild

15  neurocognitive disorder)).[7]

16      The issue of the DSM-V diagnosis is immaterial in any event.  The diagnostic label

17  provided to the impairments suffered by Ms. Steele as a result of the train wreck was irrelevant

18  since Ms. Steele had suffered a mild traumatic brain injury in the incident and all medical

19  witnesses attributed her ongoing and permanent conditions, impairments, and limitations to that

20  injury sustained in the train wreck for which Amtrak is liable.  The witnesses extensively

21  discussed of the impacts of the impairments on her daily life now and into the future, and were

22

23  [7] It also must be noted that Amtrak did not seek to specifically offer the ER and Urgent Care visit records until its own case, when no witnesses were left to discuss the records.  (TT 11/22/21 at 43:22-44:4).  As a result, there was no more substantive testimonial evidence about those records to be had at that point even had they been admitted.

24  PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL,       **ROSSI VUCINOVICH P.C.**
    JUDGMENT AS A MATTER OF LAW, OR REMITTITUR - Page 15                      1000 Second Avenue, Suite 1420
                                                                              Seattle, Washington 98104
25  Case No.: 3:19-cv-05553-BHS                                           (425) 646-8003/ Fax (425) 646-8004

consistent among one another as to those impairments and limitations.  The ER and Urgent Care records, just like the other medical records, did not and could not substantially alter that overwhelming testimony, particularly since they preceded the diagnosis of a traumatic brain injury, and thus Amtrak could not have been substantially prejudiced by the exclusion of those records as documentary evidence.  Additionally, *not one person* testified that the DSM-V diagnostic measures were not met for Ms. Steele as to her traumatic brain injury or her post-concussive syndrome.[8]

As with all medical records, Amtrak had free reign to ask about those ER and Urgent Care records as much as it wanted to throughout the course of the trial, and yet has *not even a scintilla of evidence* to support its claim that somehow Ms. Steele did not present with the symptoms described by all of the witnesses.  As with the rest of the medical records, Amtrak was not substantially prejudiced, and the motion on this ground should be denied.

### D.   The Great Weight of the Evidence Supported the Jury's Verdict, and No New Trial Should be Granted

Perhaps the weakest part of Amtrak's briefing is its head-in-the-sand suggestion that the evidence somehow did not support the verdict, requiring a new trial.  The great weight of the evidence supported a verdict well in excess of that arrived at by the jury, and Amtrak's argument in this regard is little more than fanciful thinking about how they wish the trial had gone.  While the recitation of evidence from other sections of this briefing will not be reiterated in this section

---

[8] Amtrak did not even bother to ask the two providers who use the DSM-V, Dr. Brown and Dr. Carson, about whether the diagnosis Amtrak complains about (mild neurocognitive disorder) was properly made as to Ms. Steele. They asked such questions only of Dr. Chesnutt.  They focused extensively on DSM-V diagnostic criteria for PTSD with both Dr. Brown and Dr. Carson, however.  (TT 11/17/21 at 69:9-72:19 (Dr. Brown); 11/19/21 at 211:11-215:10 and 216:11-217:12 (Dr. Carson)).  This is true even though Dr. Brown diagnosed a traumatic brain injury (TT 11/17/21 at 38:6-23) and Dr. Carson diagnosed post-concussive syndrome under ICD criteria (TT 11/19/21 at 198:21-199:3), each confirming those were the result of the train wreck (TT 11/17/21 at 35:24-36:1; 11/19/21 at 199:17-21.  Dr. Carson even went into some detail as to his diagnosis of post-concussive syndrome. (TT 11/19/21 at 203:22-204:18).

ROSSI VUCINOVICH P.C.
1000 Second Avenue, Suite 1420
Seattle, Washington 98104
(425) 646-8003/ Fax (425) 646-8004

1    for efficiency, Ms. Steele adopts and incorporates all such references in full in addition to further

2    citations below in response to this section of the Motion.

3           The Ninth Circuit holds that where the Court considers a motion for a new trial based on

4    insufficiency of the evidence, "a stringent standard applies." *Venegas v. Wagner*, 831 F.2d 1514,

5    1519 (9th Cir.1987); *Digidyne Corp. v. Data General Corp*., 734 F.2d 1336, 1347 (9th Cir.1984),

6    *cert. denied*, 473 U.S. 908, 105 S.Ct. 3534, 87 L.Ed.2d 696 (1985).  A motion for a new trial may

7    be granted on this ground only if the verdict is against the "great weight" of the evidence or "it

8    is quite clear that the jury has reached a seriously erroneous result." *Id.*  Thus, "a decent respect

9    for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly

10   suggests that in most cases the judge should accept the findings of the jury, regardless of his own

11   doubts in the matter." *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th

12   Cir.1987) (quoting 11  C.  WRIGHT  &  A.  MILLER,  FEDERAL  PRACTICE  AND

13   PROCEDURE: CIVIL § 2806, at 49 (1973)).  Here, of course, little doubt can even be raised

14   about the jury properly reaching a verdict based upon the evidence presented.

15          Amtrak's argument in its motion is the same as it made to the jury, namely that Ms. Steele

16   has participated in some activities, traveled, completed her Master's degree, and has been

17   encouraged to work by treaters.  The jury heard all of that information, of course, but they also

18   heard that Ms. Steele is not the same person she was prior to the train wreck, that she has

19   significant impairments and restrictions in her ability to perform work (*see* Section II.B.1.

20   below), and that her conditions are permanent.  It is important to cite additional testimony that

21   isn't highlighted in other sections of this briefing, since it shows Amtrak's statement in this

22   section of its briefing that Ms. Steele "recovered" from what "[a]t most [was] a mild TBI" (Dkt

23   99 at p. 18) to be a gross mischaracterization, if not a violation of Amtrak's duty of candor to this

24

25

Court.  The evidence at trial decidedly established that Ms. Steele had *not* recovered from her injuries in the train wreck.

As an example, Kirin Casteel, a friend for over a decade of Ms. Steele's life, described her before and after the train wreck, through to today:

> [Prior to the train wreck, Ms. Steele] was probably one of the funniest, loudest, most energetic people I have ever known.  Very magnetic personality.  She was friends with everybody.  She was a social butterfly. . . . I couldn't keep up.  She is very gregarious and animated, like facial expression and body, humor, very free-spirited.

(TT 11/17/21 at 9:5-12).

> [Following the train wreck,] [s]he is – it doesn't feel good saying, but she is totally different.  Her entire essence is different and personality is really polar opposite.  And it's really sad.  She is very quiet and subdued and slow at speaking and moving, and we have to be very cognizant of how she is to exert energy that day.  She is very lethargic and fatigued all the time, even now years later.  Very measured in how she speaks.  It is quite kind of like you are waiting for her to process what she is saying and get it out.

> And I just feel like that is a stark contrast.  It wouldn't be as stark if she wasn't so loud and energetic as before.  It is totally different.

(TT 11/17/21 at 12:20-13:6).

> She has a very flat affect now, which again wouldn't be so stark if she wasn't so animated before.  She had really expressive facial expressions before and spoke with her body and gestures, but now it is very robotic maybe and not a lot of emotion in her facial expression or tone.

> She used to speak with so much inflection in like her voice and excitement that kind of would match, but now it is very monotone.

(TT 11/17/21 at 13:14-22).

> She is probably pretty depressed and very anxious about certain things, too.  I mean, she has opened up a couple of times, just kind of breaking down at how her entire life trajectory and plans have had to change because of this.  I think she is justified at feeling a bit lost and depressed looking towards her future, because it is so uncertain.  She is asking what's the point a few times because you kind of sink into that depressive state sometimes, and a lot more anxious than she ever was before.

(TT 11/17/21 at 14:2-11).

ROSSI VUCINOVICH P.C.
1000 Second Avenue, Suite 1420
Seattle, Washington 98104
(425) 646-8003/ Fax (425) 646-8004

1    Dr. Brown, Ms. Steele's psychologist immediately following the train wreck, testified

2    that Ms. Steele suffers from post-traumatic stress disorder ("PTSD") as a result of the train wreck.

3    (TT 11/17/21 35:22-36:1).  And Dr. Brown diagnosed her with a traumatic brain injury as well,

4    indicating that she observed Ms. Steele's presentation "with extreme exhaustion[,]" "not

5    processing information well[,]" "frequently los[ing] her train of thought or kind of zon[ing] off

6    into space within just a few minutes of trying to do anything difficult cognitively[,]" difficulty

7    "with word finding, keeping her attention on any particular topic[,]" and "a very flat affect, which

8    is commonly seen in TBI patients, as well as mood instability and personality changes."  (TT

9    11/17/21 39:8-16).  And while Amtrak continues, as it did at trial, to focus on the fact that Ms.

10   Steele took trips and even got on airplanes to do so at times, Dr. Brown indicated that they "would

11   work on that for weeks" prior to Ms. Steele being able to do so, describing in some detail the

12   efforts undertaken before Ms. Steele could engage in that activity.  (TT 11/17/21 at 43:10-24).

13   She also noted that emotionally Ms. Steele has been impacted greatly.  "Emotionally before the

14   train wreck all reports are that she was happy, and after the train wreck she is deeply sad and very

15   scared.  Really her whole emotional picture is completely different, her ability to interact with

16   people is different, her sense of self about herself is completely different.  She really has a very

17   different internal world than before the train wreck."  (TT 11/17/21 at 48:19-25).  She noted

18   limitations of "persistent anxiety" and "extreme fatigue[,]" both of which mimicked testimony

19   of others in the trial, and noted that they were permanent in nature.  (TT 11/17/21 at 49:13-23).

20   Dr. Carson, Ms. Steele's more recent clinical psychologist, gave similar independent

21   diagnoses, of post-concussive syndrome and PTSD, both as a result of the train wreck.  (TT

22   11/19/21 at 198:21-199:21).  He also took affront to Amtrak's mischaracterization of his notes

23   as reflecting in any way that Ms. Steele was not impaired or that she didn't have post-concussive

24   PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL,
     JUDGMENT AS A MATTER OF LAW, OR REMITTITUR - Page 19

25   Case No.: 3:19-cv-05553-BHS

ROSSI VUCINOVICH P.C.
1000 Second Avenue, Suite 1420
Seattle, Washington 98104
(425) 646-8003/ Fax (425) 646-8004

1  syndrome or PTSD, responding that "it would be unfair to characterize her that way.  I think she

2  has serious impairments that will be with her the rest of her life."  (TT 11/19/21 at 209:8-14, 20-

3  22).  He noted that

> 4  [Ms. Steele] has been quite disabled in being able to resume functioning in the
>    ways that she was before, either being able – being capable of doing the kind of
> 5  work she had prepared herself to do, to be able to sustain social activities in the
>    way that she did.  She hasn't been able to – her cognitive function  has not been
> 6  the same, her emotional functioning, her physical functioning.  She had to, you
>    know, learn to drive again.  You know, that wasn't easy.  Nothing has been easy
> 7  for her.
>
> 8  And this is not going to go away.  She has permanently-altered abilities that will
>    not – she will never be the person that she was before this train wreck.  So this is
> 9  tough for her.  But she is very intent on doing her best with what capabilities she
>    has and what possibilities she has.

10  (TT 11/19/21 at 208:1-20).

11      Amtrak makes much of Ms. Steele's completion of her academic degree after the incident,

12  but completely ignores the testimony as to the rather extraordinary accommodations required to

13  allow her to do so.  Prior to the train wreck, the director of her Master's program at Antioch

14  University, Susan Byers, indicated that "Kylie was a highly engaging student, engaging with her

15  cohort members.  She was very involved in discussions in the class, contributing greatly in the

16  classroom.  She was very lighthearted. . . .  She was a strong student with strong writing and oral

17  presentation skills, as well, and a critical thinker."  (TT 11/18/21 at 142:17-143:7).  After the

18  train wreck, Ms. Byers testified "Kylie's speech patterns were slower.  She was very sensitive to

19  light.  So she would have to wear dark glasses.  She was – often appeared a little sad, and often

20  her speech patterns were measured. . . . [Ms. Byers observed Kylie appearing fatigued, and] Kylie

21  would even express to me when she felt fatigued and she could not continue."  (TT 11/18/21 at

22  147:20-148:4).

23

24  PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL,
    JUDGMENT AS A MATTER OF LAW, OR REMITTITUR - Page 20
25  Case No.: 3:19-cv-05553-BHS

ROSSI VUCINOVICH P.C.
1000 Second Avenue, Suite 1420
Seattle, Washington 98104
(425) 646-8003/ Fax (425) 646-8004

1    The accommodations the school made for Ms. Steele as a result of her injuries were

2  *extensive* (for instance, less coursework (2 classes instead of 5), scanned readings onto audio so

3  she could absorb the material, a break area for her to take during classes as needed, modification

4  of course requirements and timing of assignments, being able to leave class as necessary,

5  extending the program until she could complete it, and cohort support).  (TT 11/18/21 at 144:11-

6  145:18; 179:11-17).  Thankfully, they allowed her to complete the program, and even to succeed

7  in doing so.  (TT 11/18/21 at 148:10-16).  Ms. Byers testified that without the accommodations,

8  Ms. Steele "would not have been able to complete" the program as originally structured.

9  Interestingly, while Amtrak notes that Ms. Byers characterized Ms. Steele pre-injury as "[h]ighly

10  intelligent," (TT 11/18/21 at 143:8-9), when asked if she had any reason to doubt Ms. Steele's

11  intelligence, she indicated "I would say I had reason sometimes to doubt that she understood

12  what was needed or recalled what was needed, or what the expectations were, and tried to

13  accommodate her by repeating – meeting with her again" in reference to accommodations post-

14  injury.  (TT 11/18/21 at 179:23-180:6).  Further, though her evaluations were positive, all were

15  in the context of the accommodations granted to Ms. Steele.  (TT 11/18/21 at 179:18-22).

16    Ms. Steele herself, of course, compellingly described her disabilities that resulted from

17  the train wreck as discussed above, including her headaches and cognitive and physical fatigue

18  that she deals with constantly.

19    As noted elsewhere in this briefing, there was not *a single witness* who doubted

20  Ms. Steele's symptomology from the train wreck, or the limitations such symptomology imposed

21  on her daily living and her life.  Amtrak cites not to any such evidence, but to the few activities

22  Ms. Steele has been able to resume, in part, *despite* such limitations.  That myopic view of the

23  evidence must be rejected, as the great weight of the evidence supported an even more substantial

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL,
JUDGMENT AS A MATTER OF LAW, OR REMITTITUR - Page 21
Case No.: 3:19-cv-05553-BHS

**ROSSI VUCINOVICH P.C.**
1000 Second Avenue, Suite 1420
Seattle, Washington 98104
(425) 646-8003/ Fax (425) 646-8004

1    verdict for the permanent loss of Ms. Steele's life as she knew it prior to the train wreck.

2    Amtrak's motion on this basis must also, therefore, be denied.

3    **II.    AMTRAK'S FAULTY MOTION FOR JUDGMENT AS A MATTER OF LAW
         SHOULD BE DENIED, AS THE EVIDENCE OVERWHELMINGLY SUPPORTS
4        THE JURY'S VERDICT IN THIS CASE AS TO FUTURE MEDICATIONS AND
         ECONOMIC LOSSES**

5         Amtrak's motion for judgment as a matter of law must be rejected outright both for

6    medications and for future economic losses.  The evidence Ms. Steele adduced at trial more than

7    adequately sufficed to support both elements of her damage claim.

8         "In entertaining a motion for judgment as a matter of law, the court . . . may not make

9    credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*,

10   530 U.S. 133, 150, (2000).  All evidence must be viewed in the light most favorable to Ms. Steele,

11   the nonmoving party, and the court must draw all reasonable inferences in her favor.  *E.E.O.C.*

12   *v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009).  A jury verdict "must be upheld

13   if it is supported by substantial evidence . . . even if it is also possible to draw a contrary

14   conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

15        Here, viewed in the light most favorable to Ms. Steele, these motions by Amtrak must

16   fail.

17        **A.    Ms. Steele Met Her Burden as to Future Medications in the Life Care Plan**

18        Amtrak's effort to eliminate the medications from the life care plan are, put simply,

19   absurd in light of the overwhelming evidence supporting them.  Amtrak bases its argument,

20   somehow baselessly extended to *all* medications, off a minimal colloquy with Dr. Chesnutt as to

21   a single medication that he himself was not prescribing.  As to the single medication Emgality,

22   the questioning of Amtrak was limited to the following series:

23

24   PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL,                    **ROSSI VUCINOVICH P.C.**
     JUDGMENT AS A MATTER OF LAW, OR REMITTITUR - Page 22                    1000 Second Avenue, Suite 1420
     Case No.: 3:19-cv-05553-BHS                                                Seattle, Washington 98104
25                                                                          (425) 646-8003/ Fax (425) 646-8004

1   Q.      We are not referring to notes any more.  Emgality.  Thank you, Mr.
2   Yates.  You are familiar with the medication she was taking for her migraine,
    Emgality?

3   A.      I don't prescribe that medication.  It is prescribed by the specialty
    headache clinic neurologist.

4   Q.      Are you familiar with it at all?

5   A.      Not that familiar with it, because I don't prescribe it ever.

6   Q.      You don't know how long people can take that, do you?

7   A.      No, I don't.

8   (TT 11/18/21 at 163:11-20).  Based on that extremely limited colloquy about a single medication,

9   Amtrak has demanded that the entirety of the medication portion of the life care plan that

10  Dr. Chesnutt adopted and helped to prepare be rejected wholesale.  This is not only nonsensical,

11  but ignores that Ms. Steele was *actually taking that medication*, as Amtrak's initial question

12  above even explicitly acknowledged — "the medication she was taking for her migraine,

13  Emgality."  (TT 11/18/21 at 163:11-12) (emphasis added).[9]  Amtrak's effort to undercut the

14  medication portion of the life care plan must again be rejected.

15          Here, the evidence adduced at trial on the issue of the life care plan and Dr. Chesnutt's

16  familiarity and management of Ms. Steele's treatments, including for her headaches, and the need

17  to keep those treatments ongoing into the future, is extensive.  Realistically, there is only one

18  way to view the evidence, and that is that Ms. Steele sustained her burden to establish the need

19  for medications and treatments on into the future in accord with the life care plan to a reasonable

20  degree of medical certainty and as a result of Amtrak's negligence in causing the train wreck that

21

22  _____
    [9] While of little import, it should also be noted that on the prior page of medical records Amtrak erroneously cites
23  for Ms. Steele "running 6 miles," the fact that Ms. Steele was newly taking Emgality for her headaches is
    mentioned.  Vucinovich Decl. at Ex. 8 at Steele 9073 ("Daily headaches-on new medication Emgality injections,
    since then the severity of the headaches gone down.").

24  PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL,          **ROSSI VUCINOVICH P.C.**
    JUDGMENT AS A MATTER OF LAW, OR REMITTITUR - Page 23                1000 Second Avenue, Suite 1420
                                                                        Seattle, Washington 98104
25  Case No.: 3:19-cv-05553-BHS                                         (425) 646-8003/ Fax (425) 646-8004

1    resulted in Ms. Steele's need for such treatments.  Certainly, Amtrak's distortion of the evidence

2    based on the above minimal colloquy is meritless and should be flatly rejected.

3          Dr. Chesnutt oversaw Ms. Steele's care, including by the neurologists who prescribed her

4    ongoing medication Emgality.  Dr. Chesnutt was the primary treating physician for Ms. Steele's

5    traumatic brain injury on an ongoing basis since January 2018.  (TT 11/16/21 at 47:2-4).  He has

6    managed her care with a multidisciplinary approach throughout that time.  (TT 11/16/21 at 47:10-

7    13).  Dr. Chesnutt testified that Ms. Steele "does have chronic intractable migraine headaches."

8    (TT 11/16/21 at 47:25).  He further testified that Ms. Steele's "migraines, so the headaches are

9    helped by medicines with the neurologist and some physical therapy, et cetera."  (TT 11/16/21 at

10   63:15-17).  "So these are the domains of treatment that are part of our program, and that we have

11   as integral.  So we kind of act as the center of the spoke here . . . to help coordinate therapies . . .

12   That is my role in the care."  (TT 11/16/21 at 63:23-64:3).  He "direct[s]" "a multidisciplinary

13   concussion management team, which includes both medical evaluation, as well as . . . creat[ing]

14   a concussion rehabilitation program[.]"  (TT 11/16/21 at 50:17-22).[10]  He continues to evaluate

15   his patients over time, including Ms. Steele, and to "direct care to help alleviate those areas, to

16   improve those areas.  And we manage that[.]"  (TT 11/16/21 at 69:8-11).  And, for Kylie, "it is

17   really clear that after almost four years that she is not improving overall, and she is going to have

18   some long-term problems because of this train crash and the resulting traumatic brain injury."

19   (TT 11/16/21 at 70:20-23).

20         Dr. Chesnutt also noted that headaches from traumatic brain injuries are often difficult to

21   resolve:  "One of the areas that I will highlight here is migraine.  That area we see frequently

22

23   _____

[10] He also is "in a national expert group where we are defining concussion subtypes, those types of symptomology that go along with concussions, and we are devising new tests to evaluate, and then new treatments to treat concussion."  (TT 11/16/21 at 49:20-24).

24

ROSSI VUCINOVICH P.C.
1000 Second Avenue, Suite 1420
Seattle, Washington 98104
(425) 646-8003/ Fax (425) 646-8004

25

1   starting with a traumatic brain injury and then becoming a persistent, ongoing problem that is

2   difficult to treat and to resolve." (TT 11/16/21 at 65:4-7).  And, importantly, he noted repeatedly

3   that Ms. Steele's symptoms are unresolved and permanent in nature, testifying that when patients

4   don't improve on standard medications in his clinic, they send them to headache specialists.

5   "And so in Kylie's case, she has been seeing a headache specialist, helping her with more

6   complex migraine management, medications that most physicians don't typically use unless you

7   have expertise in neurology and headache management.  So she has needed kind of the extreme

8   experts in post-concussive headache management.  She is . . . getting special treatments . . . up

9   in the Seattle area, University of Washington, and then the PolyClinic." (TT 11/16/21 73:17-

10  74:12; *see also* 75:6-18 (discussing headache management in the OHSU Clinic)).

11      Ms. Steele described that she has had ongoing issues with headaches since the traumatic

12  brain injury.  She noted that "[p]retty much any activity gives [her] a headache." (TT 11/18/21

13  at 76:11-12).  As to treatments, she testified, "I have several headache treatments that I take all

14  the time, and then a few headache/migraine treatments that I take when I am having a really bad

15  migraine." (TT 11/18/21 at 76:13-16).  When asked how often she experiences headaches, she

16  testified that she experiences them "[d]aily" and described that "[t]hey last most of the day." (TT

17  11/18/21 at 76:23-25).  She had no headaches like this prior to the crash. (TT 11/18/21 at 77:7-

18  8).  She described the management of her headaches as well. (TT 11/18/21 at 75:4-14).

19      Further, as to ongoing therapies, Dr. Chesnutt testified that maintaining therapies,

20  *including the medications and treatment for her headaches*, was important to maintaining her

21  functional abilities. (TT 11/16/21 at 85:20-86:11).  Dr. Chesnutt prepared the life care plan that

22  included the medications in this context. (TT 11/16/21 at 87:21-24).  He has the credentials and

23  expertise to do so, and does so regularly. (TT 11/16/21 at 86:15-87:15).  He "interacted with

24  PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL,
    JUDGMENT AS A MATTER OF LAW, OR REMITTITUR - Page 25

25  Case No.: 3:19-cv-05553-BHS

1  some of the other specialists who may have recommendations, and reviewed those to see whether

2  we feel those are the type of things that would benefit [Ms. Steele] into the future" and agreed

3  with the care outlined in the plan, which are reasonable and necessary for her to retain function.

4  (TT 11/16/21 at 88:2-25; 89:1-5; 90:1-5).  All of his opinions were to a reasonable degree of

5  medical certainty and pertain directly to the injury caused by Amtrak in the train crash.  (TT

6  11/16/21 at 46:24-47:1; 90:10-17).

7       The above demonstrates the breadth of involvement of Dr. Chesnutt in Ms. Steele's care

8  and treatment, his understanding and management of her ongoing treatment of her headaches,

9  both through treatment and medication (including Emgality), and her need to maintain treatment

10 regimens into the future to avoid regression.  Given his expertise in treating persons with

11 traumatic brain injuries and his management of such care regularly in his clinic and for

12 Ms. Steele, this is determinative.  Amtrak's baseless motion should again be rejected.

13     **B.   Ms. Steele Met Her Burden as to Future Economic Losses[11]**

14          **1.   Ms. Steele's Future Wage Losses Have Abundant Support in the
               Record**

15     Just as with the medication issue, Amtrak improperly assesses evidence concerning

16 Ms. Steele's future wage losses.  The evidence, which is decidedly *not* limited to testimony of

17 one witness, overwhelmingly supports the conclusion that Ms. Steele had a "limited battery life"

18 of just a few hours of activity, and that her cognitive fatigue, headaches, and other symptoms

19 make it impossible for her to perform in a competitive work environment even part time (as

20 assumed she would in the damage calculations), much less full time.

21

22

[11] Ms. Steele assumes for purposes of this motion only that the mention orally of insufficient evidence "based on
23 Mr. Choppa's testimony" of "future economic loss" is sufficient to preserve this issue for this motion, without
prejudice to arguing on appeal that this issue was not properly preserved, especially in light of the briefing
submitted during trial by Amtrak that made no mention whatsoever of future economic losses.

24 PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL,          **ROSSI VUCINOVICH P.C.**
   JUDGMENT AS A MATTER OF LAW, OR REMITTITUR - Page 26              1000 Second Avenue, Suite 1420
                                                                     Seattle, Washington 98104
25 Case No.: 3:19-cv-05553-BHS                                      (425) 646-8003/ Fax (425) 646-8004

1    There were several witnesses who supported the concept that Ms. Steele suffered from

2    cognitive fatigue, headaches, and other symptoms that severely limited her work and functional

3    abilities:   Ms. Steele herself, Nancy Steele, Dr. Chesnutt, Dr. Wojciechewski, Dr. Brown,

4    Dr. Carson, and Dr. Lemoncello.  Each of those witnesses independently provides sufficient basis

5    for the analysis conducted by Mr. Choppa as to Ms. Steele's future wage losses, and Amtrak's

6    attempt to highlight a curated set of facts from the trial seemingly beneficial to its position while

7    ignoring the abundance of contrary evidence is entirely inconsistent with the evaluation in which

8    this Court must engage.   Amtrak has not in its motion presented the evidence most favorable to

9    Ms. Steele, and even improperly characterized evidence favorable to Ms. Steele as "mistaken

10   testimony" to attempt to make its point.  This must be rejected, along with this baseless motion.

11   Ms. Steele testified convincingly that the injury has limited her career opportunities, and

12   it has been hard for her to deal with that.  (*See, e.g.,* TT 11/18/21 at 126:6-12).  She spoke

13   extensively about her cognitive fatigue limiting her activities and length of activities in a day,

14   requiring her to prioritize what to do in a day and to take breaks after pursuing activities.  (TT

15   11/18/21 at 80:10-83:4).  And she expressed in that testimony forgetting things when cognitive

16   fatigue kicked in as well as having a difficult time with tasks, including at her volunteer job at

17   the Sarah Bellum bakery.  *Id.*

18   Her mother, Nancy Steele, confirmed much the same information in her testimony.  She

19   indicated that Ms. Steele "is still limited to one or two tasks a day.  You know, she just doesn't

20   multitask and do the things she used to. . . . Now her life is pretty limited to the energy she has,

21   and that's one or two items.  And she has to choose if it's going to therapy or doing home vision

22   therapy."  (TT 11/18/21 at 22:15-21).

23

24

**ROSSI VUCINOVICH P.C.**
1000 Second Avenue, Suite 1420
Seattle, Washington 98104
(425) 646-8003/ Fax (425) 646-8004

25

1        Dr. Limoncello gave further credence to this information.  He testified that he directly

2  observed Ms. Steele working in the Sarah Bellum bakery in November and December 2020.  (TT

3  11/19/21 at 17:5-13; 23:5-9).  During that time, Dr. Limoncello "observed her fatigue, needing

4  to sit after about an hour when we first got started, needing to sit down because of physical

5  fatigue." (TT 11/19/21 at 23:20-22).  He also "observed directly her cognitive fatigue, as well,

6  which looks like making more errors as time progresses." (TT 11/19/21 at 23:23-24; *see also* at

7  28:20-29:4).   In addition, he noted "slowed processing time" in Ms. Steele, noting that she

8  "definitely needed me to repeat more commonly and more often." (TT 11/19/21 at 24:10-15).

9  Further, he noted her inability to multitask, indicating that "Ms. Steele really was not able to take

10  on more than one thing at a time, and would get overwhelmed and confused if she needed to[.]"

11  (TT 11/19/21 at 24:22-25:6).  He noted that she works a shorter baking day in her role now at the

12  bakery one day per week, and that she rests before driving home.  (TT 11/19/21 at 26:21-27:10;

13  29:15-17).[12]

14        Importantly, Ms. Steele's treating providers likewise supported her limited activity and

15  its impacts on her ability to work as observed by Dr. Limoncello.  Dr. Chesnutt testified that she

16  "is not able to hold a regular job due to her functional capacity limitations.  She has problems

17  maintaining any sort of work capacity over about three hours." (TT 11/16/21 at 48:12-15).  He

18  went on to note that Ms. Steele

19       has made attempts to build up her tolerance of volunteer jobs.  That has been very
        difficult and she has been unable to increase her workload beyond multiple hours.
20       . . . And it is really clear that after almost four years that she is not improving
        overall, and she is going to have some long-term problems because of this train
21       crash and the resulting traumatic brain injury.

22

---

23  [12] Dr. Limoncello's personal observations, of course, are not impacted by Mr. Choppa's belief that he was an
   expert or a "treater" for Ms. Steele—they are accurate observations of her ability to work, and come from someone
   who undoubtedly has the capacity to recognize them.

24

                                       **ROSSI VUCINOVICH P.C.**
                                       1000 Second Avenue, Suite 1420
                                       Seattle, Washington 98104
                                       (425) 646-8003/ Fax (425) 646-8004

25  Case No.: 3:19-cv-05553-BHS

1   (TT 11/16/21 at 70:14-23).  He described the depletion of energy observed in Ms. Steele, similar

2   to that observed in other brain-injured patients.  (TT 11/16/21 at 76:4-23).  And he reiterated the

3   difficulties that posed for Ms. Steele in the work environment, as well as in her daily life outside

4   of work.  (TT 11/16/21 at 77:2-9).  Dr. Chesnutt indicated that was a permanent, life-long

5   condition for Ms. Steele, (TT 11/16/21 at 78:4-5; 59:7-10; 60:13-16), and went on to explain how

6   it impacts her:

7       Q.      Would that impact her ability throughout a 24-hour day?  Is that
        permanent, that energy deficit, that fatigue, is that something that can affect her
8       throughout the course of a day?

9       A.      Yes, it does.

10      Q.      Explain that please.

11      A.      So here is the problem.  A lot of us can tolerate being at work for an eight-
        hour day, and we can go home and do activities, whatever we decide to do, leisure
12      time activities, family time activities.  We can watch TV, we can look at our
        computers, and then we go to sleep, and then we recharge, and our batteries
13      recharge full every night.

        With her, her brain energy battery basically goes down to low reserve mode after
14      only, say, three hours of an activity, or after just driving around for a while,
        meaning within an hour's worth of driving can cause her to be in a state where
15      she now needs to rest.

16      Unfortunately, what happens is restorative sleep is not as efficient after brain
        injury for many people.  So it is difficult to fill the battery or the fuel tank back
17      up.  And then she goes back the next day with a 50 percent full battery, and it can
        be a vicious cycle, sometimes necessitating taking multiple days off from those
18      activities to recharge the battery before attempting to go back to any minimal
        activity that most of us would tolerate very, very well.
19
        Q.      Have you observed that very type of deficit or problem in Kylie Steele?
20
        A.      Yes.  I mean, one example that I hear a lot is she is a volunteer.  She visited
21      recently, she had a volunteer job.  She will drive to the volunteer job, and then
        work there for a relatively short amount of time, a couple of hours and then have
22      to actually nap in the car for a period of time before she feels that she can drive
        back.  And then she will feel a little – she will feel better enough.  At that point,
23

24   PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL,        **ROSSI VUCINOVICH P.C.**
     JUDGMENT AS A MATTER OF LAW, OR REMITTITUR - Page 29                1000 Second Avenue, Suite 1420
                                                                           Seattle, Washington 98104
25   Case No.: 3:19-cv-05553-BHS                                        (425) 646-8003/ Fax (425) 646-8004

she feels safe enough to drive home.  And then she has to take a rest for the next day, so she can't do that job two days in a row most of the time.

Q.      Is that type of problem or deficit, is that consistent with the type of brain-injury patients that you see?

A.      Yes.  That's a very common problem with people who have persistent problems like Kylie, who have unfortunately longer lasting traumatic brain injury symptoms.

(TT 11/16/21 at 78:6-80:2).

Dr. Wojociechowski testified in concert with Dr. Chesnutt.  "We all have a certain amount of energy to complete tasks and to do tasks.  Her battery, quote/unquote, gets drained really fast.  It is kind of like having a cell phone on roaming all the time, and it is using your battery versus having a good direct strong signal."  (TT 11/17/21 at 102:23-103:3).  When asked if she has permanent limitations in her ability to read, drive, or use a computer, Dr. Wojociechowski responded that "it is definitely a limited capacity compared to someone . . . with the advanced degree she has.  She is not able to function for extended periods of time for any of those components."  (TT 11/17/21 at 106:1-12).  He indicated that her fatigue after about two hours of those activities is significant, and "at those times when she tends to push herself, it is going to have far-reaching consequences the day or subsequently the hours after it."  (TT 11/17/21 at 117:5-11).  He even described how these limitations would need to be accommodated in the workplace, and how they would inherently limit the work that she could do.  (TT 11/17/21 at 121:18-122:7).

These references, of course, are only *some* of the evidence of the impacts of the traumatic brain injury on Ms. Steele.  Other witnesses, including Sue Byers, Dr. Brown, Dr. Carson, and Kirin Casteel, noted significant changes in Ms. Steele as well, all of which were consistent with the above citations.  And while she had improved since the early period following the train wreck,

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL,
JUDGMENT AS A MATTER OF LAW, OR REMITTITUR - Page 30
Case No.: 3:19-cv-05553-BHS

ROSSI VUCINOVICH P.C.
1000 Second Avenue, Suite 1420
Seattle, Washington 98104
(425) 646-8003/ Fax (425) 646-8004

1    it is fallacy for Amtrak to argue that snapshots of improvement or happy moments somehow

2    negate the consistent testimony as to Ms. Steele's permanent impairments as a result of the

3    traumatic brain injury she suffered in the train wreck.

4          Mr. Choppa had consistent information for her vocational assessment from a review of

5    medical records and speaking with Ms. Steele.  (TT 11/19/21 at 52:18-23).  He spoke to others

6    about Ms. Steele's condition before and after as well.  (TT 11/19/21 at 54:11-55:6).  And then he

7    spoke with Dr. Chesnutt, who had coordinated her care.  (TT 11/19/21 at 55:11-15).  Finally, for

8    the vocational piece, he also spoke with Dr. Lemoncello about Ms. Steele's job performance.

9    (TT 11/19/21 at 56:6-15).  All provided consistent information as to her "need for slow paced,

10   minimal distractions, [and her] problems maintaining performance.  This fatigue issue is very

11   troubling [as it related to her functional ability.]"  (TT 11/19/21 at 56:23-57:12).  He noted that

12   her "[m]ental fatigue creates physical fatigue, and [limits her] ability to sustain performance."

13   (TT 11/19/21 at 59:1-2).  From all of the information he reviewed and the people with whom he

14   spoke, and, importantly, consistent with *all* of the testimony in the trial, Mr. Choppa testified that

15   Ms. Steele would only be able to do "part-time work" that is "what we call rote and repetitive

16   and predictable."  (TT 11/19/21 at 63:10-11; 17-19).  He opined that it would not be in her field

17   of study, since that "is the opposite of rote, repetitive and predictable."  (TT 11/19/21 at 63:20-

18   22).  He opined that such work would earn her $14 per hour.  (TT 11/19/21 at 64:1-3).  Then she

19   analyzed her capacity pre-injury against her injured capacity.  (TT 11/19/21 at 65:2-67:2).  He

20   found what her earnings presumably would have been based on her colleagues at school and

21   Bureau of Labor Statistics data.  *Id.*

22

23

24   PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL,          **ROSSI VUCINOVICH P.C.**
     JUDGMENT AS A MATTER OF LAW, OR REMITTITUR - Page 31                1000 Second Avenue, Suite 1420
                                                                          Seattle, Washington 98104
25   Case No.: 3:19-cv-05553-BHS                                       (425) 646-8003/ Fax (425) 646-8004

1   All of Mr. Choppa's analysis as to Ms. Steele's functional limitations was consistent with

2   the testimony throughout the trial.[13]  In fact, contrary to the baseless argument of Amtrak, not a

3   *single witness* in the trial indicated that she has the capacity now or will be expected to gain the

4   capacity in the future to work full-time as Amtrak so nonchalantly suggests.  Amtrak's motion,

5   particularly when observed in the light most favorable to Ms. Steele, must therefore be denied

6   outright.

7   **2.      The Evidence Supported Ms. Steele's Need for Ongoing Assistance**

8   As specifically to the issue of the need for care assistants, that is established through both

9   Nancy Steele and Dr. Chesnutt, testimony that Amtrak simply stuck its head in the sand to avoid

10  seeing.  As it related to living in Seattle to complete her degree at Antioch, which Amtrak notes

11  was "a completely different state from her mother," Nancy Steele indicated that she "usually

12  would go up and spend a week at a time and cook meals, take her to appointments, kind of help

13  her get through this.  I think I went up 25 different weeks during the period of a year and a half

14  she was in Seattle, just to help support her, because everyday tasks of living she was unable to

15  do without a lot of support."  (TT 11/18/21 at 21:5-10).  And Ms. Steele, of course, has lived

16  with her parents since returning to Portland in mid-2019.  (TT 11/18/21 at 59:1-2).  When asked

17  directly if Ms. Steele could live independently, Nancy Steele replied, "I would love to say yes,

18  but my answer would be not at this time.  Every day takes a ton of energy.  You have to think

19

20

21

22

23

24

25

---

[13] It is important to note that Amtrak misrepresents to the Court that "Mr. Choppa testified that the sole basis for his conclusion that Plaintiff could only work at most a part time minimum wage job rested on his conversation with Dr. Lemoncello."  (Dkt. 99 at p. 22).  This is contrary to the evidence, including to the limited citations to the record mentioned in purported support of that statement.  Mr. Choppa relied on medical records as well as interactions with various individuals, including Dr. Chesnutt, Ms. Steele, and Dr. Lemoncello.  But the evidence supporting his conclusions comes from even beyond those on whom he directly relied, as explained herein.

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL,
JUDGMENT AS A MATTER OF LAW, OR REMITTITUR - Page 32
Case No.: 3:19-cv-05553-BHS

**ROSSI VUCINOVICH P.C.**
1000 Second Avenue, Suite 1420
Seattle, Washington 98104
(425) 646-8003/ Fax (425) 646-8004

1   about cooking, cleaning, living.  If there is work involved, that's multitasking every day.  At this

2   point, she is not to that level."  (TT 11/18/21 at 29:6-11).

3          Dr. Chesnutt mimicked that sentiment repeatedly under questioning from Amtrak.  When

4   asked if Ms. Steele were "independent in everyday living, yes or no[,]" Dr. Chesnutt replied,

5   "No."  (TT 11/18/21 at 166:19-20).  He went on to testify, "She is not independent – she is not

6   independent in everyday living."  (TT 11/18/21 at 166:24-25).  He noted that her mother was

7   helping to care for her, and that she had issues "getting all the food she needs and cooking all the

8   food.  So her mother has been taking care of most of those items, in terms of housecleaning and

9   things like that.  [Ms. Steele] has been trying to participate, but she is unable to.  Otherwise, she

10  would be living on her own currently."  (TT 11/18/21 at 167:2-167:22; 167:23-168:3).  When

11  asked if a case manager would be appropriate for Ms. Steele, Dr. Chesnutt replied, "Yes.  I would

12  recommend that, but her mother has been serving as that right now."  (TT 11/18/21 at 168:22-

13  169:9) (also discussing the difficulty in getting case managers and assistance needed for brain-

14  injured persons).  Even Dr. Carson recognized that Ms. Steele "often needs assistance" in her

15  daily living.  (TT 11/19/21 at 211:5-6).

16         Again, of course, it has to be noted here that the life care plan, in which the

17  recommendation for assistance for Ms. Steele appeared, was prepared in conjunction with

18  Dr. Chesnutt and endorsed by him, and the recommendations therein were fully supported by the

19  testimony on the subject.[14]  This aspect of Amtrak's post-trial motion must also, therefore, be

20  denied.

21

22

23  [14] It must also be noted that Amtrak spent some time arguing to the jury that Ms. Steele needed no assistance and that they should discount the life care plan damages accordingly, so they had the opportunity to present their interpretation of the evidence, faulty as it was, to the jury.

24    ROSSI VUCINOVICH P.C.
1000 Second Avenue, Suite 1420
Seattle, Washington 98104
(425) 646-8003/ Fax (425) 646-8004

25

III.    **REMITTITUR IS NOT APPROPRIATE IN THIS CASE, AS THE JUDGMENT WAS APPROPRIATE GIVEN THE EXTRAORDINARY LOSSES ESTABLISHED AT TRIAL**

The verdict reached by the jury in Ms. Steele's case was just and appropriate, and the jury fairly considered and elected not to grant the full amounts requested by Ms. Steele despite her lifelong impairments and limitations that she is burdened with as a result of Amtrak's negligence in causing the train wreck and Ms. Steele's traumatic brain injury.  Taken in the light most favorable to Ms. Steele, no reduction of any kind to economic or non-economic damages is appropriate, and Amtrak's motion for same should be denied.[15]

Remittitur is available to reduce an excessive verdict, not an appropriate verdict. *Pershing Park Villas Homeowners Ass'n. v. United Pac. Ins. Co.*, 219 F.3d 895, 905 (9th Cir. 2000) (citation omitted).  In federal question cases, federal courts "allow substantial deference to a jury's finding of the appropriate amount of damages ... unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996); *see also Brady v. Gebbie*, 859 F.2d 1543, 1557 (9th Cir. 1988) ("An otherwise supportable verdict must be affirmed unless it is 'grossly excessive' or 'monstrous' or 'shocking to the conscience.'").  Thus, when granting a motion for remittitur, the trial court does not substitute its judgment for that of the jury, but instead reduces the judgment to the "maximum amount sustainable by the proof." *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1094 (9th Cir. 2014).  In considering a motion for remittitur, the trial court must view the evidence concerning damages in a light most favorable to the prevailing party. *Id.*

---

[15] This is particularly true since the substantive portion of the remittitur motion exceeded the allowable page length without allowance from the Court, potentially leading to ignoring the pages exceeding the limit, including these arguments.  LR 7.

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL, JUDGMENT AS A MATTER OF LAW, OR REMITTITUR - Page 34
Case No.: 3:19-cv-05553-BHS

ROSSI VUCINOVICH P.C.
1000 Second Avenue, Suite 1420
Seattle, Washington 98104
(425) 646-8003/ Fax (425) 646-8004

A.    **Awarded Future Economic Damages Were Appropriate**

The jury appropriately considered the substantial evidence on future economic losses of Ms. Steele, including both her future wage losses and her future care expenses, and awarded an amount less than sought by Ms. Steele and supported by the evidence.  Amtrak's baseless request to reduce the $3,700,000 to $250,000 is not linked in any way to the evidence adduced at trial, and should be flatly rejected.[16]

The overwhelming evidence adduced at trial, as outlined to some degree in these opposition papers, supports both Ms. Steele's impairments to her earning capacity and the substantial costs of her medical care going forward to maintain her present limited state of functioning.  Amtrak's challenge to the future economic damages simply ignores the substantial evidence establishing job losses to her in the future of $1,947,241 and retirement losses of an additional $120,348, as well as the life care losses of as much as $2,996,722.[17,18]  The arguments Amtrak presents for a reduction to the arbitrary $250,000 are sparse and rely solely on their improperly myopic view of the evidence as presented elsewhere in their briefing.  Namely, they complain that the shower chair, assistants, and other life care needs as outlined in the life care plan prepared, adopted, and agreed to by Dr. Chesnutt, who oversaw *all* of Ms. Steele's care, should be ignored, and that Ms. Steele's severe and permanent disabilities must be rejected, as Amtrak fails to take the evidence in the light most favorable to Ms. Steele.

---

[16] Amtrak implicitly acknowledges that the jury's award of slightly in excess of the amount sought by Ms. Steele in past lost wages was fair and accurate, since Amtrak does not seek to reduce that figure at all. (Dkt. 99 at pp. 25-27).  This similarly acknowledges, of course, that the evidence adequately supported her inability to obtain gainful employment during that time as a result of the disabilities she suffered from the train wreck.

[17] (TT 11/19/21 at 174:22-175:10) (Mr. Opp's analysis of the figures derived from Mr. Choppa's report and opinions).

[18] The jury, of course, already reduced these figures by nearly 27%, presumably accounting for any determination they made that the wage figures or life care plan figures included too much.

**ROSSI VUCINOVICH P.C.**
1000 Second Avenue, Suite 1420
Seattle, Washington 98104
(425) 646-8003/ Fax (425) 646-8004

1    This is not a case where "competent evidence" (Dkt 99 at p. 25) is lacking to prove any

2    of these aspects of Ms. Steele's damages—she proved all such damages and met her burden in

3    doing so.  The motion as to future economic damages must therefore be denied.

4    **B.      Awarded Non-Economic Damages For Ms. Steele's Extraordinary Harms and Losses Were Also Appropriate**

5    The idea that this Court is asked by Amtrak to reduce the $2,960,000 in non-economic

6    damages for the loss of a young woman's life as she knew it and the need for her to live with

7    substantial disabilities permanently and to relive the trauma caused by Amtrak through her PTSD

8    is, honestly, disgusting.   As discussed above and throughout this opposition, the jury

9    appropriately considered the substantial evidence about the non-economic losses of Ms. Steele.

10   That Amtrak does not like the result is not a basis for remittitur.

11   Amtrak also is again not showing appropriate candor to the Court in this portion of its

12   moving papers, <u>falsely</u> claiming that Ms. Steele "has recovered and not one physician testified

13   her condition will deteriorate." (Dkt 99 at p. 26.)   There is overwhelming evidence that

14   Ms. Steele's recovery was halting and woefully incomplete, that she is burdened by permanent

15   and substantial deficits as a result of the injuries she sustained in the train wreck—every single

16   witness who testified for Ms. Steele at trial from all walks of her life supported that.   And

17   Dr. Chesnutt *expressly* indicated that the failure to maintain treatments would likely lead to

18   regression.   As to ongoing therapies, Dr. Chesnutt testified "that her needs are not going to

19   significantly improve [as she ages and goes to her life expectancy].  And we almost always see

20   people when they stop doing therapies that they regress in their abilities and functions.  So we do

21   feel like these therapies will need to be maintained, not only on her own but with some expert

22   guidance to kind of help direct her over time.  If she were to stop everything at this point, I think

23   that she would have regression in her current state." (TT 11/16/21 at 85:20-86:4).  He went on,

24   PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL,
     JUDGMENT AS A MATTER OF LAW, OR REMITTITUR - Page 36

25   Case No.: 3:19-cv-05553-BHS

1  stating, "That's why I recommend some ongoing therapies, and you know, certainly medical

2  visits with the doctors, helping with her headaches, and some of the medications and treatment

3  strategies for that, as well as the therapies that seem to be heling her – helped her over the years."

4  (TT 11/16/21 at 86:6-11).  As discussed above, Dr. Chesnutt then indicated that the items in the

5  life care plan were "reasonable and necessary for Ms. Steele in order to maintain her current level

6  of function now and for the rest of her life[.]"  (TT 11/16/21 at 89:1-5; 90:1-5).

7       This case was not about the TBI patients who improve as Amtrak wishes it were (Dkt 99

8  at p. 26) ("patients with mild TBI's [*sic*] typically improve")); this was about Kylie Steele, who

9  remains burdened by severe and pervasive effects of a brain injury caused by Amtrak.  That

10  Amtrak still refuses to take responsibility for that injury is no real surprise, as their platitudes to

11  the contrary were always just for show.  But Amtrak destroyed a young life, and the jury has

12  rendered an appropriate, if low, verdict for what they did to Ms. Steele.  That verdict should

13  stand, and Amtrak's misleading request for remittitur for non-economic damages should also be

14  denied.

15                                 **CONCLUSION**

16       For the reasons outlined above, all of Amtrak's motions for post-trial relief should be

17  denied.  Amtrak is not entitled to upend the jury's just and appropriate verdict for Ms. Steele on

18  any of the outlined grounds, and the judgment for Ms. Steele must not be upset.

19  Dated January 10, 2022              **ROSSI VUCINOVICH PC**

20                       By:   */s C. N. Coby Cohen*

21                            James K. Vucinovich, WSBA #29199
                          C. N. Coby Cohen, WSBA #30034

22                            **ATTORNEYS FOR PLAINTIFF**

23

24
        **ROSSI VUCINOVICH P.C.**
                                          1000 Second Avenue, Suite 1420
                                            Seattle, Washington 98104
                              (425) 646-8003/ Fax (425) 646-8004

25  Case No.: 3:19-cv-05553-BHS