THE HONORABLE BENJAMIN H. SETTLE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

KYLIE STEELE, )
) Case No. 3:19-cv-05553-BHS
Plaintiff, )
) **DEFENDANT NATIONAL**
) **RAILROAD PASSENGER**
v. ) **CORPORATION'S REPLY IN**
) **FURTHER SUPPORT OF ITS**
) **MOTION FOR A NEW TRIAL,**
NATIONAL RAILROAD PASSENGER ) **JUDGMENT AS A MATTER OF LAW,**
CORPORATION, d/b/a AMTRAK, ) **OR IN THE ALTERNATIVE**
) **REMITTITUR**
Defendant. )
) **NOTE ON MOTION CALENDAR:**
) **JANUARY 14, 2022**

Defendant National Railroad Passenger Corporation ("Amtrak") submits this reply in further support of its motion for a new trial, judgment as a matter of law, or in the alternative remittitur.

I.      **THE IMPROPER IMPOSITION OF A REMOTE PROCEEDING OVER AMTRAK'S OBJECTION WARRANTS A NEW TRIAL**

The fact that the current public health situation presents unique challenges is well-understood and well-appreciated by both parties and the Court. That unusual and sub-optimal measures must be taken is also universally acknowledged. The issue is what measures are most appropriate in any given case. For the reasons in Amtrak's opening brief and this reply, the selected measure – a remote trial instead of a continuance – produced several interrelated prejudicial errors that warrant a new trial. Plaintiff's opposition underscores that there was no "good cause" for allowing this case to go forward as a virtual trial, which error was then

magnified by the Court's refusal to allow the jury to see indisputably admissible medical records that completely undermined plaintiff's economic and non-economic claims.  All of this led to a verdict which was most certainly against the weight of evidence.  Moreover, Plaintiff's opposition fails to point to any evidence supporting major elements of Mr. Choppa's life care plan and Plaintiff's future wage loss.   In the alternative to ordering a new trial, as required to prevent this miscarriage of justice, a substantial remittitur should be granted.

## A. Amtrak Did Not Consent to a Remote Trial and the Good Cause and Compelling Circumstances Findings Required to Overrule its Objection Were Not Made

Any decision to compel a non-consenting party to try its case to a jury remotely must be supported by a finding of good cause and compelling circumstances. *Le v. King Cty.,* 524 F. Supp. 3d 1113, 1116 (W.D. Wash. 2021); General Orders 10-21; 16-21; 1-22.  Here, the required circumstances cannot have been made because the Court conducted an in-person jury trial the week following this trial and into December 2021.  *Norvell v. BNSF Railway Co*., 3:17-cv-05683-BHS, Dkt. 182.  This timeframe was within the specific time window of the short continuance Amtrak requested when it objected to the remote trial prior to jury selection. Dkt. 100-4 (11/16/2021 TT 4:19-7:17, 7:8-8:11); Dkt. 100-5 (Tel Conf. Tr. 11/10/2021, at 11:10-17).   In fact, the decision to grant the parties in *Norvell* an in-person trial appears to have been made during this trial.  This cannot be squared with the Court's basis for imposing a remote trial in this case.

In overruling Amtrak's objection, the Court made brief reference to the infection rates in the counties from which the juror pool is drawn. Dkt. 100-4 (11/16/2021 TT 7:18-24).  This brief statement does not come close to satisfying the required finding of good cause and compelling circumstances.  In another case, *Greiner v. Cameron Wall*., No. CV14-5579BHS, this Court held a pretrial conference while the Steele jury was deliberating.  Declaration of Andrew G. Yates ("Yates Decl."), January 14, 2022, at ¶ 2 and Ex. A attached thereto.  Even though there was no vigorous objection to a virtual trial, as herein, the Court found that case to have good cause for a

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S REPLY BRIEF ISO POST-TRIAL MOTIONS - 2
CASE NO. 3:19-cv-05553-BHS
019188.0447/8830595.3

**LANE POWELL PC**
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

virtual trial because it was a simple case with a simple fact pattern ("it is not a complex case"), there was at most one expert, the plaintiff was always planning to testify by deposition, the witnesses were going to be brief, and the plaintiff's case was going to be less than two (2) days. *Id.*, at 4:21-5:7, 6:7-7:6.  In contrast, this case had multiple experts and treating health care providers, complex medical issues based primarily on subjective complaints of the Plaintiff, and extraordinary damage claims which raised significant credibility issues.  Good cause simply did not exist to require a virtual trial.

In addition, the public health circumstances could not have so markedly changed in less than a week such that it was suddenly safe enough to have an in-person civil jury trial.  If this were true or possible, there can be no reasonable doubt that the most appropriate remedy was to grant the short continuance Amtrak requested.  There is no dispute that the Court found that the public health situation permitted an in person civil jury trial the week after this case finished. That is when this trial could and should have been held.

Plaintiff wholly ignores this fact, as well as the additional facts that the Western District of Washington had been handling in-person proceedings and jury trials prior to this matter.  In fact, before this matter commenced, the Honorable Robert Bryan had just completed a three-week in-person jury trial.  *See, e.g., Dragos v. Cronea*, et al., 2:19-cv-01338-JCC.

In a belated effort to show good cause, Plaintiff cites the advisory committee's note to the 1996 amendment to Fed. R. Civ. P. 43(a), which provides that "The most persuasive showings of good cause and compelling circumstances are likely to arise when a witness is unable to attend trial for unexpected reasons, such as accident or illness, but remains able to testify from a different place." Dkt. 109, at 3:12-17.  But Plaintiff does not point to any evidence that she, or any of her witnesses, had an accident or illness that would have prevented them from attending court and offering live testimony.  Indeed, an inability of a witness to travel or otherwise attend in-person was not even the issue.

Plaintiff also relies on the bare language of Fed. R. Civ. P. 77(b) that "[e]very trial on the merits must be conducted in open court and, so far as convenient, in a regular courtroom,"

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S REPLY BRIEF ISO POST-TRIAL MOTIONS - 3
CASE NO. 3:19-cv-05553-BHS
019188.0447/8830595.3

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

1
2
3
without context or connection to this case.  As the case law and this Court's own General Orders make clear, other factors must be taken into consideration, including the nature of the case, the magnitude of the case, and whether the credibility of the witnesses is at issue.

4
5
6
7
8
9
10
11
12
In support of its arguments that the remote jury trial violated its constitutional rights, Amtrak cited numerous cases in various jurisdictions that recognized the importance of live testimony in person and the inferiority of trial by videoconference.  *See, e.g., Infernal Technology, LLC v. Sony Interactive Entertainment, LLC*, No. 2:19-CV-00248-JRG, at 3 (E.D. Tex. Nov. 20, 2020); *In re RFC and ResCap Liquidating Trust Action*, 444 F. Supp. 3d 967 (D. Minn. 2020); *Fairstein v. Netflix, Inc*., No. 2:20-cv-00180-JLB-MRM, 2020 WL 5701767, at *8 (M.D. Fla. Sept. 24, 2020).  Plaintiff chose to completely ignore any of these decisions and the report by the American Board of Trial Advocates COVID-19 Task Force.  *See* Dkt. 99, at 6:23-7:4.

13
14
15
16
17
18
Plaintiff's only retort is that Amtrak was able to cross-examine Plaintiff's witnesses. Plaintiff misses the point.  The issue is not whether witnesses were cross examined – it is the *quality* of the cross examination, and the jury observation and deliberation experience.  The fact that juror attention was diminished during a trial with individual credibility issues at the core underscores that the proper remedy was to have an in person trial a short time later – the very thing that the Court did in another matter.  *See* Dkt. 99, at 6:10-11:26.

19
**B.  The Remote Jury Trial Lacked Adequate Safeguards**

20
21
22
23
24
25
26
Adequate safeguards are a requirement if a party is to be compelled to try its case to a jury remotely.  *Le*, 524 F. Supp. 3d at 1116.  Plaintiff suggests that this Court is "well aware" that the committee's study of the use of Zoom.gov to conduct jury trials produced a firm consensus that adequate safeguards were in place and that the matter is not open to debate. *See* Dkt. 109 at 6 (citing *Goldstine v. FedEx Freight Inc.*, No. C18-1164 MJP, 2021 WL 952354, at *11 (W.D. Wash. Mar. 11, 2021)).  However, as the Court is no doubt actually aware, this is not the case.  Three months after *Goldstine* was decided, the Honorable John C. Coughenour in an

27

DEFENDANT NATIONAL RAILROAD PASSENGER CORPORATION'S REPLY BRIEF ISO POST-TRIAL MOTIONS - 4
CASE NO. 3:19-cv-05553-BHS
019188.0447/8830595.3

**LANE POWELL PC**
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000 FAX: 206.223.7107

Op-Ed in the Seattle Times voiced his opposition to the expanded use of virtual court proceedings, in large part because:

> [T]he venerable courthouse, with its majestic halls and stately courtrooms, engender a respect for the rule of law upon all that enter. This is a place where life-changing decisions happen. Holding court on Zoom is like church in a supermarket parking lot. There's a reason that parishioners who tried it during the pandemic were eager to return to their sanctified spaces—the experience is different. The same is true for courts. Remote proceedings cheapen and trivialize the sacred ceremony that is a trial. . . .

Yates Decl., at ¶ 3 and Ex. B attached thereto. As Judge Coughenour aptly explained:

> An impartial, observant and engaged jury is a necessity. . . . A remote juror is inherently different from one who serves in person. There are physical cues and a rapport between parties that a juror can only fully observe and appreciate in person. But this is far from the only issue. Whether it be checking email, making purchases or simply surfing the internet, we all have been guilty of multi-tasking during an online meeting. This is an issue. A juror's engagement and focus must remain on the matter at hand.

*Id.*

Other than claiming without analysis that it is a settled matter, Plaintiff offers no response to Amtrak's concerns that a virtual trial is inappropriate in a case that involves complicated medical and credibility issues. Plaintiff does not even address the authorities that Amtrak cited that address the stark differences between trial in the courthouse and trial by Zoom, which voiced the same concerns as Judge Coughenour. Susan A. Bandes and Neal Feigenson, "Virtual Trials: Necessity, Invention, and the Evolution of the Courtroom," 68 Buff. L. Rev. 1275, 1316 (Dec. 2020).

The risk of juror inattention and the attendant problems it produces are perhaps the place where the perceived safeguards are most inadequate. Indeed, this is a problem inherent in conducting a civil jury trial remotely that cannot be solved. Nonetheless, Plaintiff contends, without evidence, that the jurors were "clearly" attentive "throughout the whole trial." Dkt. 109, at 7:10. This is a subjective view that Plaintiff cannot prove. Plaintiff is unable to say that none

of the jurors were multi-tasking while the trial was underway.  She cannot say that none of the jurors were checking their emails or chatting with someone else on another device throughout the trial.  Nor could she say that none of the jurors did not access the internet to learn more about the Amtrak derailment and verdicts in other cases arising out of the derailment or search the internet for medical conditions during medical testimony.  Without the jury in the courtroom, the Court could not monitor what each juror was doing and ensure that they were paying attention. It simply belies common sense in this day of pervasive social media, constant electronic communications, and tantalizing "pop-up" windows to believe that all the jurors were paying attention during multiple hours of complex medical testimony for over four (4) days.

The high risk of juror inattention during a remote trial is not acceptable given the stakes. Here, there was more than a risk.  Plaintiff did not meaningfully respond to Amtrak's observations that throughout the trial, the jurors frequently looked off screen, appeared to look down at their cell phones, or in the case of one juror, walked from room to room during testimony. Instead, Plaintiff contends that "a juror may have looked away momentarily is no different than jurors briefly looking away during a trial in the courtroom." Dkt. 109, at 7:8-9.  This is not true. The judge and attorneys in the courtroom can monitor the jurors, ensure that they are paying attention, aren't looking down at their cell phone, and will not walk from room to room while trial is in progress.  There is much greater social incentive to pay attention in the Courtroom than there is online.

Attention to the trial is only one part of the issue to Amtrak's right to a fair trial.  It was critical that the jury have the opportunity to observe the Plaintiff in the courtroom and how she was able to function because this case centered around Plaintiff's subjective cognitive and physical complaints, whether these complaints had resolved or were permanent in nature, and whether these complaints caused Plaintiff's alleged diminished earning capacity and claimed extraordinary future care needs.  *See* Dkt. 100-4 (11/16/2021 TT 4:23-5:11).

Moreover, essentially, other than her own testimony, Plaintiff was able to hide from the jury and from a more thorough cross examination.  For example, if she was at the trial, she could

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S REPLY BRIEF ISO POST-TRIAL MOTIONS - 6
CASE NO. 3:19-cv-05553-BHS
019188.0447/8830595.3

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

have been confronted with the inconsistencies from Nancy Steele and Ms. Casteel's testimony regarding her alleged limitations with what Plaintiff had told her treaters, but Plaintiff was able to avoid that by claiming she did not tune in to any of the trial.

Amtrak was also not afforded a fair trial because it cannot be sure that witnesses were properly excluded from testimony.  That Nancy Steele indicated she had not attended the trial prior to her testimony is not evidence that no other witness did the same.  Amtrak expressed concerns about the issue of witness exclusion. Dkt. 100-4 (11/16/2021 TT 6:3-12).  The Court agreed there was no way to monitor that. Dkt. 100-8 (9/27/2021 PTC Tr. 21:6-22:2).

It was error to require a remote trial in this case, and any lingering doubt as to that point is removed by examining the impact of this format on the trial itself and the errors that occurred during it.

## II. THE EXCLUSION OF PLAINTIFF'S MEDICAL RECORDS ALSO WARRANTS A NEW TRIAL

### A. Plaintiff's Key Medical Records Should Have Been Admitted

The exclusion of key medical records in a case with claims of serious permanent personal and cognitive injuries should warrant a new trial in any circumstance. "Courts routinely admit medical records under Rule 803(6), which applies to business records." *LaBrec v. Wisconsin & S. R.R. Co.*, No. 17-CV-828-JDP, 2019 WL 325131, at *2 (W.D. Wis. Jan. 25, 2019) (citing cases). *See also State v. Garrett*, 76 Wn. App. 719, 723–725, 887 P.2d 488 (1995) (medical records properly admitted through treating physician who routinely relied on records prepared by her fellow physicians in the ordinary course of business in treating her patients).  There was no substantive evidentiary reason to exclude these records.  Plaintiff did not offer any such reason at trial or in their response to Amtrak's motion.  Nor does Plaintiff ever

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S REPLY BRIEF ISO POST-TRIAL MOTIONS - 7
CASE NO. 3:19-cv-05553-BHS
019188.0447/8830595.3

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

address Amtrak's arguments regarding the hearsay exception under Federal Rule of Evidence 803, because there is no credible response.[1]

The problems with the exclusion of these records were particularly acute in the context of a remote trial.  Because the primary issues at trial were Plaintiff's physical and mental health conditions, Plaintiff's medical records were essential to Amtrak's damages defense.  By excluding the vast majority of the key medical records, a situation existed in which Plaintiff could offer extensive self-serving testimony from friends, family, experts, treaters and herself that belied her actual medical records.  Further Plaintiff was allowed to present multiple demonstrative exhibits to the jury highlighting the fact that she attended over 300 medical appointments, without having to reckon with the jury seeing for itself what was actually said and done at these appointments.

Plaintiff makes much of the fact that Amtrak cross examined her witnesses extensively with medical records.  This is true but misses the point.  The right to confrontation through cross examination is unacceptably hindered when that confrontation must be done without the ability to put the documents being discussed into evidence so that they are available for the jury when it deliberates.  While Amtrak could ask questions on cross, the jury was of course properly instructed that the questions themselves are not evidence.  Dkt. 85, Instruction No. 5 ("Questions and objections by lawyers are not evidence. . . .").  Once again, this is not a theoretical concern.  Without the risk that the jury would read their records, key witnesses contradicted their own records or equivocated on key points.

In addition, seeing hard copies of the records would have been more impactful during the trial, summation, and especially deliberations than transitory cross examination on a virtual platform for multiple days.  As this Court recently observed in another case, it likes to see the

---

[1] Underlying this problem were the Court's comments at the Pretrial Conference where it correctly stated that a medical record could be admitted if it satisfies the rules of evidence, including hearsay rules, but then did not let in this most probative evidence at trial.  Dkt. 100-8 (9/27/2021 PTC Tr. 7:20-8:10, 27:17-23); Dkt. 100-9 (11/17/2021 TT 172:25-173:7); Dkt. 100-10 (11/18/2021 TT 151:14-20); Dkt. 100-11 (11/22/2021 TT 43:24-44:4).

DEFENDANT NATIONAL RAILROAD PASSENGER CORPORATION'S REPLY BRIEF ISO POST-TRIAL MOTIONS - 8 CASE NO. 3:19-cv-05553-BHS
019188.0447/8830595.3

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

hard copy of the exhibits.  Ex. A (*Greiner* 11/22/2021 PTC 24:23-25:4).  Of course, the jurors, as the triers of fact, should have had a similar opportunity before deciding to award a multi-million dollar verdict.

For example, Dr. Carson's record reflects that Plaintiff was being coached by her lawyers as to how to handle difficult questions in front of the jury and that she was concerned that she would be thought to be faking her injuries or at least the extent of them.  Yates Decl., at ¶ 4 and Ex. C (A-90 at Steele 8744-45, 8883-84) attached thereto.  Yet, at trial, Plaintiff testified that she didn't remember saying that and denied that it would be accurate if it was in Dr. Carson's notes.  Yates Decl., at ¶ 5 and Ex. D (11/18/2021 TT 93:7-13) attached thereto.

Dr. Carson's notes also state that he and Plaintiff "discussed whether she can start 'dreaming' about her post-trial future, and [he] suggested think along realistic lines but that what seems possible may change after the trial," and there was a need to wait before it was "clear what options may be."  Ex. C (A-90 at Steele 8816-17); Yates Decl., at ¶ 6 and Ex. E (A-109) attached thereto.  Although Dr. Carson was cross examined on these records, he equivocated and contradicted himself at several points during this testimony.  Yates Decl., at ¶ 7 and Ex. F (11/19/21 TT at 220:21 to 222:18) attached thereto.

Similarly, although Dr. Chesnutt was cross examined about the inconsistencies between his records and his testimony regarding issues such as whether Plaintiff could live independently and the extent to which she could work, the jury was not allowed to see these contrasts in black and white when they deliberated because the records themselves were not admitted. *See* Dkt. 100-12 (A-90 at 696-697) ("I would highly encourage engaging in work and using your education to continue progressing back into this part of life."); *see also* Sec. III.A-B. below.  Further, the records from the Emergency Room and Urgent Care, should have been admitted to: (1) demonstrate that the sequelae of a mild neurocognitive disorder flowing from Plaintiff's mTBI was not present and (2) highlight the fact that Dr. Chesnutt's conclusions on this point were at variance to the DSM-5, a critical credibility point that the jury should have been allowed to

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S REPLY BRIEF ISO POST-TRIAL MOTIONS - 9
CASE NO. 3:19-cv-05553-BHS
019188.0447/8830595.3

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

evaluate with the aid of the actual records.[2]

Plaintiff's own medical records raised serious questions about the extent of her alleged disability and the credibility of the treaters she relied upon to establish the necessity of the items in her voluminous multi-million-dollar Life Care Plan.  The Court disallowed Amtrak from introducing even the most probative medical records (see Dkt. 100-8 [9/27/2021 PTC Tr. 7:20-8:10, 27:17-23]; Dkt. 100-9 [11/17/2021 TT 172:25-173:7]; Dkt. 100-11 [11/22/2021 TT 43:22-44:4]), including records that would have established that the symptoms Plaintiff allegedly experienced did not meet the DSM-5 criteria for mild neurocognitive disorder.  See also Dkt. 100-10 (11/18/2021 TT. 11:3-14), Ex. I (11/17/2021 TT 190:23-192:5).

Plaintiff misleadingly refers to the fact that Amtrak did not offer the ER and Urgent Care visit records until its own case. Dkt. 109, at p. 15, fn. 7.  By the time of Amtrak's case in chief, it was clear that the Court did not intend to admit the records, but Amtrak nonetheless hoped to convince the Court to change its ruling and needed to offer the records to preserve its appellate issues, including the grant of partial summary judgment to Plaintiff.  11/22/2021 TT 43:24-44:4 ("I am not going to have medical records come in. I have already indicated that this is going to come through the healthcare providers.  If we start with medical records, then we are going to start with all kinds of other medical records.  Those are not going to come into evidence.").

Plaintiff also incorrectly asserts that Amtrak "had free reign to ask about those ER and Urgent Care records…." Dkt. 109, at p. 16:8-9.  Again, this is not adequate even if it were true.  Without the opportunity to have these records admitted into evidence, the jury could not see the differences between what the records actually said and what Plaintiff's treaters and experts claimed when they testified, including on the critical point regarding the disputed sequelae from Plaintiff's mTBI.

---

[2] Amtrak reserves its right to appeal the Court's partial summary judgment decision on the issue of whether Plaintiff suffered a mild traumatic brain injury as a matter of law, as this Court ruled. (Dkt. 36).  Plaintiff's claim that Amtrak had "free reign" to examine her witnesses regarding the ER and Urgent Care records rings hollow when compared to the Court's directive regarding the DSM-5 and the mTBI on the day the Plaintiff's mother, Plaintiff, Dr. Chesnutt (for the second time) and Dr. Lemoncello testified.  Dkt. 100-10 (11/18/21 TT at 11:3-15).

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S REPLY BRIEF ISO POST-TRIAL MOTIONS - 10
CASE NO. 3:19-cv-05553-BHS
019188.0447/8830595.3

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

1   Because the Court's ruling caused the jury to conduct their deliberations without the
2   benefit of Plaintiff's key medical records, Amtrak was deprived of its right to effectively
3   challenge during the evidence and in closing the extent and permanency of Plaintiff's claims that
4   she would, *inter alia*, need over 50 years of future treatment and could only, at best, work part
5   time at a minimum wage job for the rest of her life.  Amtrak could not effectively highlight the
6   inconsistencies and differences between the opinions and conclusions of Plaintiff's treaters and
7   experts in their testimony with what was recorded in the contemporaneous medical records.  Nor
8   could Amtrak effectively demonstrate the many examples of substantial improvement in physical
9   and cognitive function that Plaintiff reported over the course of her treatment.

10   In a personal injury such as this one, medical records should have been admitted.  This is
11   especially true where, as here, there were credibility issues at stake and the record contradicted
12   the witnesses' testimony.  The Court's refusal to permit Amtrak to admit Plaintiff's medical
13   records without any basis for an evidentiary objection was error and therefore Amtrak's motion
14   for a new trial must be granted.

15   **B.   The Exclusion of the Key Medical Records Contributed to a Verdict Against the Weight of the Evidence**

16   Even if a verdict is supported by substantial evidence, the court may grant a motion for a
17   new trial if it concludes that the verdict is contrary to the clear weight of the evidence.  *Silver*
18   *Sage Partners Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001).  When
19   weighing the evidence and evaluating the credibility of the witnesses, the Court is not required
20   to view the evidence from the perspective most favorable to the prevailing party.  *U.S. v.*
21   *Kellington*, 217 F.3d 1084, 1095 (9th Cir. 2000).  "Instead, if, having given full respect to the
22   jury's findings, the judge on the entire evidence is left with the definite and firm conviction that
23   a mistake has been committed, then the motion should be granted." *Lacey Marketplace Assocs.*
24   *II, LLC v. United Farmers of Alberta Co-op. Ltd.*, No. C13-0383JLR, 2015 WL 4604044, at *3
25   (W.D. Wash. July 30, 2015), *rev'd in part sub nom. Lacey Marketplace Assocs. II LLC v. United*
26   *Farmers of Alberta Co-op. Ltd.*, 720 F. App'x 828 (9th Cir. 2017) (quoting *Landes Const. Co. v.*

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S REPLY BRIEF ISO POST-TRIAL MOTIONS - 11
CASE NO. 3:19-cv-05553-BHS
019188.0447/8830595.3

**LANE POWELL PC**
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

*Royal Bank of Can.*, 833 F.2d 1365, 1371-72 (9th Cir.1987)) (internal quotation marks omitted).

As discussed in Amtrak's opening brief and below in the context of Amtrak's motion for a judgment as a matter of law and for remittitur, the jury's verdict is at best excessive and at worst against the clear weight of the evidence.  At most, Plaintiff suffered a mild TBI, from which she recovered, as demonstrated by her returning to Antioch University where she completed her master's degree in education with a specialization in urban environmental education, while receiving many outstanding evaluations of her coursework following the derailment.  And the medical records are replete with the evidence of her improvements and moving forward with life through travel and other activities.  There can be little doubt that the jury's inability to read of the improvements in Plaintiff's medical situation and contrast those with the testimony of Plaintiff and her witnesses contributed substantially to an unreasonably large verdict.

## III.   AMTRAK RENEWS ITS MOTIONS FOR JUDGMENT AS A MATTER OF LAW ON THE CLAIMS FOR FUTURE MEDICATIONS AND ECONOMIC LOSSES

### A.  There Is No Evidence That Plaintiff Requires Emgality or Any Other Medication For the Next 50 Years

Plaintiff labels Amtrak's motion on this point "absurd" and "baseless," yet never addresses her failure to meet her burden under black letter law to establish through competent medical testimony that it is more probable than not that a future medical treatment is necessary to a reasonable degree of medical certainty.  *See, e.g., Erdman v. Lower Yakima Valley, Washington Lodge No. 2112 of B.P.O.E.*, 41 Wn. App. 197, 208 , *review denied*, 104 Wn.2d 1030 (1985); *Stevens v. Gordon*, 118 Wn. App. 43, 55, 74 P.3d 653, 660 (2003).

Even though the burden was on Plaintiff to prove that she will require Emgality or any other medication for the next 50 years, she offered only her own testimony that she "actually" takes Emgality now (Dkt. 109, at p. 23:11).  This of course does *not* mean that Plaintiff will need to take Emgality for the next 50 years.  For that she required expert medical testimony, and what she offered was insufficient.  Plaintiff does not point to a single trial transcript or medical record (she fought hard to keep them out) establishing that Plaintiff will require Emgality for the next

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S REPLY BRIEF ISO POST-TRIAL MOTIONS - 12
CASE NO. 3:19-cv-05553-BHS
019188.0447/8830595.3

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

50 years.

Rather, her claim rests on Dr. Chesnutt's testimony, but he did not know anything about Emgality, was not familiar with it, did not prescribe it, and did not know how long people can take it.  Dkt. 100-17 (11/18/2021 TT 163:11-20).  Dr. Chesnutt's dissembling comment that he was relying on Dr. Nago for management of that medicine is no doubt true, but it does not meet Plaintiff's burden of proof.  Contrary to Plaintiff's contentions (Dkt. 109, at 24:3-4), Dr. Chesnutt (who works at Oregon Science Health University) did not supervise Plaintiff's neurological treatment by Dr. Nago at the University of Washington.  As Dr. Chesnutt's own testimony makes clear, Dr. Nago, not he, was responsible for managing Plaintiff's headache medications. Dkt. 100-17 (11/18/2021 TT 163:11-18); Dkt. 100-4 (11/16/21 TT at 74:9-12).  Moreover, Mr. Choppa testified that there was nothing in Plaintiff's medical records that suggests, much less establishes that Plaintiff would require Emgality or any other medication for the next 50 years. Dkt. 100-17 (11/19/21 TT at 100:11-16).  Because the Life Care Plan items for future medications lack the necessary support in the record, the jury's award for future medicals cannot be upheld and Amtrak should be granted judgment as a matter of law on this issue.

## B. Plaintiff's Future Wage Loss and Services Claims Lack Proper Evidentiary Support.

### 1. Plaintiff's Future Wage Losses Lack Support

The sole basis for Mr. Choppa's opinion that Plaintiff can only work at most a part time minimum wage job was his conversation with Dr. Lemoncello, whom he erroneously assumed to be a "treater" charged with returning Plaintiff to work. Dkt. 100-17 (11/19/2021 TT 124:21-25, 144:14-17; 145:5-9).  Mr. Choppa was, of course, wrong since Dr. Lemoncello was neither an expert witness nor a treater, an error Plaintiff is forced to acknowledge in their brief.  Dkt. 100-10 (11/18/2021 TT 187:21-22, 190:8-191:7).

While Plaintiff was a graduate student at Antioch University, she worked as a writing advisor by helping students with their writing assignments after the derailment.   Ex. D (11/18/2021 TT 111:4-13).  There is no evidence that Plaintiff experienced any issues or

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S REPLY BRIEF ISO POST-TRIAL MOTIONS - 13
CASE NO. 3:19-cv-05553-BHS
019188.0447/8830595.3

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

difficulties working in this job.   Since completing her "masterful final essay" and graduating with her Master's degree in Urban Environmental Education in June 2019, Plaintiff made little effort to find work.  As Ms. Susan Marie Byers testified, "The goal of the program is to prepare leaders to move into the field of environmental education or roles that work directly with the community in helping to support community members." *Id.* (11/18/2021 TT 141:5-10).  And even though Plaintiff graduated, she only submitted a "few" applications and had only one interview. *Id.* (11/18/2021 TT 137:8-14).  She did not get the position because she did not have extensive experience with the SalesForce software platform used by the potential employer, not because of a cognitive inability to do the job. *Id.* (11/18/2021 TT 111:21-25).  Plaintiff did not offer any evidence that she made substantial effort at finding employment.  As noted above, she decided to wait until the conclusion of this case to look for work.  This despite the fact that Dr. Chesnutt encouraged Plaintiff to go back to work and encouraged her to use her degree in February 2019.  Dkt. 100-12 (A-90 at 696-697) ("I would highly encourage engaging in work and using your education to continue progressing back into this part of life.").

Susan Marie Byers, the director of the urban environment education master's program at Antioch University, testified that there was a networking event for Plaintiff's graduating cohort, but Ms. Byers did not recall if Plaintiff attended.  Ex. D (11/18/2021 TT 154:18-155:9).  Ms. Byers also testified that Plaintiff was "highly intelligent" and "a strong student with strong writing and oral presentation skills, as well, and a critical thinker." Dkt. 100-10, at 140:3-16, 142:13-143:9.  There was no testimony from any treating provider that Plaintiff could not work or that Plaintiff will never be able to work full time for the rest of her work life.  In fact, Plaintiff makes no mention of the medical records that repeatedly discuss Plaintiff's improvement and that she had encouraged her to work.  Dkt. 100-9 (11/17/2021 TT 75:9-16 [Brown], 207:4-9 [Chesnutt]); *see also* Dkt. 100-12 (OHC 000696-697).  Her psychologist, Dr. Brown, never told Plaintiff that she could not work and did not place any limitations on her.  Dkt. 100-9 (11/17/2021 TT 75:9-10, 15-16).

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S REPLY BRIEF ISO POST-TRIAL MOTIONS - 14
CASE NO. 3:19-cv-05553-BHS
019188.0447/8830595.3

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

2.  <u>There Is No Evidence of Ms. Steele's Need for Ongoing Assistance</u>

Plaintiff's own Life Care Planning expert, Mr. Choppa, admitted that Plaintiff is independent in everyday living. Ex. F (11/19/2021 TT 106:15-18, 106:25-107:3). Mr. Choppa testified that in the healthcare field, there will be entries in the records that doctors will note "independent activities of daily life." *Id.* (11/19/2021 TT 106:19-24). Yet, there is no evidence in the trial transcript or in the evidence that Dr. Chesnutt ever noted in his medical records that Plaintiff was not independent in everyday living.

When Dr. Chesnutt was asked if he ever noted that Plaintiff was not independent in everyday living, Dr. Chesnutt avoided answering the question directly, stating, "She is not independent – she is not independent in everyday living." Ex. D (11/18/2021 TT 166:21-25). Asked again if he ever noted that in his records, Dr. Chesnutt stated, "I'm sure we could go through and find some episodes where we note she is living with her mother. I think we read some yesterday where she was living with her mother because she was helping care for her." *Id.* (11/18/2021 TT 167:1-5). But the fact that Plaintiff lives with her mother is not evidence that Plaintiff is not independent in everyday living. And Dr. Chesnutt was unable to point to any particular note supporting his claim that Plaintiff was not independent in everyday living. And when questioned if the reason why Plaintiff does not live on her own is because she does not have a job, Dr. Chesnutt again skirted the question by testifying that "We can ask her and see what she says about that. I mean, I think there are multiple reasons she is not living on her own right now." *Id.* (11/18/2021 TT 168:3-7).

The most Plaintiff can do on the issue of her independence is to cite to Nancy Steele's testimony that she went up to Seattle "25 different weeks." Ex. D (11/18/21 TT at 21:5-10). But Nancy no longer drives Plaintiff. *Id.* (11/18/2021 TT 25:5-6) ("So the great thing is I don't have to drive her anymore."). And Nancy does not monitor Plaintiff's appointments and testified that Plaintiff was capable of managing her own appointments. *Id.* (11/18/2021 TT 45:10-19) (**Q.** She is capable of managing her own appointments; is that right? **A.** She is now."). In fact, Plaintiff herself testified that her mother only took care of her appointments "for a few months."

DEFENDANT NATIONAL RAILROAD PASSENGER CORPORATION'S REPLY BRIEF ISO POST-TRIAL MOTIONS - 15
CASE NO. 3:19-cv-05553-BHS
019188.0447/8830595.3

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

1   *Id.* (11/18/2021 TT 91:11-12).  Since then, Plaintiff has been managing her own appointments
2   and puts in in her calendar on her phone.  *Id.* (11/18/2021 TT 91:12-16).

3          Plaintiff testified at trial that she can cook, garden, read, and manage her own doctors'
4   appointments on her computer's calendar without assistance.  Ex. D (11/18/2021 TT 117:4-18,
5   134:12-135:20).  She is also capable of interviewing her potential treating providers before
6   deciding who she wants to work with.  Dkt. 100-9 (11/17/2021 TT 65:17-19).

7          Ultimately, the Life Care Plan's inclusion of multiple assistants lacks evidentiary support.
8   Plaintiff did not meet her burden to prove that she needed every day living assistance or help
9   with appointments, medications, or gardening. Nor did Mr. Choppa's Life Care Plan contain any
10  reference to any medical notes recommending assistance for everyday living.  In fact, there was
11  no medical documentation that Plaintiff was unable to care for herself or required assistance.
12  Accordingly, judgment as a matter of law on this issue is appropriate.

13  **IV.   A SUBSTANTIAL REMITTITUR OR AMENDMENT OF THE JUDGMENT IS
14         APPROPRIATE IF THE COURT DOES NOT GRANT A NEW TRIAL OR
           ENTER JUDGMENT AS A MATTER OF LAW**

15         **A.  Remittitur of Future Economic Damages Is Appropriate.**

16         For each item or service that Mr. Choppa cited in his Life Care Plan for the next 50 years
17  but lacked medical support, remittitur is appropriate.  By way of example:

18  •  A substantial reduction in future wage losses is appropriate.  Plaintiff's economist opined
19     that over Plaintiff's lifetime, Plaintiff's future lost earnings would range between
20     $1,455,687 and $2,271,087.  (Plaintiff's Exhibit 17).  But as discussed above, Plaintiff
21     returned to graduate school after the derailment, worked as a writing advisor while she
22     was a student, completed a "masterful final essay" as part of her graduation requirements.
23     But despite no restrictions to work and Dr. Chesnutt's encouragement to utilize her
24     degree, Plaintiff made no effort to find gainful employment after graduating with a
25     Master's degree, submitted only a "few" job applications and only started actively
26     looking for employment in June 2021.  *See* Ex. D (11/18/2021 TT 137:8-14); Ex. F

27

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S REPLY BRIEF ISO POST-TRIAL MOTIONS - 16
CASE NO. 3:19-cv-05553-BHS
019188.0447/8830595.3

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

(11/19/2021 TT 218:19-24); Dkt. 100-12 (A-90 at 696-697) ("I would highly encourage engaging in work and using your education to continue progressing back into this part of life.").

- Plaintiff's economist calculated that over Plaintiff's lifetime, the cost of Emgality or its generic Galcanezumab will be $627,104.14. (Plaintiff's Exhibit 18, p. 15). As stated above, Dr. Chesnutt did not know anything about Emgality, did not prescribe it, and did not know how long people could take it. Dkt. 100-17 (11/18/2021 TT 163:11-20). There was no competent evidence that Plaintiff would require Emgality for the next 50 years or even now.

- Plaintiff's economist calculated that over Plaintiff's lifetime, the cost of Rimegepant (Nurtec) will be $508,923.79, Propanolol $48,486.97, Amitriptyline $13,405.49, and NEERIVIO $30,294.89. (Plaintiff's Exhibit 18, p. 15). But as with Emgality, there was no evidence that Plaintiff would require any of these medications for the next 50 years, and Mr. Choppa does not cite to any medical record the basis for these medications for the next 50 years. (*See* Plaintiff's Exhibit 16, p. 32).

- Plaintiff's economist calculated that over Plaintiff lifetime, the cost of hiring assistants to manager her care will amount to $655,693.90. (Plaintiff's Exhibit 18, p. 16). Again, there was no evidence that Plaintiff will require four assistants for the rest of her life or that Plaintiff is incapable of managing her own care. Dr. Brown and Dr. Carson testified that Plaintiff was capable of managing her own care. Dkt. 100-9 (11/17/2021 TT 65:20-24 [Brown]); Dkt. 100-17 (11/19/2021 TT 219:11-13 [Carson]). Plaintiff admitted she cooked, drove, gardened, and managed her own doctors' appointments on her computer's calendar. Contrary to needing a medical case management, when Plaintiff returned to Portland from Seattle, after obtaining her Master's she interviewed several therapists before deciding upon Dr. Carson. Dkt. 100-9 (11/17/2021 TT 65:17-19). Mr. Choppa's opinion that Plaintiff will need a chore service worker, household assistance, yard/home maintenance, and case manager is not based on any medical opinion or documentation.

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S REPLY BRIEF ISO POST-TRIAL MOTIONS - 17
CASE NO. 3:19-cv-05553-BHS
019188.0447/8830595.3

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

1    (*See* Plaintiff's Exhibit 16, pp. 46-48)

2   • Plaintiff's economist calculated that over Plaintiff's lifetime, the cost of massages,

3      shower chairs, a handheld shower, grab bar, and gym membership will amount to

4      $334,684.74. (Plaintiff's Exhibit 18, pp. 15-16). But there was no evidence that Plaintiff

5      would need 1,200 massages or any of the other items for the next 50 years. Again, Mr.

6      Choppa did not cite any medical opinion or documentation that Plaintiff would need any

7      of these services. (*See* Plaintiff's Exhibit 16, pp. 31, 39, 49)

8      **B. Remittitur of Non-Economic Damages Is Appropriate.**

9      With regard to past non-economic damages, a reduction from $960,000 to $350,000 is

10   appropriate because Plaintiff completed her Master's degree and enjoyed leisure activities. At

11   trial, there were many photographs showing Plaintiff enjoying life, including with crowds, loud

12   noise and bright lights, with no manifestation of the slightest distress. Ex. A-59, A-107. Contrary

13   to Plaintiff's testimony, by July 5, 2018, she was able to go to the park, sit in the sun with no hat

14   and interact comfortably with others and was not trying to avoid crowds. Ex. A-108. By

15   November and December 2020, she only complained of headaches "occasionally." Dkt. 100-17

16   (11/19/2021 TT 40:7-15).

17   With regard to the reduction of future non-economic damages from $2 million to $75,000,

18   this is also appropriate because Plaintiff admitted on cross examination that she traveled

19   extensively, had gone to large events such as Mariner's games, reads and goes to the library,

20   spends time on the computer for social and volunteer activities, kayaks, exercises daily, attends

21   weddings and other celebrations, gets together with friends, including trips together to other

22   states, runs, snorkels, fishes, plays pick-up soccer and basketball, gardens, mountain bikes,

23   dances, sews, bakes, camps and kept up on her multiple foreign language study.

24                        **V.   CONCLUSION**

25   For the reasons above and in Amtrak's moving papers, this Court should order a new trial

26   on all issues, issue a judgment as a matter of law, or enter an amended judgment substantially

27   reducing the jury's excessive and unsupported compensatory damages award.

DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S REPLY BRIEF ISO POST-TRIAL MOTIONS - 18
CASE NO. 3:19-cv-05553-BHS
019188.0447/8830595.3

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

1    DATED:  January 14, 2022

2                                              LANE POWELL PC

3

4                                              By   s/ Andrew G. Yates
                                                    Andrew G. Yates, WSBA No. 34239
5                                                   yatesa@lanepowell.com
                                                    Tim D. Wackerbarth, WSBA No. 13673
6                                                   wackerbartht@lanepowell.com

7                                              LANDMAN CORSI BALLAINE & FORD, PC

8

9                                              By   s/ Mark S. Landman
                                                    Mark S. Landman, Pro Hac Vice
10                                                  mlandman@lcbf.com
                                                    John A. Bonventre, Pro Hac Vice
11                                                  jbonventre@lcbf.com

12                                             Attorneys for Defendant National Railroad
13                                             Passenger Corporation

14

15

16

17

18

19

20

21

22

23

24

25

26

27

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107