1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

KYLIE STEELE,

                          Plaintiff,

        v.

NATIONAL RAILROAD PASSENGER
CORPORATION,

                          Defendant.

CASE NO. C19-5553 BHS

ORDER ON AMTRAK'S MOTION
FOR A NEW TRIAL, JUDGMENT
AS A MATTER OF LAW, OR
REMITTITUR

THIS MATTER is before the Court on Defendant Amtrak's Motion for a New

Trial, for Judgment as a Matter of Law, or, in the Alternative, Remittitur, Dkt. 99. The

motion follows a jury trial and a $6.875 million verdict in Plaintiff Kylie Steele's favor.

Amtrak argues that it is entitled to a new trial under Federal Rule of Civil

Procedure 59(a)(1)(A), for several reasons. First, it argues that the Court violated

Amtrak's Seventh Amendment right to a jury trial, or at least abused its discretion, when

it ordered that the trial be conducted by ZOOM, over Amtrak's objection. Dkt. 99 at

2–11. Second, it argues that the Court denied Amtrak a fair trial when it required Amtrak

to introduce Steele's medical records individually, through a witness, and declined to

permit Amtrak to admit all of her records *en masse*. *Id*. at 12–17. Third, Amtrak argues that it is entitled to a new trial because the verdict was "clearly against the weight of the evidence." *Id*. at 17–19.

Amtrak also seeks judgment as a matter of law on Steele's claim for future economic losses, arguing the verdict is not supported by substantial evidence. *Id.* at 19–24. As an alternative, it seeks a substantial remittitur of the Jury's $3.7 million future economic damages award. *Id*. at 24–27.

The issues are addressed in turn.

**A.     Amtrak is not entitled to a new trial based on the ZOOM format.**

Amtrak seeks a new trial based on its claim that the Court abused its discretion in ordering that the trial be held on the ZOOM platform, over Amtrak's objection. Dkt. 99 at 2–6.

As an initial matter, Amtrak did not expressly object to the ZOOM format at the September 27, 2021 Pretrial Conference, at which the virtual format was discussed. At the start of that conference, the Court told the parties that the then-scheduled October 12 trial date would have to moved, due to the Court's calendar.[1] Dkt. 78 at 3. Amtrak's attorney informed the Court that there had been a "bad derailment" in Montana, and expressed his concern trying this case in the wake of bad publicity regarding that

---

[1] The Court held a ZOOM jury trial in a civil case, *Berg v. Bethel School District*, No. 18-cv-5345 BHS, from Tuesday, October 5 to the Jury's Verdict on Wednesday, October 20. It conducted a live jury trial in a criminal case, *United States v. Marschall*, No. 20-cr-5270 BHS, beginning with jury selection on Monday October 18 (while the Berg virtual jury was deliberating), and concluding with a verdict on Friday, October 22.

derailment. *See id.* at 3–4. He asked if a continuance to December might lead to an in-person trial, and the Court informed him that that was "conceivable," but that the Court did not have a crystal ball and that Pierce County was having the highest infection rates it had had since the pandemic began. *Id.* at 4. Steele objected to a longer continuance, and the parties and the Court agreed on a November 16 trial date, likely by ZOOM. *Id.*; *see also* Dkt. 53 ("This is likely to be a remote/virtual trial.").

As Amtrak implicitly concedes, the matter is addressed to the Court's discretion, and the Court can order a trial over ZOOM based on good cause and compelling circumstances. *Bao Xuyen Le v. Reverend Dr. Martin Luther King, Jr. Cnty.*, 524 F. Supp. 3d 1113, 1115–16 (W.D. Wash. 2021) (Federal Rules of Civil Procedure 43(a) and 77(b) authorize the Court to "permit testimony in open court by contemporaneous transmission from a different location," for good cause in compelling circumstances); *see also* Order for Remote / Virtual Civil Jury Trial, *Orn v. City of Tacoma*, No. 3:13-cv-05974 MJP (W.D. Wash. Nov. 19, 2020), Dkt. 205 (holding a ZOOM trial over party's objection).

Amtrak argues the Court's decision to hold the trial over ZOOM was inconsistent with the then-applicable General Order No. 10-21, which, unlike the General Order in effect when *Le* was decided, permitted live trials: "All civil, criminal, and bankruptcy in-person hearings and trials may proceed as scheduled. The courthouses are open to the public." Dkt. 99 at 4–5 (citing W.D. Wash. General Order No. 10-21 at 2 (June 30, 2021)). But that Order also acknowledged that the pandemic was not over, and that the then-dominant Delta variant had led to an increase in cases and renewed protective

1    measures. It specifically ordered: "Civil bench and jury trials may be conducted remotely

2    over Zoom.gov if good cause is established for such a procedure on a case-by-case basis,

3    at the discretion of individual judges." General Order No. 10-21 at 3.

4        Amtrak argues that due to vaccinations and falling infection rates, it was an abuse

5    of discretion to require a ZOOM trial, a claim it argues is proven by the Court

6    subsequently reversing its similar Order in *Norvell v. BNSF*, No. 17-cv-5683 BHS, a case

7    that went to trial two weeks after *Steele*. In *Norvell*, the Court ordered a ZOOM trial, over

8    BNSF's formal objection, on November 9, 2021. *See* Order, *Norvell v. BNSF*,

9    No. 17-cv-5683 BHS (W.D. Wash. Nov. 9, 2021), Dkt. 154. *Norvell* had a trial date of

10   November 30.[2] *Id.* The Court reiterated its decision to try *this* case over ZOOM on

11   November 10, Dkt. 60, and the ZOOM trial began six days later, on November 16, Dkt.

12   70.

13       On November 19, the Court ordered that *Norvell* would be tried in person,

14   notwithstanding the Court's prior Order. *See* Minute Order, *Norvell*, No. 17-cv-5683

15   BHS, Dkt. 172. The fact that *Norvell* was the first in-person civil jury trial this Court has

16   held since the pandemic began is not proof that the Court abused its discretion in not

17   trying this case in person, or in refusing to continue the case again. The purpose of a

18   ZOOM trial is, primarily, to protect jurors summoned to the Court, many against their

19   own wishes. This includes protecting the jury pool from each other in the jury assembly

20   _____

21       [2] Amtrak argues that it sought only a short continuance, which in hindsight would have
     led to an in-person trial. Dkt. 99 at 5. But the Court did not have a place in its calendar for a short
     continuance, in part because of the scheduled trial in *Norvell*—a case that was older than *Steele*.

22   The Court's schedule was discussed at the September 27 Pretrial Conference. Dkt. 78.

1    room, particularly when there are multiple trials being held in the Federal Courthouse,

2    requiring large numbers of potential jurors. It also is an effort in uncertain times to

3    protect witnesses, litigants, their attorneys, and the Court staff. This Court prefers live

4    trials, but the Court exercised its discretion to hold a ZOOM trial in the face of the

5    continuing pandemic. Its decision to return to in person trials earlier than it expected (in

6    *Norvell*) was not the result of any perceived issue in the *Steele* ZOOM trial.

7           At the time this trial started, the Court decided to be cautious, and to heed the

8    Chief Judge's request that civil trials continue to be held virtually, even though criminal

9    trials were being held live, and notwithstanding the General Order's new language.

10   Infection rates were not falling dramatically, and the Delta variant was becoming more

11   prevalent.[3] The fact that the Court held one in-person civil jury trial last fall is not

12   evidence Amtrak did not get a fair trial, or that the Court abused its discretion in trying

13   the matter virtually. It determined, and ruled, that there was good cause shown, in the

14   form of the pandemic. In overruling BNSF's objection in *Norvell*, the Court explained:

15       COVID-19 is a compelling circumstance. While the disease's transmission
16       rate in this District is not as bad as it has been at times over the past two
         years, the CDC's published information about transmission rates in
         counties comprising the Western District of Washington at Tacoma's jury
17       pool demonstrate that the risk remains high.[4] This risk constitutes good

18   _____

19       [3] In the weeks and months following the *Steele* and *Norvell* trials, infection rates
     nationally and locally hit their highest peaks yet, as a result of the Omicron variant. The next

20   civil jury trial on the Court's calendar, *Greiner v. Wall*, No. 14-cv-5579 BHS, was also tried
     virtually, beginning December 8, 2021. The Court did not have another civil jury trial until
     *Torjusen v. Amtrak*, No. 18-5785 BHS, which was tried in person beginning March 29 of this

21   year.
         [4] *See* Center for Disease Control and Prevention, *COVID Data Tracker*,

22   https://covid.cdc.gov/covid-data-tracker/ (last visited Nov. 8, 2021).

cause for avoiding unnecessary physical contact among jurors who are
summoned to serve in Court.

*See* Order in *Norvell*, No. 17-cv-5683 BHS, Dkt. 154. This was consistent with Federal

Rules of Civil Procedure 77(b) and 43(a), which specifically permit non-traditional trials

where exigent circumstances like COVID-19 make the traditional practice impracticable.

Nor did Amtrak clearly object to the ZOOM trial format at the second, telephonic

Pretrial Conference, though it did raise "Seventh Amendment" concerns about how a

ZOOM trial might play out, specifically as to jury deliberations. *See* Dkt. 71 at 18–19.

The parties and the Court had prepared witnesses and jurors to appeal virtually, at a trial

that was going to commence in six days. The Court exercised its discretion to hold the

trial virtually, based on the good cause of the ongoing pandemic.

Furthermore, Amtrak has not demonstrated that the ZOOM platform deprived it of

a fair trial. This Court and this District took great pains to ensure that all parties received

fair trials, even though the virtual format was sub-optimal, for everyone. There is no

evidence supporting Amtrak's claim that the jury in this case was not attentive, or

otherwise engaged in misconduct. Absent such a showing, jurors are presumed to have

followed the Court's instructions. *See Cheney v. Washington*, 614 F.3d 987, 997 (9th Cir.

2010). All of Amtrak's claims about the risks of juror inattentiveness, or failing to follow

the Court's instructions, are general and speculative. It is true that some commentators

have lamented the use of virtual trials, and Judge Coughenour wrote eloquently about his

view of them. *See* Dkt. 115-2. Other of the Court's colleagues find ZOOM trials to be

1  efficient and effective. No Court has held that the platform is fundamentally flawed, or

2  that it violates a party's constitutional right to a jury trial.

3      Amtrak points out that *Norvell*, tried in person two weeks after this case, resulted

4  in a defense verdict. Dkt. 99 at 5. This Court's next civil trial, *Greiner v. Wall*, was tried

5  over ZOOM in December, and it too resulted in a defense verdict. *See* Jury Verdict,

6  *Greiner v. Wall*, No. 14-cv-5579 BHS (W.D. Wash. Dec. 16, 2021), Dkt. 249. In short,

7  with respect to civil jury trials in this Court in 2021, *Norvell* was the only one tried in

8  person, and it, not *Steele*, was the anomaly.

9      Finally, Amtrak recently obtained an arguably worse result in a similar case tried

10  in person (but otherwise tried in much the same way, with a similar jury pool, voir dire,

11  facts, evidence, cross examinations, arguments, and jury instructions). *See Torjusen v.*

12  *Amtrak*, No. 18-5785 BHS (W.D. Wash), which involved a mild traumatic brain injury

13  and an $8 million verdict, with no economic damages sought or awarded. Together, these

14  trials and results undermine any claim that the ZOOM format itself was the cause of what

15  Amtrak views as an unjust result in this case.

16      Amtrak's motion for a new trial based on its objection to the ZOOM platform is

17  DENIED.

18      Amtrak's alternate claim that ZOOM trials violate a party's constitutional rights is

19  inconsistent with its concession that courts have discretion to order such a trial during the

20  pandemic. Its claim that it did not obtain a fair trial because of the virtual format is not

21  persuasive. ZOOM trials are not demonstrably more favorable to one sort of party rather

22  than another, and the novel determination that that ZOOM trials are inherently

1    unconstitutional (and the far-reaching consequences of such a ruling) is a matter for a

2    higher Court. Amtrak's Motion for New Trial based on the ZOOM trial is DENIED.

3    **B.    Amtrak did not offer the medical records it now complains were excluded.**

4         Amtrak also seeks a new trial based on its claim that the Court excluded relevant

5    admissible medical records. Dkt. 99 at 12–17. It relies on its claim that, at the Pretrial

6    Conference, the Court "stated that a medical record could be admitted if it satisfies the

7    rules of evidence, including hearsay rules." *Id.* at 12 (citing Dkt. 100-8 (Pretrial

8    Conference Transcript) at 7:20–8:10). That quote is incomplete and inaccurate. Instead,

9    the Court specifically explained, as it has in other 501 derailment cases:

10        Generally, it is through the testimony of plaintiff and healthcare providers
          regarding symptoms, and healthcare providers, in particular, for them to
11        testify regarding presentation, clinical observations, tests, plan of care, and
          prognosis.

12
          Amtrak has *the right to test this testimony through cross-examination with
13        the use of medical records as impeachment if the testimony can be viewed
          as inconsistent with the records*. Generally, this is done by *placing the
14        record before the witness and asking about it*. *If a medical record satisfies
          the rules of evidence, including hearsay rules, they* ***may*** *be admitted*.

15
          The Court *reserves ruling until trial and specific medical records are
16        before the Court*.

17   Dkt. 100-8 at 7:21–8:10 (emphasis added).

18        Amtrak complains first that it was not permitted to introduce all of Steele's

19   medical records into the record, without a witness to describe or interpret or explain

20   them, and to effectively invite the jury dig through the records themselves, arguing

21   primarily the records are not hearsay, and thus admissible. Dkt. 99 at 13. But the fact a

22   medical record is not hearsay does not automatically lead to the conclusion it is

admissible; there are other rules and considerations governing the admission of evidence, including Rule 403 (which is not mentioned in Amtrak's motion). This rule was the basis for the Court's preliminary ruling on the admissibility of medical records *en masse*.

The Court has explained in these derailment cases that even though the plaintiff's medical records are not hearsay, only those medical records that are introduced through a witness or offered to impeach that witness' testimony will be admitted. It expressly invited Amtrak to discuss any specific record with a witness, and to separately offer any such record into evidence after doing so. It explained that simply providing thousands of pages of medical records without any context would lead to jury confusion and speculation, and would not be permitted under Rule 403. It did not exclude any such record as hearsay. Amtrak acknowledged this ruling prior to trial, yet for reasons that are not clear, declined the Court's offer to introduce "critical" records in this fashion. Amtrak argues that despite the Court's pre-trial ruling, it did not admit specific medical records, either. Dkt. 99 at 12. Two of Amtrak's specific examples are worthy of discussion.

Amtrak argues primarily that the "excluded" records would have permitted it to demonstrate to the jury "in black and white" that Steele "[ran] up to 6 miles per day"—an assertion she had denied in her testimony. Dkt. 99 at 12–13. It argues that instead of allowing Amtrak to demonstrate that Steele was more capable than she claimed, the Court's exclusion of the record permitted *Steele* to claim in closing that *Amtrak* lied in its opening statement about her ability to "run up to 6 miles." *Id*. Amtrak's argument is based exclusively on a note from Dr. Chesnutt, a part of Defendant's Exhibit A90 (which

1  was all 1700+ pages of Chesnutt's records on Steele). *See* Dkt. 100-12 at 28. It is Bates

2  No. "Steele 009074," and it is attached as an Appendix to this Order.

3        Despite Amtrak's claim that it was not allowed to use this document with Dr.

4  Chesnutt, Amtrak never offered this specific record. It did not even assign it a separate

5  exhibit number, as it did with other specific documents from Chesnutt's file, including

6  A-109. It was not error warranting a new trial to reject an exhibit that was not offered.

7        Furthermore, and in any event, the medical record would not have had the

8  dramatic effect Amtrak claims, and it would not have supported Amtrak's claim in its

9  opening statement that the evidence would show Steele was running six miles a day.

10  Chesnutt's record makes no reference, whatsoever, to running six miles, or any number

11  of miles, at all; the word "miles" is not in the document. There are instead references to

12  Steele trying to "get her steps in," to her being "up to 9000 steps daily," a reference to

13  "jog 1x per week, more working getting 10k," and "Had vasovagal sys with running,

14  walking more, mostly getting 10k." *Id*.

15        Perhaps Amtrak simply misread this record and believed Steele was running 10

16  *kilometers*—a "10K," or 6.2 miles—daily. Perhaps it hoped the jury would believe that is

17  what was Chesnutt's note meant. But it is plain from the context of the document that

18  "10k" refers to *ten thousand steps*. Steele told Chesnutt, and the jury, that she was

19  counting *steps*; not kilometers, and not miles. *See* Dkt. 109 at 14 n.6. That is what her

20  counsel argued in closing.

21

22

1    And, in any event, Steele correctly points out that, without using or offering this

2 document, Amtrak obtained from Chesnutt the inaccurate concession that his notes

3 reflected that Steele could run six miles a day:

> Q. She has been able to run up to six miles a day?
> A. At times she annotated that there.
> Q. And she has been able to kayak?
> A. Not currently running like that. Has been able to kayak. I think
> she has written down that she has been able to kayak.

7 Dkt. 90 (November 17, 2021 Trial Transcript) at 199:20–25.

8    If Amtrak had offered this specific record, presumably Chesnutt would have

9 clarified that the reference was to Steele's goal of getting ten thousand "steps," not

10 running a 10K every day. As it was, Amtrak got from Chesnutt the "evidence" it wanted,

11 even though his record did not in fact reflect that she ever told him she ran six miles a

12 day. Amtrak benefitted from not offering or having this record admitted.

13    This un-offered medical record does not show what Amtrak claims it does, and it

14 does not support Amtrak's argument for a new trial. Amtrak staked at least some of its

15 credibility on its claim that despite her claimed injuries, Steele was in fact an avid, well-

16 above-average, runner, and it could not prove that claim.

17    Next, Amtrak argues that it was not able to offer medical records in its own case.

18 Dkt. 114 at 10. As an initial matter, the Court had already ruled that the records would

19 come in through a witness, and Amtrak did not call any witnesses. The Court accepts

20 Amtrak's claim that it waited to offer exhibits until its own case in the hope the Court

21 would change its mind, Dkt. 114 at 10, but it did not ever offer any medical records in its

22 own case, or argue why they should be admitted despite the prior ruling. Instead, it relies

on a discussion with opposing counsel and the Court, just before closing arguments.

Steele's counsel informed the Court that Amtrak had told him that it wanted to introduce

four medical records in its case. Steele's counsel described the documents generally, and

objected to their admission. The Court stated:

> Mr. Landman, I am not going to have medical records come in. I have
> already indicated that this is going to come through the healthcare
> providers. If we start with medical records, then we are going to start with
> all kinds of other medical records. Those are not going to come into
> evidence.

Dkt. 93 (November 22, 2021 Trial Transcript) at 43:24–44:4. Amtrak's counsel did not

describe or offer any specific document, but instead simply objected for the record. *Id.* at

44:5–6. Amtrak did not offer these documents through the treating physicians, as it was

repeatedly invited to do.

Amtrak was informed before trial of the Court's determination that admitting the

records without a witness would likely cause confusion, and instead invited Amtrak to

use and offer specific medical records to impeach witnesses. Amtrak objected to that

preliminary ruling, and then elected not to accept the Court's invitation. Each of its

complaints about the admission of medical records could have been addressed at trial. As

Steele argues, Amtrak was free to cross examine the witnesses with any record it chose,

and any prejudice from the failure to admit the records *en masse* is minimal, if not non-

existent. *See* Dkt. 109 at 14. Its objection to the exclusion of Chesnutt's specific record at

Bates No. "Steele 009074" is without merit.

Amtrak's motion for a new trial on this basis is DENIED.

1    **C.      Amtrak is not entitled to a new trial based on the size of the verdict.**

2          Amtrak next argues that the verdict was clearly against the weight of the evidence,

3    requiring a new trial. It acknowledges that the standard for such a motion is a high one:

4    while the Court need not view the evidence in the light most favorable to the prevailing

5    party, it cannot grant a new trial on this basis unless it "is left with the definite and firm

6    conviction that a mistake has been committed." Dkt. 99 at 17 (citing *Lacey Marketplace*

7    *Assocs. II, LLC v. United Farmers of Alberta Co-op. Ltd.*, No. C13-0383 JLR, 2015 WL

8    4604044, at *3 (W.D. Wash. July 30, 2015), *rev'd in part on other grounds*, 720 F.

9    App'x 828 (9th Cir. 2017)). It argues that, at most, Steele suffered from a mild traumatic

10   brain injury, from which she has recovered. Dkt. 99 at 18. This is not the Court's view of

11   the evidence, and the Court is not left with the firm conviction that the verdict was

12   against the weight of the evidence. Amtrak repeats the argument it made unsuccessfully

13   to the jury, that all the things Steele has done and accomplished—film clubs, baking,

14   shooting baskets, playing games, reading, walking, dancing, going to sporting events,

15   traveling, attending weddings, and the like—demonstrate that she is that she has

16   recovered from her mild injuries. *Id.* at 18–19.

17         Respectfully, this is not persuasive. Amtrak again makes much of its "surveillance

18   video" (the only evidence it offered during its case) and the fact that it showed Steele

19   walking around a park in the sun without a hat. *Id.* Like Dr. Chesnutt's note, this video is

20   not the powerful evidence that Amtrak claims it is. Amtrak's video did not expose a

21   plaintiff whose claim rests on the allegation he can't leave his bed posing on the summit

22

1    of Mt. Rainier. It does not otherwise objectively demonstrate that Steele was

2    exaggerating, or outright lying.

3            A motion for a new trial under this standard is not a remedy for trial tactics that

4    were not successful. Amtrak defended this case by subjecting the plaintiff and her

5    treating and expert doctors to "vigorous" cross-examination. Amtrak conceded liability,

6    and Steele's relatively modest burden was to prove her damages—her injuries, their

7    sequalae, and their impacts on her life and livelihood—by a preponderance of the

8    evidence. The only issue was the impact the derailment had on Steele. Amtrak did not

9    call an expert to explain why the treating physicians were wrong, why Steele should be

10   doing better than she is, or why she is not likely to need the future care she claims. It also

11   elected not to offer or introduce what it now claims are critical medical records, in the

12   manner the Court clearly explained would be required.

13           Amtrak chose instead to implicitly accuse Steele of malingering, at least. It

14   argued, as it does now, that she already "recovered" from her injuries. It chose to surveil

15   her for 180 hours, and to show the jury a benign "highlights" clip that was the net result

16   of those efforts. Explicitly or even implicitly accusing a plaintiff of exaggerating puts not

17   only the plaintiff's credibility at issue, but also the credibility of the defendant's theory of

18   the case. It is possible that the jury was unimpressed by Amtrak spying on Steele to prove

19   she was more capable than she claimed, and found Amtrak's arguments to be generally

20   unpersuasive when it apparently concluded that the video did no such thing. The jury

21   clearly did not agree that what the video showed was inconsistent with the rest of the

22   testimony, which amply supports its finding that Steele is profoundly and permanently

injured. Its verdict, while on the high end, was within the range of evidence. It did not

and does not leave the Court with a firm conviction that it was mistaken.

Amtrak's motion for a new trial based on its claim that the amount of the verdict

was against the weight of the evidence is DENIED.

**D.     Amtrak is not entitled to a judgment as a matter of law on future economic losses.**

Amtrak next argues that the Court should have granted its Federal Rule of Civil

Procedure 50(b) motion for judgment as a matter of law on Steele's claim for future

economic damages. It renews its motion and asks the Court to enter judgment as a matter

of law on Steele's claims for future economic damages, arguing the verdict is not

supported by substantial evidence. Dkt. 99 at 19 (citing *EEOC v. Go Daddy Software,*

*Inc.*, 581 F.3d 951, 961 (9th Cir. 2009)). That portion of the verdict totaled $3.7 million.

Dkt. 83.

**1.     Steele's future medical expenses.**

Amtrak argues primarily that Dr. Chesnutt, who "vouched" for the life care plan

prepared by Mr. Choppa, testified that he had not ever prescribed that Steele (or anyone

else) take Emgality, a drug for treating migraine headaches; it was instead prescribed by

Steele's headache specialists at the University of Washington and the Polyclinic in

Seattle. Dkt. 99 at 20. Amtrak argues that absent testimony from Chesnutt that Steele

would more probably than not have to take Emgality for the rest of her life, there was no

evidence to support a future economic damages award based on the future cost of that

drug. *Id.* at 20–21. Amtrak argues that the same is true of other future medications that

1  Steele's economist opined had a present value of roughly $800,000 to a million dollars.

2  *Id.* at 22 n.7. Amtrak argues that there was no evidence that Steele was more likely than

3  not to need future medical treatment, and that Choppa was not permitted to rely on

4  Chesnutt for the future need for these medications because Chesnutt testified he did not

5  prescribe them *Id.* at 20.

6        Steele responds that Chesnutt, a national concussion expert, was the "center of the

7  spoke" who coordinated Steele's various treatments, including "direct[ing] a

8  multidisciplinary concussion management team, which includes both medical evaluation,

9  as well as . . . creating a concussion rehabilitation program." Dkt. 109 at 24 (citing Dkt.

10  89 (Dr. Chesnutt's Trial Testimony) at 50:18–22, 63:25) (cleaned up). Chesnutt testified

11  that after four years, it was "really clear" that Steele was "not improving overall," and

12  that she "is going to have some long-term problems because of this train crash and the

13  resulting traumatic brain injury." Dkt. 89 at 70:19–23. Additionally, Steele testified that

14  her headaches are a daily occurrence, lasting most of the day. She testified that the

15  headache treatments help, but that she nevertheless continually struggles with headaches

16  and their impact on her daily activities.

17        Dr. Chesnutt also described these symptoms, and his conclusion that the injuries

18  were permanent:

19        [A.] She does have chronic intractable migraine headaches. She has
    a cervical strain. She has mild cognitive impairment. She has visual

20      tracking and accommodation issues, and associated anxiety issues, sleep
    problems, and significant fatigue, and some other related issues like that

21      which we can go over as we speak.
      Q. Are these problems that you just identified as a result of her brain

22      injury?

1          A. Yes, they are.

          Q. Do these conditions, these -- that you just described, do they limit
2   Ms. Steele in her activities, either for vocational work purposes or
recreationally?

3          A. Yes. Right now, she is not able to hold a regular job due to her
functional capacity limitations. She has problems maintaining any sort of
4   work capacity over about three hours. She has not been able to return to her
usual, you know, physical activities, as well as some of her leisure time
5   activities.

          Q. Are these limitations that you have just described, are you
6   prepared to tell us whether those are permanent or not, and if they arose out
of the derailment?

7          A. Yes, I believe they are permanent at this time, unfortunately.

8   *Id.* at 47:25–48:22. Chesnutt testified that maintaining Steele's current therapies,

9   including her headache management regime, was important to maintaining her functional

10   abilities. *Id.* at 85:20–86:11.

11       The Court agrees that Dr. Chesnutt, as the "quarterback" of Steele's health care

12   team, was entitled to and properly did rely on the opinions and diagnoses and

13   prescriptions made by other members of his multi-disciplinary team, within each treater's

14   expertise. The fact that Chesnutt did not personally prescribe Emgality or any other

15   migraine headache treatment is not itself fatal to the inclusion of the cost of such

16   treatment in Steele's life care plan. She was currently taking that (and several other)

17   medications, and there was ample testimony that Steele's headaches were not improving,

18   and had not markedly improved in the four years since the accident. Chesnutt regarded

19   the headaches and the limitations they imposed on Steele as permanent.

20       Amtrak's questions at trial suggested there is some limit to how long a patient can

21   take Emgality, but it did not introduce or elicit testimony about any such limitation. The

22   jury was permitted to find that Steele's symptoms and the treatment for them would

continue, that her injuries and their symptoms and other impacts were permanent. Its

verdict based on that evidence was sound and Amtrak's renewed motion for a judgment

as a matter of law on this basis is DENIED.

### 2. Steele's future wage losses.

This evidence also undermines Amtrak's claim that there was no support for

Steele's claimed future wage loss. Amtrak argues that there is no evidence that Steele's

condition will deteriorate and argues that even Steele's treating doctors told her to "get on

with her life" and encouraged her to work. Dkt. 99 at 23.

In context, the treating physicians encouraged her to focus on her life, not her

injuries, which is hardly proof that Steele is malingering, or that, but for her own lack of

drive, she could be more gainfully employed. There was ample, unrebutted testimony that

Steele does not have the mental stamina to work more than a few hours at a time, in part

because of debilitating headaches. Dr. Lemoncello, who was not an expert witness or a

"treater" but nevertheless properly provided first-hand observations of Steele's abilities,

explained that Steele takes frequent breaks, and even rests after work before driving

home. This and similar evidence permitted the jury to conclude that Steele would not be

able to work full time, or to be paid for full time work, in the future.

Amtrak also contends that the life care plan (and the verdict) includes amounts for

future in-home care and accommodations, which it denies she needs or will need. This

issue—whether Steele was "independent in the activities of daily life"—was hotly

contested throughout the trial. *See, e.g.*, Dkt. 115-6 (November 19, 2021 Trial Transcript)

at 106:15–18. It is true that Amtrak demonstrated that Steele finished school away from

her mother, but the testimony from several other witnesses was more than enough for the jury to find that Steele was not independent in her daily activities, and that she likely will not be in the future.

In the end, Amtrak does not demonstrate that there was no evidence supporting the jury's finding, it instead argues that the jury should have been more persuaded by the evidence it highlighted in closing. But that is the jury's province, not the Court's. Viewed in the light most favorable to Steele, the evidence supports the jury's verdict on future economic damages. Amtrak's motion for judgment as a matter of law on that element of damages is DENIED.

**E.      Amtrak is not entitled to a remittitur.**

Finally, Amtrak argues that each element of the jury's verdict is "grossly excessive" and that it is at the very least entitled to a substantial remittitur, to prevent injustice. This argument is based on the same points discussed above: Steele's activities, and the video.

Steele accurately sets out the standard against which this alternative motion must be measured. Federal courts "allow substantial deference to a jury's finding of the appropriate amount of damages . . . unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." Dkt. 109 at 34 (quoting *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996); and parenthetically quoting *Brady v. Gebbie*, 859 F.2d 1543, 1557 (9th Cir. 1988) ("An otherwise supportable verdict must be affirmed unless it is 'grossly excessive,' 'monstrous' or 'shocking to the conscience.'")). In considering a motion for

1    remittitur, the trial court must view the evidence concerning damages in a light most

2    favorable to the prevailing party. *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1094 (9th Cir.

3    2014).

4        Amtrak argues that, at most, Steele's future economic damage award should be

5    reduced to $250,000. Dkt. 99 at 26. Amtrak points to no evidence supporting this

6    number, and there is none; it is speculative and arbitrary. Amtrak argues that because

7    Steele engages in multiple activities, "there is no basis for any non-economic award for

8    the future," and asks the Court to reduce Steele's future non-economic damages from $2

9    million to $75,000. *Id*. at 26.

10        This number too is arbitrary, and Amtrak ignores ample evidence that Steele's

11   injuries and their sequalae remain, and will remain in the future. Amtrak's view that

12   passengers who can continue their lives with some personal enjoyment cannot be injured

13   in way worthy of substantial compensation is misplaced, it is not supported by the

14   evidence, and it is not the law. The fact that Steele smiled in wedding photos does not

15   mean that there was no evidence that she continues to struggle with migraine headaches,

16   fatigue, the inability to "multi-task," or that the jury could not consider any of the other

17   impacts the evidence shows the derailment had on her life. This reasoning applies to

18   Amtrak's final request, similarly untethered to any evidence or standard, that the Court

19   should reduce the jury's award for past non-economic damages from $960,000 to

20   $350,000.

21        The jury's verdict was supported by the evidence. Amtrak's alternate motion for

22   remittitur is DENIED.

1    **IT IS SO ORDERED.**

2    Dated this 19th day of April, 2022.

3

4    _____

5    BENJAMIN H. SETTLE
     United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22